**Note: The official version of this document is the document published in the Federal Register. This document has been sent to the Office of the Federal Register but has not yet been scheduled for publication.**

4000-01-U

DEPARTMENT OF EDUCATION

34 CFR Part 106

RIN 1870–AA14

[Docket ID ED-2018-OCR-0064]

## Title IX of the Education Amendments of 1972

AGENCY: Office for Civil Rights, Department of Education.

ACTION: Notice of proposed rulemaking.

SUMMARY: The Secretary of Education proposes to amend regulations implementing Title IX of the Education Amendments of 1972 (Title IX). The proposed regulations would clarify and modify Title IX regulatory requirements pertaining to the availability of remedies for violations, the effect of Constitutional protections, the designation of a coordinator to address sex discrimination issues, the dissemination of a nondiscrimination policy, the adoption of grievance procedures, and the process to claim a religious exemption. The proposed regulations would also specify how recipient schools and institutions covered by Title IX (hereinafter collectively referred to as recipients or schools) must respond to incidents of sexual harassment consistent with Title IX's

prohibition against sex discrimination. The proposed regulations are intended to promote the purpose of Title IX by requiring recipients to address sexual harassment, assisting and protecting victims of sexual harassment and ensuring that due process protections are in place for individuals accused of sexual harassment.

DATES: We must receive your comments on or before [INSERT DATE 60 DAYS AFTER PUBLICATION IN THE FEDERAL REGISTER].

ADDRESSES: Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments by fax or by e-mail, or comments submitted after the comment period closes. To ensure that we do not receive duplicate copies, please submit your comments only once. Additionally, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Adobe Portable Document Format (PDF), we strongly encourage you to convert the PDF to "print-to-PDF" format, or to use some other commonly-used searchable text format. Please do not submit the PDF in a scanned format. Using a print-to-PDF format allows the U.S. Department of Education (the Department) to electronically search and copy certain portions of your submissions.

- *Federal eRulemaking Portal*: Go to www.regulations.gov to submit your comments electronically. Information on using Regulations.gov, including

instructions for finding a rule on the site and submitting comments, is available on the site under "How to use Regulations.gov" in the Help section.

- *Postal Mail, Commercial Delivery, or Hand Delivery:*

The Department strongly encourages commenters to submit their comments electronically. If, however, you mail or deliver your comments about these proposed regulations, address them to Brittany Bull, U.S. Department of Education, 400 Maryland Avenue S.W., Room 6E310, Washington, D.C. 20202. Telephone: (202) 453-7100.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at www.regulations.gov. Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

FOR FURTHER INFORMATION CONTACT: Brittany Bull, U.S. Department of Education, 400 Maryland Avenue S.W., Room 6E310, Washington, D.C. 20202. Telephone: (202) 453-7100. You may also email your questions to TitleIXNPRM@ed.gov, but, as described above, comments must be submitted via the Federal eRulemaking Portal, postal mail, commercial delivery, or hand delivery.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1-800-877-8339.

SUPPLEMENTARY INFORMATION:

Executive Summary

*Purpose of this regulatory action*

Based on its extensive review of the critical issues addressed in this rulemaking, the Department has determined that current regulations and guidance do not provide appropriate standards for how recipients must respond to incidents of sexual harassment. To address this concern, we propose regulations addressing sexual harassment under Title IX to better align the Department's regulations with the text and purpose of Title IX and Supreme Court precedent and other case law. This will help to ensure that recipients understand their legal obligations including what conduct is actionable as sexual harassment under Title IX, the conditions that activate a mandatory response by the recipient, and particular requirements that such a response must meet so that recipients protect the rights of their students to access education free from sex discrimination.

In addition to providing recipients with clear legal obligations, the transparency of the proposed regulations will help empower students to hold their schools accountable for failure to meet those obligations. Under the proposed regulations, complainants reporting sexual harassment will have greater control over the process. The Department recognizes that every situation is unique and that individuals react to sexual harassment differently; thus, the proposed regulations help ensure that schools provide complainants with clear options and honor the wishes of the reporting individual about how to respond to the situation, including increased access to supportive measures. Where a reporting complainant elects to file a formal complaint triggering the school's grievance process, the proposed regulations require the school's investigation to be fair and impartial, applying mandatory procedural checks and balances, thus producing more reliable factual

outcomes, with the goal of encouraging more students to turn to their schools for support in the wake of sexual harassment.

*Summary of the Major Provisions of This Regulatory Action:*

With regard to sexual harassment, the proposed regulations would:

- Define the conduct constituting sexual harassment for Title IX purposes;
- Specify the conditions that activate a recipient's obligation to respond to allegations of sexual harassment and impose a general standard for the sufficiency of a recipient's response;
- Specify situations that require a recipient to initiate its grievance procedures; and
- Establish procedural safeguards that must be incorporated into a recipient's grievance procedures to ensure a fair and reliable factual determination when a recipient investigates and adjudicates a sexual harassment complaint.

In addition, the proposed regulations would: clarify that in responding to any claim of sex discrimination under Title IX, recipients are not required to deprive an individual of rights that would be otherwise guaranteed under the U.S. Constitution; prohibit the Department's Office for Civil Rights (OCR) from requiring a recipient to pay money damages as a remedy for a violation of any Title IX regulation; and eliminate the requirement that religious institutions submit a written statement to qualify for the Title IX religious exemption.

**Costs and Benefits**

5

As further detailed in the *Regulatory Impact Analysis*, we estimate that the total monetary cost savings of these regulations over ten years would be in the range of $286.4 million to $367.7 million. In addition, the major benefits of these proposed regulations, taken as a whole, include achieving the protective purposes of Title IX via fair, reliable procedures that provide adequate due process protections for those involved in grievance processes.

*Invitation to Comment*: We invite you to submit comments regarding these proposed regulations and directed questions. To ensure that your comments have the maximum effect on developing the final regulations, you should identify clearly the

specific section or sections of the proposed regulations that each of your comments addresses, and arrange your comments in the same order as the proposed regulations.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 (explained further below), and their overall goal of reducing the regulatory burden that might result from these proposed regulations. Please let us know of any further ways that we may reduce potential costs or increase potential benefits, while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about these proposed regulations by accessing Regulations.gov. You also may inspect the comments in person at 400 Maryland Avenue S.W., Room 6E310, Washington, D.C., between the hours of 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday of

each week, except federal holidays. Please contact the person listed under FOR

FURTHER INFORMATION CONTACT.

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record*: Upon

request, we will provide an appropriate accommodation or auxiliary aid to an individual

with a disability who needs assistance to review the comments or other documents in the

public rulemaking record for these proposed regulations. If you want to schedule an

appointment for this type of accommodation or auxiliary aid, please contact the person

listed under FOR FURTHER INFORMATION CONTACT.


**Background**

Title IX prohibits discrimination on the basis of sex in education programs and activities

that receive federal financial assistance. *See* 20 U.S.C. 1681(a). Existing Title IX

regulations contain specific provisions regarding (i) the Assistant Secretary's authority to

determine remedies necessary to overcome effects of discrimination (34 CFR 106.3), (ii)

the effect of other requirements (34 CFR 106.6), (iii) designation of a responsible employee

(34 CFR 106.8(a)), (iv) adoption of grievance procedures (34 CFR 106.8(b)),

(v) dissemination of policy (34 CFR 106.9), and (vi) exemption for religious schools (34

CFR 106.12). For reasons described in this preamble, the Secretary proposes to amend the

Title IX regulations at 34 CFR 106.3, 106.6, 106.8, 106.9, and 106.12, as well as add new

sections 106.44 and 106.45.

The Department's predecessor, the Department of Health, Education and Welfare (HEW), promulgated implementing regulations under Title IX effective in 1975.[1] Among other things, those regulations require recipients to create and disseminate a policy of non-discrimination based on sex, designate a Title IX Coordinator, and adopt and publish grievance procedures providing for prompt and equitable resolution of complaints that a school is discriminating based on sex.

When the current regulations were issued in 1975, the federal courts had not yet addressed recipients' Title IX obligations to address sexual harassment as a form of sex discrimination. The Supreme Court subsequently elaborated on the scope of Title IX, ruling that money damages are available for private actions under Title IX based on sexual harassment by a teacher against a student, *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992); that such damages may only be recovered under Title IX when a school official with authority to institute corrective measures has actual notice of the harassment but is deliberately indifferent to it, *Gebser v. Lago Vista Ind. Sch. Dist.*, 524

U.S. 274 (1998); and that a school can likewise be liable under Title IX based on sexual harassment by a *student* against a student but only if "the recipient is deliberately indifferent to known acts of student-on-student sexual harassment," "the harasser is under the school's disciplinary authority," and "the behavior is so severe, pervasive, and

---

[1] 40 Fed. Reg. 24128 (June 4, 1975) (codified at 45 CFR pt. 86). In 1980, Congress created the United States Department of Education. Pub. L. No. 96-88, § 201, 93 Stat. 669, 671 (1979); Exec. Order No. 12212, 45 Fed. Reg. 29,557 (May 2, 1980). By operation of law, all of HEW's determinations, rules, and regulations continued in effect and all functions of HEW's Office for Civil Rights, with respect to educational programs, were transferred to the Secretary of Education. 20 U.S.C. § 3441(a)(3). The regulations implementing Title IX were recodified without substantive change in 34 CFR pt. 106. *See* 45 Fed. Reg. 30,802, 30,955–65 (May 9, 1980).

objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 647, 652 (1999).

In the four decades since HEW issued the 1975 rule, no Title IX regulations have been promulgated to address sexual harassment as a form of sex discrimination; instead, the Department has addressed this subject through a series of guidance documents. *See, e.g.,* Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034 (March 13, 1997); Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (January 19, 2001) (2001 Guidance); Dear Colleague Letter on Sexual Harassment (January 25, 2006); Dear Colleague Letter: Sexual Violence (issued April 4, 2011, withdrawn September 22, 2017) (2011 Dear Colleague Letter); Questions and Answers on Title IX and Sexual Violence (issued April 29, 2014, withdrawn September 22, 2017) (2014 Q&A); Questions and Answers on Campus Sexual Misconduct (September 22, 2017) (2017 Q&A). The decades since the passage of Title IX have revealed that how schools address sexual harassment and sexual assault (collectively referred to herein as sexual harassment) affects the educational access and opportunities of large numbers of students in elementary, secondary, and postsecondary schools across the nation.

Beginning in mid-2017, the Department started to examine how schools and colleges were applying Title IX to sexual harassment under then-applicable guidance. The Department conducted listening sessions and discussions with stakeholders expressing a

variety of positions for and against the status quo, including advocates for survivors of sexual violence; advocates for accused students; organizations representing schools and colleges; attorneys representing survivors, the accused, and institutions; Title IX Coordinators and other school and college administrators; child and sex abuse prosecutors; scholars and experts in law, psychology, and neuroscience; and numerous individuals who have experienced school-level Title IX proceedings as a complainant or respondent. The Department also reviewed information that includes white papers, reports, and recommendations issued over the past several years by legal and public policy scholars, civil rights groups, and committees of nonpartisan organizations[2] as well as books detailing

---

[2] *E.g.*, Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881 (2016); John Villasenor, *A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard*, 15 LAW, PROBABILITY AND RISK 223, 223–37 (2016), https://doi.org/10.1093/lpr/mgw006; Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J. ONLINE (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty); *Rethink Harvard's Sexual Harassment Policy*, BOSTON GLOBE (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (Statement of 28 members of the Harvard Law School faculty); AM. BAR ASSN., ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS: RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT (2017), https://www.americanbar.org/content/dam/aba/publications/ criminaljustice/2017/ABA-Due-Process-Task-Force-Recommendations-and-Report.authcheckdam.pdf; AMERICAN COLLEGE OF TRIAL LAWYERS, TASK FORCE ON THE RESPONSE OF UNIVERSITIES AND COLLEGES TO ALLEGATIONS OF SEXUAL VIOLENCE, WHITE PAPER ON CAMPUS SEXUAL ASSAULT INVESTIGATIONS (2017), https://www.actl.com/docs/default-source/default-document-library/position-statements-and-white-papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf; Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, Fairness For All Students Under Title IX (Aug. 21, 2017), http://nrs.harvard.edu/urn-3:HUL.InstRepos:33789434. *See also* NEDDA BLACK ET AL., THE NCHERM GROUP, LLC, 2017 NCHERM GROUP WHITE PAPER: DUE PROCESS AND THE SEX POLICE (2017), https://www.ncherm.org/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf; SHARYN POTTER ET AL., PREVENTION INNOVATIONS RESEARCH CTR., UNIV. OF NEW HAMPSHIRE, IT'S NOT JUST THE WHAT BUT THE HOW: INFORMING STUDENTS ABOUT CAMPUS POLICIES AND RESOURCES (2015), https://cola.unh.edu/sites/cola.unh.edu/files/departments/Prevention%20Innovations%20Research%20Center/White_Paper_87367_for_web.pdf; Dana Bolger, *Gender Violence Costs: Schools' Financial Obligations Under Title IX*, 125 YALE L. J. 2106 (2016), https://www.yalelawjournal.org/feature/gender-violence-costs-schools-financial-obligations-under-title-ix; KATHERINE K. BAKER ET AL., TITLE IX AND THE PREPONDERANCE OF THE EVIDENCE: A WHITE PAPER, http://www.feministlawprofessors.com/wp- content/uploads/2016/11/Title-IX-Preponderance-White-Paper-signed-11.29.16.pdf (signed by dozens of law professors and scholars); Alexandra Brodsky, *A Rising Tide: Learning About Fair Disciplinary Process from Title IX*, 66 J. OF LEGAL EDUC. 822 ( 2017). https://jle.aals.org/cgi/viewcontent.cgi?article=1517&context=home.

case studies of campus Title IX proceedings.[3] The Department learned that schools and colleges were uncertain about whether the Department's guidance was or was not legally binding. To the extent that guidance was viewed as mandatory, the obligations set forth in previous guidance were issued without the benefit of notice and comment that would have permitted the public and all stakeholders to comment on the feasibility and effectiveness of the guidance. Several of the prescriptions set forth in previous guidance (for example, compulsory use by all schools and colleges of the preponderance of the evidence standard and prohibition of mediation in Title IX sexual assault cases) generated particular criticism and controversy.

Other criticisms of the previous guidance included that those guidance documents pressured schools and colleges to forgo robust due process protections;[4] captured too wide a range of misconduct, resulting in infringement on academic freedom and free

speech and government regulation of consensual, noncriminal sexual activity;[5] and

---

[3] *E.g.*, K.C. JOHNSON AND STUART TAYLOR, JR., CAMPUS RAPE FRENZY, (2017); LAURA KIPNESS, UNWANTED ADVANCES ( 2017). *See also* ANNIE E. CLARK AND ANDREA L. PINO, WE BELIEVE YOU: SURVIVORS OF CAMPUS SEXUAL ASSAULT SPEAK OUT (2016); JON KRAKAUER, MISSOULA: RAPE AND THE JUSTICE SYSTEM IN A COLLEGE TOWN, (2015).

[4] *E.g.*, Open Letter from Members of the Penn Law School Faculty, *supra* note 2 ("[W]e believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."). *See also* Bartholet et al., *supra* note 2, at 1 ("In the past six years, under pressure from the previous Administration, many colleges and universities all over the country have put in place new rules defining sexual misconduct and new procedures for enforcing them. While the Administration's goals were to provide better protections for women . . . the new policies and procedures have created problems of their own, many of them attributable to directives coming from [OCR]. Most of these problems involve unfairness to the accused; some involve unfairness to both accuser and accused[.] OCR has an obligation to address the unfairness that has resulted from its previous actions and the related college and university responses"). *See also Plummer v. Univ. of Houston*, 860 F.3d 767, 777–78 (5th Cir. 2017) (Jones, J., dissenting) (The 2011 Dear Colleague Letter "was not adopted according to notice-and-comment rulemaking procedures; its extremely broad definition of 'sexual harassment' has no counterpart in federal civil rights case law; and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt").

[5] E.g., Kipness, supra note 3, at 33 ("The reality is that a set of incomprehensible directives, issued by a branch of the federal government, are being wielded in wildly idiosyncratic ways, according to the whims and biases of individual Title IX officers operating with no public scrutiny or accountability. Some of them are also all too willing to tread on academic and creative freedom as they see fit"). See also Gersen and Suk, supra note 2, at 902–03 (Asserting that OCR's guidance requires schools to regulate student conduct "that is not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance oversteps OCR's

11

removed reasonable options for how schools should structure their grievance processes to accommodate each school's unique pedagogical mission, resources, and educational community.[6]

After personally engaging with numerous stakeholders including sexual violence survivors, students accused of campus sexual assault, and school and college attorneys and administrators, the Secretary of Education delivered a speech in September 2017[7] in which she emphasized the importance of Title IX and the high stakes of sexual misconduct. The Secretary identified problems with the current state of Title IX's application in schools and colleges, including overly broad definitions of sexual harassment, lack of notice to the parties, lack of consistency regarding both parties' right to know the evidence relied on by the school investigator and right to cross-examine parties and witnesses, and adjudications reached by school administrators operating under a federal mandate to apply the lowest possible standard of evidence. Secretary DeVos stated that in endeavoring to find a "better way forward" that works for all students, "non-negotiable principles" include the right of every survivor to be taken seriously and the right of every person accused to know that guilt is not predetermined.[8] Quoting an open letter from law school faculty,[9] Secretary DeVos affirmed that "there is nothing inconsistent with a policy that both strongly condemns and

---

jurisdictional authority); see also Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, THE CHRONICLE OF HIGHER EDUC. (Jan. 6, 2017) (https://www.chronicle.com/article/The-College-Sex-Bureaucracy/238805) (OCR's "broad definition" of sexual harassment has "grown to include most voluntary and willing sexual contact"). See also Open Letter from Members of the Penn Law School Faculty, supra note 2 ("These cases are likely to involve highly disputed facts, and the 'he said/she said' conflict is often complicated by the effects of alcohol and drugs").
[6] *E.g.*, *Institutional Challenges in Responding to Sexual Violence On College Campuses: Testimony Provided to the Subcomm. on Higher Educ. and Workforce Training*, 114th Cong. 2, 5–6 (2015) (statement of Dana Scaduto, Campus Counsel, Dickinson College, discussing the problems with attempting to impose one-size-fits-all rules that fail to account for the wide diversity of institutions of higher education across the country),https://edworkforce.house.gov/uploadedfiles/testimony_scaduto.pdf.
[7] Betsy DeVos, U.S. Sec'y of Educ., Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.
[8] *Id.*
[9] Open Letter from Members of the Penn Law School Faculty, *supra* note 2.

12

punishes sexual misconduct and ensures a fair adjudicatory process."

On September 22, 2017, the Department rescinded previous guidance documents that had never had the benefit of the public notice and comment process;[10] left in place the 2001 Guidance that had been subjected to public notice and comment (though not rulemaking); issued the 2017 Q&A as an interim question and answer document to identify recipients' obligations under Title IX to address sexual harassment as a temporary measure to provide necessary information while proceeding with the time-intensive process of notice and comment rulemaking; and announced its intent to promulgate regulations under Title IX following the rulemaking requirements of the Administrative Procedure Act. The Department has continued to hold listening sessions and discussions with stakeholders and experts since the rescission of the previous guidance to inform the Department's proposed Title IX regulations including hearing from stakeholders who believe the Department should adopt the policies embodied in its previous or current guidance. The need to address through rulemaking the serious subject of how schools respond to sexual harassment was well expressed by sixteen law school faculty at University of Pennsylvania Law School:

> Both the legislative process and notice-and-comment rulemaking are transparent, participatory processes that afford the opportunity for input from a diversity of viewpoints. That range of views is critical because this area implicates competing values, including privacy, safety, the functioning of the academic community, and the integrity of the educational process for both the victim and the accused, as well as the fundamental fairness of the disciplinary process. . . . In addition, adherence to a rule-of-law standard would have resulted in procedures with greater legitimacy and buy-in from the universities subject to the resulting rules.[11]

While implementing regulations under Title IX since 1975 have required schools to provide for a "prompt and equitable" grievance process to resolve complaints of sex discrimination

---

[10] Specifically, the Department rescinded the 2011 Dear Colleague Letter and the 2014 Q&A.
[11] Open Letter from Members of the Penn Law School Faculty, *supra* note 2.

by the school, the Department's guidance (both the guidance documents rescinded in 2017 and the ones remaining) fails to provide the clarity, permanence, and prudence of regulation properly informed by public participation in the full rulemaking process. Under the system created by the Department's guidance, hundreds of students have filed complaints with OCR alleging their school failed to provide a prompt or equitable process in response to a report of sexual harassment,[12] and over 200 students have filed lawsuits against colleges and universities alleging their school disciplined them for sexual misconduct without providing due process protections.[13] The Department recognizes that despite well-intentioned efforts by school districts, colleges and universities, advocacy organizations, and the Department itself, sexual harassment continues to present serious problems across the nation's campuses. The lack of clear regulatory standards has contributed to processes that have not been fair to all parties involved, that have lacked appropriate procedural protections, and that have undermined confidence in the reliability of the outcomes of investigations of sexual harassment allegations. Such deficiencies harm complainants, respondents, and recipients alike.

The framework created under these proposed regulations stems from the Department's commitment to the rule of law and the Department's recognition that it has statutory authority under 20 U.S.C. 1682 to issue regulations that effectuate Title IX's provisions – to protect all students from sex discrimination (here, in the form of sexual harassment) that jeopardizes equal access to education. The proposed regulations would help ensure that the

---

[12] *See, e.g.*, OCR's website listing currently pending investigations into sex discrimination, sexual harassment, and sexual violence: https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open- investigations/index.html.

[13] *See* KC Johnson, *Judge Xinis' Outrage*, ACAD. WONDERLAND: COMMENTS ON THE CONTEMP. ACAD. (Apr. 3, 2018), https://academicwonderland.com/2018/04/03/judge-xinis-outrage/ (over 200 students have sued their colleges over due process issues since the 2011 Dear Colleague Letter); KC Johnson, *Pomona, the Courts, & Basic Fairness*, ACAD. WONDERLAND: COMMENTS ON THE CONTEMP. ACAD. (Dec. 8, 2017), https://academicwonderland.com/2017/12/08/pomona-the-courts-basic-fairness/ (over 90 colleges have lost due process challenges by respondent students since the 2011 Dear Colleague Letter).

obligations imposed on recipients fall within the scope of the civil rights law that Congress created and, where persuasive, align with relevant case law. Thus, the proposed regulations set forth clear standards that trigger a recipient's obligation to respond to sexual harassment, including defining the conduct that rises to the level of Title IX as conduct serious enough to jeopardize a person's equal access to the recipient's education program or activity, and confining a recipient's Title IX obligations to sexual harassment of which it has actual knowledge.

Within those clarified standards triggering a recipient's Title IX obligations, the proposed regulations instruct recipients to take certain steps that, in the Department's judgment based on extensive interaction with stakeholders, will foster educational environments where all students and employees know that every school must respond appropriately to sexual harassment. The proposed regulations provide that complainants experiencing sexual harassment may report allegations to their school and expect their school to respond in a manner that is not clearly unreasonable and incentivize recipients to give various supportive measures to complainants to restore or preserve the individual's equal access to education as a way of demonstrating that the recipient's response to the complainant's report was not deliberately indifferent.

The proposed regulations require schools to investigate and adjudicate formal complaints of sexual harassment, and to treat complainants and respondents equally, giving each a meaningful opportunity to participate in the investigation and requiring the recipient to apply substantive and procedural safeguards that provide a predictable, consistent, impartial process for both parties and increase the likelihood that the recipient will reach a determination regarding the respondent's responsibility based on objective standards and relevant facts and evidence. By separating a recipient's obligation to *respond to each known*

15

*report* of sexual harassment from the recipient's obligation to *investigate formal complaints* of sexual harassment, the proposed regulations give sexual harassment complainants greater confidence to report and expect their school to respond in a meaningful way, while requiring that where a complainant also wants a formal investigation to potentially result in discipline against a respondent, that grievance process will be predictable and fair to both parties, resulting in a factually reliable determination about the complainant's allegations.

## Significant Proposed Regulations

Rather than proceeding sequentially, we group and discuss the proposed amendments under the substantive or procedural issues to which they pertain. We do not address proposed regulatory changes that are technical or otherwise minor in effect.

In discussing the proposed regulations, we first address how recipients must respond to sexual harassment and the procedures for resolving formal complaints of sexual harassment. Under the response provisions, we address: adoption of standards from Title IX Supreme Court precedent and other case law (proposed section 106.44(a), 106.44(e)(1), and 106.44(e)(6)); responses required in specific circumstances and accompanying safe harbors (proposed section 106.44(b)); emergency removals (proposed section 106.44(c)); and the use of administrative leave (proposed section 106.44(d)). We next turn to grievance procedures for addressing formal complaints of sexual harassment (proposed section 106.45) including: clarification that the recipient's treatment of both complainant and respondent could constitute discrimination on the basis of sex (proposed section 106.45(a)); general requirements for grievance procedures (proposed section 106.45(b)(1)); notice to the parties (proposed section 106.45(b)(2)); and procedures for investigations (proposed section 106.45(b)(3)). Also within the grievance procedures section we address evidentiary standards for determinations of responsibility (proposed section 106.45(b)(4)(i)); the

content of such written determinations (proposed section 106.45(b)(4)(ii)); and the timing of providing the determinations to the parties (proposed section 106.45(b)(4)(iii)). We next address procedures for appeals of written determinations (proposed section 106.45(b)(5)); informal resolution procedures (proposed section 106.45(b)(6)); and recordkeeping procedures (proposed section 106.45(b)(7)).

The proposed regulations also seek to clarify existing Title IX regulations in other areas beyond sexual harassment. Specifically, we state that OCR shall not deem necessary the payment of money damages to remedy violations under part 106 (proposed section 106.3(a)). We address the intersection among Title IX regulations, constitutional rights, student privacy rights, and Title VII of the Civil Rights Act of 1964 (proposed section 106.6). We clarify the provisions governing the designation of a Title IX Coordinator (proposed section 106.8). And we clarify that a recipient that qualifies for the religious exemption under Title IX can claim its exemption without seeking written assurance of the exemption from the Department (proposed section 106.12).

## I.    Recipient's response to sexual harassment

*(Proposed section 106.44)*

Statute: Title IX states generally that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance, 20 U.S.C. 1681(a), but does not specifically mention sexual harassment.

Current Regulations: None.

### A. Adoption of Supreme Court standards for sexual harassment

*Section 106.44(a) General; Section 106.44(e)(1); Section 106.44(e)(6)*

17

Proposed Regulations: We propose adding a new section 106.44 covering a recipient's response to sexual harassment. Proposed section 106.44(a) would state that a recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent. Proposed section 106.44(a) would also state that a recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

We propose definitions for "sexual harassment" and "actual knowledge" in section 106.44(e). Paragraph (e)(1) defines "sexual harassment" to mean either an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; or unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or sexual assault as defined in 34 CFR 668.46(a), implementing the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act). Paragraph (e)(6) defines "actual knowledge" as notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to a teacher in the elementary and secondary context with regard to student-on-student harassment. Paragraph (e)(6) also states that imputation of knowledge based solely on respondeat superior or constructive notice is insufficient to constitute actual knowledge, that the standard is not met when the only official of the recipient with actual knowledge is also the respondent, and that the mere ability or obligation to report sexual harassment does not qualify an employee, even if that employee is an official, as one who has authority to institute corrective measures on behalf of the recipient.

Reasons: The Department believes that the administrative standards governing recipients' responses to sexual harassment should be generally aligned with the standards developed by the Supreme Court in cases assessing liability under Title IX for money damages in private litigation. The Department believes that students and institutions would benefit from the clarity of an essentially uniform standard. More importantly, the Department believes that the Supreme Court's foundational decisions in this area, *Gebser* and *Davis*, are based on a textual interpretation of Title IX and on policy rationales that the Department finds persuasive for the administrative context. The Department's proposed regulations significantly reflect legal precedent because, while we could have chosen to regulate in a somewhat different manner, we believe that the standards articulated by the Court in these areas are the best interpretation of Title IX and that a consistent body of law will facilitate appropriate implementation.

First, the Court has held that Title IX governs misconduct by recipients, not by third parties such as teachers and students. As the Court noted in *Gebser*, Title IX is a statute "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." *Gebser*, 524 U.S. at 292; *Cannon v. Univ. of Chicago*, 414 U.S. 677, 704 (1979) (noting that the primary congressional purpose behind the statutes was "to avoid the use of federal resources to support discriminatory practices"). It is thus a recipient's *own* misconduct—not the actions of employees, students, or other third parties—that subjects the recipient to liability under Title IX.

Second, because Congress enacted Title IX under its Spending Clause authority, the obligations it imposes on recipients are in the nature of a contract. *Gebser,* 524 U.S. at 286; *Davis*, 526 U.S. at 640. The Court has reasoned that it follows from this that recipients must be on clear notice of what conduct is prohibited and that recipients must be held liable

19

only for conduct over which they have control. *Id.* at 644-45.

Third, the text of Title IX prohibits only discrimination that has the effect of denying access to the recipient's educational program or activities. *Id.* at 650-52. Accordingly, Title IX does not prohibit sex-based misconduct that does not rise to that level of severity.

And finally, the Court reasoned in *Davis* that Title IX must be interpreted in a manner that leaves room for flexibility in schools' disciplinary decisions and that does not place courts in the position of second-guessing the disciplinary decisions made by school administrators. *Id.* at 648.

As a matter of policy, the Department believes that these same principles should govern administrative enforcement of Title IX. To that end, the proposed regulation would provide that actual knowledge – rather than mere constructive knowledge or imputation of knowledge based on a respondeat superior theory – triggers the recipient's duty to respond. Consistent with Title IX's focus on the recipient's own misconduct and with the contractual nature of the duty imposed by Title IX, this standard ensures that the recipient is on clear notice of the discrimination (or alleged discrimination) that it must address. By contrast, as the Court observed in *Gebser*, a constructive knowledge standard would make a funding recipient liable for misconduct of which it was unaware. *Gebser*, 524 U.S. at 287. Further, applying this standard in the administrative enforcement context is consistent with "Title IX's express means of enforcement – by administrative agencies – [which] operates on the assumption of actual notice to officials of the funding recipient." *Id.* at 288.

Similarly, proposed section 106.44(a) adopts the *Gebser/Davis* standard that actual knowledge means "notice of sexual harassment or allegations of sexual harassment to an

official of the recipient who has authority to institute corrective measures on behalf of the recipient." Consistent with the text and purpose of Title IX, this standard ensures that a recipient is liable only for its own misconduct. As the Court noted in *Gebser* and *Davis*, it is only when the recipient makes an intentional decision not to respond to third-party discrimination that the recipient itself can be said to "subject" its students to such discrimination. *Gebser*, 524 U.S. at 291-92; *Davis*, 526 U.S. at 642-43. Determining whether someone is an official with authority to take corrective action is a fact-specific inquiry. *See e.g., Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1256 (11th Cir. 2010) ("we also note that the ultimate question of who is an appropriate person is 'necessarily a fact-based inquiry' because 'officials' roles vary among school districts.'") (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999)).

For recipients that are elementary and secondary schools, with respect to student-on-student sexual harassment, proposed section 106.44(e)(6) states that actual knowledge can also come from notice to a teacher. The Department recognizes that the Supreme Court has not held definitively that teachers are "appropriate officials with the authority to take corrective action" with respect to student-on-student sexual harassment; however, in the elementary and secondary school setting where school administrators and teachers are more likely to act *in loco parentis*, and exercise a considerable degree of control and supervision over their students, the Department believes this interpretation is reasonable.

*Davis*, 526 U.S. at 646, citing *Veronica Sch. Dist. v. Acton*, 515 U.S. 646, 655 (1995) (noting that a public school's power over its students is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults"). Teachers specifically have a "degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child." *New Jersey v. T.L.O.*, 469 U.S. 325, 348 (1985) (Powell, J., concurring). Thus, the Department believes that teachers at elementary and secondary schools should be considered to have the requisite authority to impart actual knowledge to the recipient regarding student-on-student conduct that could constitute sexual harassment and to trigger a recipient's obligations under Title IX. Whether in the context of elementary and secondary schools, or institutions of higher education, determining who is an official to whom notice of sexual harassment gives actual knowledge to the recipient will be fact- specific. Notice to a recipients' Title IX Coordinator, however, will always confer actual knowledge on the recipient; therefore, every student has a clearly designated option for reporting sexual harassment to trigger their school's response obligations.

The definition in proposed section 106.44(e)(6) also states that the mere ability or obligation to report sexual harassment does not qualify an employee, even if that employee is an official, as one who has authority to institute corrective measures on behalf of the recipient. *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) ("After all, each teacher, counselor, administrator, and support-staffer in a school building has the authority, if not the duty, to report to the school administration or school board potentially discriminatory conduct. But that authority does not amount to an authority to take a corrective measure or institute remedial action within the meaning of

Title IX. Such a holding would run contrary to the purposes of the statute"); *see also Santiago v. Puerto Rico*, 655 F.3d 61, 75 (1st Cir. 2011) ("The empty allegation that a school employee 'failed to report' harassment to someone higher up in the chain of command who could have taken corrective action is not enough to establish institutional liability. Title IX does not sweep so broadly as to permit a suit for harm-inducing conduct that was not brought to the attention of someone with the authority to stop it.") (internal citation omitted).

Further, a recipient's actual knowledge must be regarding conduct of the type proscribed under Title IX. The Department intends that the proposed definition of sexual harassment be consistent with the text of Title IX and with the Court's decisions in *Gebser* and *Davis*. The proposed regulation defines sexual harassment as either an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; or unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or sexual assault as defined in 34 CFR 668.46(a) (implementing the Clery Act). In each instance, following the text and purpose of Title IX, the definition thus seeks to include only sex- based discrimination that is sufficiently serious as to effectively deprive a student of equal access to a funding recipient's educational program or activity. Institutions of higher education must comply with both the Clery Act and Title IX. Because the purpose of Title IX is to prohibit a recipient from subjecting individuals to sex discrimination in its education program or activity, the definition of sexual harassment under Title IX focuses on sexual conduct that jeopardizes a person's equal access to an education

program or activity. Such sexual harassment includes conduct that is also a crime (such as

23

sexual assault), but Title IX does not focus on crimes per se. By contrast, the Clery Act focuses on particular crimes (stalking, dating violence, domestic violence, sexual assault) and an institution's obligation to disclose information and services to victims, and otherwise respond, to reports of such crimes. Although the Clery Act focuses on crimes that may also meet the definition of "sexual harassment" under the Title IX definition proposed in section 106.44(e)(1), such crimes do not always necessarily meet that definition (for example, where an incident of stalking is not "based on sex" as required under the Title IX definition of sexual harassment). The proposed regulations set forth definitions and obligations that further the purpose of Title IX with the goal of ensuring that institutions of higher education can also comply with their Clery Act obligations without conflict or inconsistency.

Proposed section 106.44(a) also reflects the statutory provision that a recipient is only responsible for responding to conduct that occurs within its "education program or activity." *See* 20 U.S.C. § 1681(a) (prohibiting a recipient from subjecting persons in the United States to discrimination "under any education program or activity"). The Title IX statute defines "program or activity" as "all of the operations of" a recipient. *See* 20 U.S.C. 1687. An "education program or activity" includes "any academic, extracurricular, research, [or] occupational training." 34 CFR § 106.31. *See also Doe v. Brown Univ.*, 896 F.3d 127, 132 n.6 (1st Cir. 2018) ("an institution's education program or activity" may include "university libraries, computer labs, and vocational resources . . . campus tours, public lectures, sporting events, and other activities at covered institutions"). Whether conduct occurs within a recipient's education program or activity

does not necessarily depend on the geographic location of an incident (e.g., on a recipient's campus versus off of a recipient's campus). *See e.g., Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX").

In determining whether a sexual harassment incident occurred within a recipient's program or activity, courts have examined factors such as whether the conduct occurred in a location or in a context where the recipient owned the premises; exercised oversight, supervision, or discipline; or funded, sponsored, promoted, or endorsed the event or circumstance. *See e.g., Davis*, 526 U.S. at 646 ("Where, as here, the misconduct occurs during school hours and on school grounds—the bulk of G.F.'s misconduct, in fact, took place in the classroom—the misconduct is taking place 'under' an 'operation' of the funding recipient."); *Samuelson v. Or. State Univ.*, 725 Fed. Appx. 598, 599 (9th Cir. 2018) (affirming dismissal of plaintiff's Title IX claim against OSU because she "failed to allege that her sexual assault occurred 'under' an OSU 'program or activity'" where plaintiff alleged that she was assaulted "off campus by a non-university student at a location that had no sponsorship by or association with OSU"); *Farmer v. Kansas State Univ.*, 2017 WL 980460, at * 8 (D. Kan. Mar. 14, 2017) (holding that a KSU fraternity is an "education program or activity" for purposes of Title IX because "KSU allegedly devotes significant resources to the promotion and oversight of fraternities through its websites, rules, and Office of Greek Affairs. Additionally, although the fraternity is housed off campus, it is considered a 'Kansas State University Organization,' is open only to KSU students, and is directed by a KSU instructor. Finally, KSU sanctioned the

alleged assailant for his alcohol use, but not for the alleged assault. Presented with these allegations, the Court is convinced that the fraternity is an 'operation' of the University, and that KSU has substantial control over student conduct within the fraternity.").

Importantly, nothing in the proposed regulations would prevent a recipient from initiating a student conduct proceeding or offering supportive measures to students who report sexual harassment that occurs outside the recipient's education program or activity (or as to conduct that harms a person located outside the United States, such as a student participating in a study abroad program). Notably, there may be circumstances where the harassment occurs in a recipient's program or activity, but the recipient's response obligation is not triggered because the complainant was not participating in, or even attempting to participate in, the education programs or activities provided by that recipient. *See e.g., Doe*, 896 F.3d at 132-33 (affirming judgement on the pleadings and "[f]inding no plausible claim under Title IX" where plaintiff alleged that, while a Providence College student, three Brown University students sexually assaulted her on Brown's campus, and Brown notified the plaintiff that she had a right to file a complaint under Brown's Code of Student Conduct—but not Title IX—because she had not availed herself or attempted to avail herself of any of Brown's educational programs and therefore could not have been denied those benefits).

The Department wishes to emphasize that when determining how to respond to sexual harassment, recipients have flexibility to employ age-appropriate methods, exercise common sense and good judgment, and take into account the needs of the parties involved. Finally, the Department wishes to clarify that Title IX's "education program or activity" language should not be conflated with Clery Act geography; these are distinct

jurisdictional schemes, though they may overlap in certain situations.

Once it has been established that a recipient has actual knowledge of sexual harassment in its education program or activity, it becomes necessary to evaluate the recipient's response. Although the Department is not required to adopt the deliberate indifference standard articulated by the Court, we are persuaded by the policy rationales relied on by it and believe it's the best policy approach. As the Court reasoned in *Davis*, a recipient acts with deliberate indifference only when it responds to sexual harassment in a manner that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-49. The Department believes this standard holds recipients accountable without depriving them of legitimate and necessary flexibility to make disciplinary decisions and to provide supportive measures that might be necessary in response to sexual harassment. Moreover, the Department believes that teachers and local school leaders with unique knowledge of the school culture and student body are best positioned to make disciplinary decisions; thus, unless the recipient's response to sexual harassment is clearly unreasonable in light of known circumstances, the Department will not second guess such decisions. In fact, the Court observed in *Davis* that courts must not second guess recipients' disciplinary decisions. *Id.* As a matter of policy, the Department believes that it would be equally wrong for it to second guess recipients' disciplinary decisions through the administrative enforcement process. Where a respondent has been found responsible for sexual harassment, any disciplinary sanction decision rests within the discretion of the recipient, although the recipient must also provide remedies, as appropriate, to the complainant designed to restore or preserve the complainant's educational access, as provided for in proposed section 106.45(b)(1)(i).

The Department acknowledges that proposed section 106.44(a) would adopt standards that depart from those set forth in prior guidance and OCR enforcement of Title IX. The Department's guidance and enforcement practices have taken the position that constructive notice – as opposed to actual notice – triggered a recipient's duty to respond to sexual harassment; that recipients had a duty to respond to a broader range of sex- based misconduct than the sexual harassment defined in the proposed regulation; and that recipients' response to sexual harassment should be judged under a reasonableness standard, rather than under the deliberate indifference standard adopted by the proposed regulation. In 2001, the Department asserted that the Court's decisions in *Gebser* and *Davis* and the liability standard set out for private actions for monetary damages did not preclude the Department from maintaining its administrative enforcement standards reflected in the 1997 guidance. *See* 2001 Guidance at iii-iv.

Based on its consideration of the text and purpose of Title IX, of the reasoning underlying the Court's decisions in *Gebser* and *Davis*, and of the views of the stakeholders it has consulted, the Department now believes that the earlier guidance should be reconsidered. Contrary to the text of Title IX and inconsistent with the contractual nature of the obligations the statute imposes pursuant to Congress' Spending Clause authority, the guidance's constructive notice standard made funding recipients liable for conduct of which they were unaware. Similarly, the guidance arguably exceeded the text of the statute by requiring institutions to respond to conduct less severe than that proscribed by Title IX. And, by evaluating schools' responses under a mere reasonableness standard, the guidance improperly deprived administrators of needed flexibility to make disciplinary decisions affecting their students.

The deliberate indifference standard set forth in *Davis* and in proposed section 106.44(a) allows schools predictably to evaluate their response to sexual harassment for purposes of both civil litigation and administrative enforcement by the Department based on a consistent standard. Although the Department is not required to adopt the liability standards applied by the Supreme Court in private suits for money damages, the Department is persuaded by the policy rationales relied on by the Court. Generally, the liability standards of actual knowledge and deliberate indifference are also appropriate in administrative enforcement of Title IX, where a recipient's federal funding is at stake if it fails to comply with Title IX, because such standards are premised on holding recipients accountable for responding to discrimination of which the recipients know and have control. Recognizing that the Department has broad authority under the Title IX statute to issue regulations that effectuate the provisions of Title IX, the Department is retaining and proposes to add in the proposed regulation provisions that would clarify that, in addition to a general deliberate indifference standard, schools must take other actions that courts do not require in private litigation under Title IX (e.g., requiring a designated Title IX Coordinator, requiring written grievance procedures, describing the supportive measures that a non-deliberatively indifferent response may require, requiring a school to investigate and adjudicate formal complaints, and other requirements found in proposed sections 106.8, 106.44, and 106.45.)

**B. Responding to formal complaints of sexual harassment; safe harbors**

*Section 106.44(b) Specific circumstances; Section 106.44(e)(2) through (e)(5)*

Proposed Regulations: We propose adding section 106.44(b) to address specific circumstances under which a recipient will respond to sexual harassment. We propose adding paragraph (b)(1) stating that a recipient must follow procedures (including

29

implementing any appropriate remedy as required) consistent with section 106.45 in response to a formal complaint as to allegations of conduct within its education program or activity, and that if the recipient follows procedures consistent with section 106.45 in response to a formal complaint, the recipient's response to the formal complaint is not deliberately indifferent and does not otherwise constitute sex discrimination under Title

IX. Proposed section 106.44(e)(5) defines "formal complaint" as a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment against a respondent about conduct within its education program or activity, and requesting initiation of the recipient's grievance procedures consistent with section 106.45.

We also propose adding paragraph (b)(2), stating that when a recipient has actual knowledge of reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment, the Title IX Coordinator must file a formal complaint; if the Title IX Coordinator files a formal complaint in response to such allegations, and the recipient follows procedures (including implementing any appropriate remedy where required) consistent with section 106.45 in response to the formal complaint, the recipient's response to the reports is not deliberately indifferent.

In addition, we propose adding paragraph (b)(3), which states that, for institutions of higher education, in the absence of a formal complaint, a recipient is not deliberately indifferent when it implements supportive measures designed to effectively restore or preserve access to the recipient's education program or activity. We further proposed that the recipient must also at the same time give written notice to the complainant stating that the complainant can choose to file a formal complaint at a later time despite having

declined to file a formal complaint at the time the supportive measures are offered.

We propose adding paragraph (b)(4), which states that where paragraphs (b)(1) through

(b)(3) are not implicated, a recipient with actual knowledge of sexual harassment in its education program or activity against a person in the United States must, consistent with paragraph (a), respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

Proposed section 106.44(e)(2) defines "complainant" as an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint. Additionally, for purposes of this proposed subsection, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under section 106.44(e)(6).

Proposed section 106.44(e)(3) defines "respondent" as an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment.

Proposed section 106.44(e)(4) defines "supportive measures" as non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge, to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Paragraph (e)(4) goes on to explain that such measures are designed to restore or preserve access to the recipient's education program or activity, without unreasonably burdening the other party; protect the safety of all parties and the recipient's educational environment; and deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or

other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the

campus, and other similar measures. Paragraph (e)(4) also states that the recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the institution to provide the supportive measures. Furthermore, paragraph (e)(4) clarifies that the Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

Finally, we propose adding section 106.44(b)(5), which explains that the Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient merely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence.

Reasons: To clarify a recipient's responsibilities under this standard, proposed section 106.44(b) would specify two circumstances under which a recipient must initiate its grievance procedures, and in those situations provide a safe harbor from a finding of deliberate indifference where the recipient does in fact implement grievance procedures consistent with the proposed section 106.45. Those two situations are (i) where a formal complaint is filed, or (ii) where the recipient has actual knowledge of reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment (in which case the proposed regulations require the recipient's Title IX Coordinator to file a formal complaint if none has already been filed). In response to either of these two

situations, if the recipient follows grievance procedures consistent with proposed section 106.45, including implementing any appropriate remedy as required for the complainant, the recipient is given a safe harbor from a finding of deliberate indifference by the Department with respect to its response to the formal complaint, because the recipient's response would not be "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-49, 654. The Department believes that including these safe harbors in the regulations emphasizes a recipient's obligation to respond to known sexual harassment and to ensure a complainant's access to the recipient's education program or activity in situations where a finding of responsibility has been made, while preserving the recipient's flexibility to implement its grievance procedures, provided those procedures comply with the requirements of proposed section 106.45. The safe harbor available in proposed section 106.44(b)(1) would shield the recipient from a finding by the Department that the recipient's response to the formal complaint constituted sex discrimination under Title IX, regardless of whether the complainant claimed that the response was deliberately indifferent, or whether the respondent claimed that the recipient's response otherwise constituted sex discrimination. For institutions of higher education, proposed section 106.44(b)(3) provides a safe harbor against a finding of deliberate indifference where, in the absence of a formal complaint, a school's response to known, reported, or alleged sexual harassment is to offer and provide the complainant supportive measures designed to effectively restore or preserve the complainant's access to the recipient's education program or activity. This provision is intended to call recipients' attention to the importance of offering supportive measures to students who may not wish to file a formal complaint that would initiate a grievance process. The

33

Department has heard from a wide range of stakeholders about the importance of a school taking into account the wishes of the complainant in deciding whether or not a formal investigation and adjudication is warranted. The proposed regulation creates a framework where a complainant has the right to file a formal complaint and the school must then initiate its grievance procedures, but in proposed section 106.44(b)(3) the Department also recognizes that for a variety of reasons, not all complainants want to file a formal complaint, and that in many situations a complainant's access to his or her education can be effectively restored or preserved through the school providing supportive measures. The proposed regulation requires that, to be entitled to this safe harbor, the recipient must first inform the complainant in writing of his or her right to pursue a formal complaint, including the right to later file a formal complaint (consistent with any other requirements of the proposed regulation). Proposed section 106.44(b)(3) gives a safe harbor only to institutions of higher education, in recognition that college and university students are generally adults capable of deciding whether supportive measures alone suffice to protect their educational access.

Proposed section 106.44(b)(4) states that even if none of the safe harbor situations is present, the recipient's response to sexual harassment must still meet the general requirement in section 106.44(a) to not be deliberately indifferent, which means the recipient's response must not be clearly unreasonable in light of the known circumstances. Section 106.44(b)(1)-(b)(3) explains what deliberate indifference means in three specific contexts. Section 106.44(b)(4) clarifies that when those three situations are not implicated, the general deliberate indifference standard specific in section 106.44(a) applies to a recipient with actual knowledge of sexual harassment in and

34

education program or activity of the recipient against a person in the United States that effectively denies an individual equal access to the recipient's education program or activity.

To define the respective parties involved in a recipient's grievance procedures, proposed section 106.44(e)(2) defines "complainant" as one who has reported being the victim of sexually harassing conduct. To be considered a "complainant," such a report must be made to the recipient's Title IX Coordinator or other official to whom notice of sexual harassment results in the recipient having actual knowledge as described in section 106.44(e)(6). This clarifies when a recipient must view a person as a complainant for purposes of offering supportive measures, investigating a formal complaint, and any other response necessary to meet the recipient's obligation to not be deliberately indifferent. Proposed section 106.44(e)(3) defines "respondent" as an individual who has been the subject of a report of sexual harassment.

Consistent with feedback from many stakeholders, the Department recognizes that often the most effective measures a recipient can take to support its students in the aftermath of an alleged incident of sexual harassment are outside the grievance process and involve working with the affected individuals to provide reasonable supportive measures that increase the likelihood that they will be able to continue their education in a safe, supportive environment.

Also consistent with feedback from stakeholders on the issue of supportive measures and to provide needed clarity, we (1) propose to define them as non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge, to the complainant or the respondent before or after the filing of a formal

35

complaint or where no formal complaint has been filed; (2) propose to specify, in the definition, that the recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the institution to provide the supportive measures, and (3) further specify that such measures are designed to restore or preserve access to the recipient's education program or activity, without unreasonably burdening the other party; protect the safety of all parties and the recipient's educational environment; and deter sexual harassment.. For added clarity on supportive measures, proposed section 106.44(e)(4) contains a non-exclusive list of examples of supportive measures. Recipients are encouraged to broadly consider what measures they can reasonably provide to individual students to ensure continued equal access to educational programs, activities, opportunities, and benefits for a complainant at the time the complainant reports or files a formal complaint, and for a respondent when a formal complaint is being investigated.

We also specify in the proposed definition that the recipient's Title IX Coordinator is responsible for coordinating effective implementation of supportive measures. Many supportive measures involve implementation through various offices or departments within a school; when supportive measures are part of a school's response to a Title IX sexual harassment report or formal complaint, the Title IX Coordinator must serve as the point of contact for the affected students to ensure that the supportive measures are effectively implemented so that the burden of navigating paperwork or other policy requirements within the recipient's own system does not fall on the student receiving the supportive measure. For example, where a mutual no-contact order has been imposed as a

supportive measure, the affected complainant and respondent should know to contact the Title IX Coordinator with questions about how to interpret or enforce the no-contact order; as a further example, where a student receives an academic course adjustment as a supportive measure, the Title IX Coordinator is responsible for communicating with other offices within the school as needed to ensure that the adjustment occurs as intended and without fee or charge to the student. As another example, if counseling services are provided as a supportive measure, the Title IX Coordinator should help coordinate the service and ensure the sessions occur without fee or charge. Proposed section 106.44(b)(5) would provide that the Assistant Secretary will not deem a recipient's determination regarding responsibility that results from the implementation of its grievance procedures to be evidence of deliberate indifference by the recipient merely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence. During a complaint investigation or compliance review, OCR's role is not to conduct a de novo review of the recipient's investigation and determination of responsibility for a particular respondent. Rather, OCR's role is to determine whether a recipient has complied with Title IX and its implementing regulations. Thus, OCR will not find a recipient to have violated Title IX or this part solely because OCR may have weighed the evidence differently in a given case. The Department believes it is important to include this provision in the regulations to provide notice and transparency to recipients about OCR's role and standard of review in enforcing Title IX. This provision does not, however, preclude OCR from requiring a recipient's determination of responsibility to be set aside if the recipient did not comply with proposed section 106.45.

**C. Additional rules governing recipients' responses to sexual harassment**

*Section 106.44(c) Emergency removal*

Proposed Regulations: We propose adding section 106.44(c) stating that nothing in section 106.44 precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate threat to the health or safety of students or employees justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. Paragraph (c) also states that the paragraph shall not be construed to modify any rights under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504) , or Title II of the Americans with Disabilities Act (ADA).

Reasons: Recognizing that there are situations in which a respondent may pose an immediate threat to the health and safety of the campus community before an investigation concludes, proposed section 106.44(c) would allow recipients to remove such respondents, provided that the recipient undertakes a safety and risk analysis and provides notice and opportunity to the respondent to challenge the decision immediately following removal. This proposed provision tracks the language in the Clery Act regulations at 34 CFR 668.46(g) and would apply to all recipients subject to Title IX. The Department believes that this provision for emergency removals should be applicable at the elementary and secondary education level as well as the postsecondary education level to ensure the health and safety of all students. When considering removing a respondent pursuant to this provision, the proposed regulations require that a recipient

follow the requirements of the IDEA, Section 504, and Title II of the ADA. Thus, a recipient may remove a student on an emergency basis under section 106.44(c), but only to the extent that such removal conforms with the requirements of the IDEA, Section 504 and Title II of the ADA.

*Section 106.44(d) Administrative leave*

Proposed Regulations: We propose adding section 106.44(d) stating that nothing in section 106.44 precludes a recipient from placing a non-student employee respondent on administrative leave during the pendency of an investigation.

Reasons: Because placing a non-student respondent on administrative leave does not implicate access to the recipient's education programs and activities in the same way that other respondent-focused measures might, and in light of the potentially negative impact of forcing a recipient to continue an active agency relationship with a respondent while accusations are being investigated, the Department concludes that it is appropriate to allow recipients to temporarily put non-student employees on administrative leave pending an investigation.

## II.     Grievance procedures for formal complaints of sexual harassment

*(Proposed section 106.45)*

Statute: The statute does not directly address grievance procedures for formal complaints of sexual harassment. The Secretary has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving federal financial assistance specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

Current Regulations: 34 CFR 106.8(b) states that "A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

*Section 106.45(a) Discrimination on the basis of sex*

Proposed Regulations: We propose adding a new section 106.45 addressing the required grievance procedures for formal complaints of sexual harassment. Proposed paragraph (a) states that a recipient's treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex, and also states that a recipient's treatment of the respondent may constitute discrimination on the basis of sex under Title IX.

Reasons: Deliberate indifference to a complainant's allegations of sexual harassment may violate Title IX by separating the student from his or her education on the basis of sex; likewise, a respondent can be unjustifiably separated from his or her education on the basis of sex, in violation of Title IX, if the recipient does not investigate and adjudicate using fair procedures before imposing discipline. Fair procedures benefit all parties by creating trust in both the grievance process itself and the outcomes of the process.

**A. General requirements for grievance procedures**

*Section 106.45(b)(1)*

Proposed Regulations: We propose adding section 106.45(b) to specify that for the purpose of addressing formal complaints of sexual harassment, grievance procedures must comply with the requirements of proposed section 106.45. Paragraph (b)(1) states that grievance procedures must--

(i)     Treat complainants and respondents equitably; an equitable resolution must include remedies for the complainant where a finding of responsibility against the respondent has been made, with such remedies designed to restore or preserve access to the recipient's education program or activity, and due process protections for the respondent before any disciplinary sanctions are imposed;

(ii)    Require an investigation of the allegations and an objective evaluation of all relevant evidence – including both inculpatory and exculpatory evidence – and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness;

(iii)   Require that any individual designated by a recipient as a coordinator, investigator, or decision-maker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent; and that a recipient ensure that coordinators, investigators, and decision-makers receive training on the definition of sexual harassment and how to conduct an investigation and grievance process – including hearings, if applicable – that protect the safety of students, ensure due process protections for all parties, and promote accountability; and that any materials used to train coordinators, investigators, or decision-makers not rely on sex stereotypes and instead promote impartial investigations and adjudications of sexual harassment;

(iv)    Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process;

(v)     Include reasonably prompt timeframes for completion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals if the recipient

offers an appeal, and including a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension, and the reasons for the action; good cause may include considerations such as the absence of the parties or witnesses, concurrent law enforcement activity, or the need for language assistance or accommodation of disabilities;

(vi) Describe the range of possible sanctions and remedies that the recipient may implement following any determination of responsibility;

(vii) Describe the standard of evidence to be used to determine responsibility;

(viii) Include the procedures and permissible bases for the complainant and respondent to appeal if the recipient offers an appeal; and

(ix) Describe the range of supportive measures available to complainants and respondents.

Reasons: In describing the requirements for grievance procedures for formal complaints of sexual harassment in paragraph (b)(1), the Department's intent is to balance the need to establish procedural safeguards providing a fair process for all parties with recognition that a recipient needs flexibility to employ grievance procedures that work best for the recipient's educational environment.

Proposed section 106.45(b)(1)(i) would require that grievance procedures treat complainants and respondents equitably, echoing the existing requirement in 34 CFR 106.8 that a recipient's grievance procedures provide for "prompt and equitable resolution" of complaints. Stakeholders have urged the Department to protect the

interests of both the complainant and the respondent, and to ensure that recipients' procedures treat both parties equitably and fairly throughout the process, including incorporating the protections described throughout proposed section 106.45(b). A fair and equitable grievance process benefits all parties because they are more likely to trust in, engage with, and rely upon the process as legitimate. The Department recognizes that some recipients are state actors with responsibilities to provide protections to students and employees under the Fourteenth Amendment's Due Process Clause. Other recipients are private institutions that do not have constitutional obligations to their students and employees. The due process protections provided under these proposed regulations aim to effectuate the objectives of Title IX by creating consistent, fair, objective grievance processes that make the process equitable for both parties and are more likely to generate reliable outcomes. When presented with an allegation of sexual harassment the recipient must respond in a manner that is not deliberately indifferent, but to evaluate what constitutes an appropriate response, the recipient must first reach factual determinations about the allegations at issue. This requires the recipient to employ a grievance process that rests on fundamental notions of fairness and due process protections so that findings of responsibility rest on facts and evidence. Only when an outcome is the product of a predictable, fair process that gives both parties meaningful opportunity to participate will the recipient be in a position to determine what remedies and/or disciplinary sanctions are warranted. When a recipient establishes an equitable process with due process protections and implements it consistently, its findings will be viewed with more confidence by the parties and the public.

Although both complainants and respondents have a common interest in a fair process,

they also have distinct interests that are recognized in paragraph (b)(1)(i). For example, paragraph (b)(1)(i) explains that equitable grievance procedures will provide remedies for the complainant as appropriate and due process protections for the respondent before any disciplinary action is taken. Because a grievance process could result in a determination that the respondent sexually harassed the complainant, and because the resulting sanctions against the respondent could include a complete loss of access to the education program or activity of the recipient, an equitable grievance procedure will only reach such a conclusion following a process that seriously considers any contrary arguments or evidence the respondent might have, including by providing the respondent with all of the specific due process protections outlined in the rest of the proposed regulations. Likewise, because the complainant's access to the recipient's education program or activity can be limited by sexual harassment, an equitable grievance procedure will provide relief from any sexual harassment found under the procedures required in the proposed regulations and restore access to the complainant accordingly.

Proposed section 106.45(b)(1)(ii) requires that a recipient investigate a complaint and that grievance procedures include an objective evaluation of the evidence. Stakeholders have raised concerns that recipients sometimes ignore evidence that does not fit with a predetermined outcome, and that investigators and decision-makers have inappropriately discounted testimony based on whether it comes from the complainant or the respondent. Paragraph (b)(1)(ii) responds to these concerns by requiring the recipient to conduct an investigation and objectively evaluate all evidence, and by prohibiting the recipient from basing its evaluation of testimony on the person's status as a complainant, respondent, or witness.

Proposed section 106.45(b)(1)(iii) would address the problems that have arisen for complainants and respondents as a result of coordinators, investigators, and decision-makers making decisions based on bias by requiring recipients to fill such positions with individuals free from bias or conflicts of interest. This proposed provision generally tracks the language in the Clery Act regulations at 34 CFR 668.46(k)(3)(i)(C) and would apply to all recipients subject to Title IX. Paragraph (b)(1)(iii) would also require that coordinators, investigators, and decision-makers receive training on (1) the definition of sexual harassment and (2) how to conduct the investigation and grievance process in a way that protects student safety, due process, and accountability. This proposed provision generally tracks the language in the Clery Act regulations at 34 CFR 668.46(k)(2)(ii) and would apply to all recipients subject to Title IX. The Department believes that such training will help ensure that those individuals responsible for implementing the recipient's grievance procedures are appropriately informed at the elementary and secondary education level as well as the postsecondary education level. Recipients would also be required to use training materials that promote impartial investigations and adjudications and that do not rely on sex stereotypes, so as to avoid training that would cause the grievance process to favor one side or the other or bias outcomes in favor of complainants or respondents. Recipients would continue to have the discretion to use their own employees to investigate and/or adjudicate matters under Title IX or to hire outside individuals to fulfill these responsibilities.

Proposed section 106.45(b)(1)(iv) would require that a recipient's grievance procedures establish a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance

process. This requirement is added to ensure impartiality by the recipient until a determination is made. The requirement also bolsters other provisions in the proposed regulation that place the burden of proof on the recipient, rather than on the parties; indicate that supportive measures are "non-disciplinary" and "non-punitive" (implying that the recipient may not punish an accused person prior to a determination regarding responsibility); and impose due process protections throughout the grievance process. Finally, pending the finding of facts sufficient for the recipient to make a determination regarding responsibility, the requirement mitigates the stigma and reputational harm that accompany an allegation of sexual misconduct. A fundamental notion of a fair proceeding is that a legal system does not prejudge a person's guilt or liability.

The proposed regulations recognize that the time that it takes to complete the grievance process will vary depending on, among others things, the complexity of the investigation, and that prompt resolution of the grievance process is important to both complainants and respondents. Proposed paragraph (b)(1)(v) would require recipients to designate reasonably prompt timeframes for the grievance process, including for appeals if the recipient offers an appeal, but also provide that timeframes may be extended for good cause with written notice to the parties and an explanation for the delay. This proposed provision generally tracks the language in the Clery Act regulations at 34 CFR 668.46(k)(3)(i)(A), which the Department believes is important to include for all recipients subject to Title IX. Some recipients felt pressure in light of prior Department guidance to resolve the grievance process within 60 days regardless of the particulars of the situation, and in some instances, this resulted in hurried investigations and adjudications, which sacrificed accuracy and fairness for speed. Proposed paragraph

(b)(1)(v) specifies examples of possible reasons for such a delay, such as absence of the parties or witnesses, concurrent law enforcement activity, or the need for language assistance or accommodation of disabilities. For example, if a concurrent law enforcement investigation has uncovered evidence that the police plan to release on a specific timeframe and that evidence would likely be material to determining responsibility, a recipient could reasonably extend the timeframe of the grievance process in order to allow that evidence to be included in the final determination of responsibility. Any reason for a delay must be justified by good cause and communicated by written notice to the complainant and the respondent of the delay or extension and the reasons for the action; delays caused solely by administrative needs are insufficient to satisfy this standard. Moreover, recipients must meet their legal obligation to provide timely auxiliary aids and services and reasonable accommodations under Title II of the ADA, Section 504, and Title VI of the Civil Rights Act of 1964, and should reasonably consider other services such as meaningful access to language assistance.

It is important for individuals to have a clear understanding of the recipients' policies and procedures related to sexual harassment, including the consequences of being found responsible for sexual harassment, and the procedures the recipient will use to make such a determination; otherwise, the parties may not have a full and fair opportunity to present evidence and arguments in favor of their side, and the accuracy and impartiality of the process could suffer as a result. Proposed paragraphs (b)(1)(vi) through (b)(1)(ix) would require that the parties be informed of the possible sanctions and remedies that may be implemented following the determination of responsibility, the standard of evidence to be used during the grievance process, the procedures and permissible bases for appeals if the

recipient offers an appeal, and the range of supportive measures available to complainants and respondents. These proposed provisions generally track the language in the Clery Act regulations at 34 CFR 668.46(k)(1) and would apply to all recipients subject to Title IX. The Department believes that requiring a recipient to notify the parties of these matters in advance is equally important at the elementary and secondary education level as it is at the postsecondary education level to ensure the parties are fully informed.

### B. Notice and investigation

*Section 106.45(b)(2) Notice of allegations*

Proposed Regulations: We propose adding section 106.45(b)(2) stating that upon receipt of a formal complaint, a recipient must provide written notice to the parties of the recipient's grievance procedures and of the allegations. Such notice must include sufficient details (such as the identities of the parties involved in the incident, if known, the specific section of the recipient's policy allegedly violated, the conduct allegedly constituting sexual harassment under this part and under the recipient's policy, and the date and location of the alleged incident, if known) and provide sufficient time to prepare a response before any initial interview. The written notice must also include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The notice must inform the parties that they may request to inspect and review evidence under section 106.45(b)(3)(viii). Additionally, the notice must inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process. Also,

if the recipient decides later to investigate allegations not included in the notice provided pursuant to paragraph (b)(2)(i)(B) of this section, the recipient must provide notice of the additional allegations to known parties.

Reasons: To meaningfully participate in the process, all parties must have adequate notice of the allegations and grievance procedures. Without the information included in the written notice required by proposed section 106.45(b)(2), a respondent would be unable to adequately respond to allegations. This notice will also ensure that the complainant is able to understand the grievance process, including what allegations are part of the investigation. The requirement to provide sufficient details (such as the identities of the parties involved in the incident, if known, the specific section of the recipient's policy allegedly violated, the conduct allegedly constituting sexual harassment under this part and under the recipient's policy, and the date and location of the alleged incident, if known) applies whenever a formal complaint is filed against a respondent, whether the complaint is signed by the complainant or by the Title IX Coordinator. The qualifier "if known" reflects that in some cases, a complainant may not know details that ideally would be included in the written notice, such as the identity of the respondent, or the date or location of the incident. If during the investigation the recipient learns these details then the recipient should promptly send the written notice as required by paragraph (b)(2)(i) to the now-identified respondent, as applicable, and/or inform the respondent of the details of allegations that were previously unknown (such as the date or location of the alleged incident). The unavailability of material details, particularly the identity of the respondent, may impede a recipient's ability to investigate and thus impact whether the recipient's response is deliberately indifferent. If, during the investigation,

the recipient decides to investigate additional allegations, the recipient must provide notice of those allegations to the parties. This notice would keep the parties meaningfully informed of any expansion in the scope of the investigation. It is also important for recipients to notify parties about any provisions in its code of conduct that prohibit knowingly making false statements or knowingly submitting false information during the grievance process so as to emphasize the recipients' serious commitment to the truth- seeking nature of the grievance process and to incentivize honest, candid participation in it.

*Section 106.45(b)(3) Investigations of a formal complaint*

Proposed Regulations: We propose adding section 106.45(b)(3) stating that the recipient must conduct an investigation of the allegations in a formal complaint. Proposed section 106.45(b)(3) also states that if the conduct alleged by the complainant would not constitute sexual harassment as defined in section 106.44(e) even if proved or did not occur within the recipient's program or activity, the recipient must terminate its grievance process with regard to that conduct, and that when investigating a formal complaint, a recipient must—

(i)  Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties;

(ii)  Provide equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence;

(iii)  Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence;

(iv)    Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, and not limit the choice of advisor or presence for either the complainant or respondent in any meeting or grievance proceeding; however, the recipient may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties;

(v)    Provide to the party whose participation is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings with a party, with sufficient time for the party to prepare to participate;

(vi)    For recipients that are elementary and secondary schools, the recipient's grievance procedures may require a live hearing. With or without a hearing, the decision-maker must, after the recipient has incorporated the parties' responses to the investigative report under paragraph (b)(3)(ix) of this section, ask each party and any witnesses any relevant questions and follow-up questions, including those challenging credibility, that a party wants asked of any party or witnesses. If no hearing is held, the decision-maker must afford each party the opportunity to submit written questions, provide each party with the answers, and allow for additional, limited follow-up questions from each party. With or without a hearing, all questioning must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. The

decision-maker must explain to the party proposing the questions any decision to exclude questions as not relevant;

(vii)     For institutions of higher education, the recipient's grievance procedure must provide for a live hearing. At the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at a hearing must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under paragraph (b)(3)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings. If a party does not have an advisor present at the hearing, the recipient must provide that party an advisor aligned with that party to conduct cross-examination. All cross-examination must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility;

(viii)     Provide both parties an equal opportunity to inspect and review evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. Prior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format, such as a file sharing platform, that restricts the parties and advisors from downloading or copying the evidence, and the parties shall have at least ten days to submit a written response, which the investigator will consider prior to completion of the investigative report. The recipient must make all such evidence subject herein to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination; and

(ix)      Create an investigative report that fairly summarizes relevant evidence and, at least ten days prior to a hearing (if a hearing is required under section 106.45) or other time of determination regarding responsibility, provide a copy of the report to the parties for their review and written response.

Reasons: Proposed section 106.45(b)(3) would set forth specific standards to govern investigations of formal complaints of sexual harassment. To ensure a recipient's resources are directed appropriately at handling complaints of sexual harassment, proposed paragraph (b)(3) would require recipients to dismiss a formal complaint or an allegation within a complaint without conducting an investigation if the alleged conduct, taken as true, is not sexual harassment as defined in the proposed regulations or if the

conduct did not occur within the recipient's program or activity. This ensures that only conduct covered by Title IX is treated as a Title IX issue in a school's grievance process. The Department emphasizes that a recipient remains free to respond to conduct that does not meet the Title IX definition of sexual harassment, or that did not occur within the recipient's program or activity, including by responding with supportive measures for the affected student or investigating the allegations through the recipient's student conduct code, but such decisions are left to the recipient's discretion in situations that do not involve conduct falling under Title IX's purview.

Proposed paragraph (b)(3)(i) would place the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility on the recipient, not on the parties. Recipients, not complainants or respondents, must comply with Title IX, so the burden of gathering evidence relating to allegations of sexual harassment under Title IX and determining whether the evidence shows responsibility appropriately falls to the recipient. Although a school could contract with a third-party agent to perform an investigation or otherwise satisfy its responsibilities under this section, including to gather evidence, the recipient will be held to the same standards under this section regardless of whether those responsibilities are performed by the recipient directly through its employees or through a third party such as a contractor. Likewise, although schools will often report misconduct under this section to the appropriate authorities, including as required under state law, a report to police or the presence of a police investigation regarding misconduct under this section does not relieve a recipient of its obligations under this section. Nothing in the proposed regulation prevents a recipient from using evidence merely because it was collected by law enforcement.

With the goal of ensuring fairness and equity for all parties throughout the investigation

process, proposed paragraphs (b)(3)(ii), (b)(3)(iii), (b)(3)(iv), and (b)(3)(viii) would require recipients to provide the parties with an equal opportunity to present witnesses and other inculpatory and exculpatory evidence; permit the parties to discuss the investigation; provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied by an advisor of their choice with any restrictions on the advisor's participation being applied equally to both parties; provide the parties with equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility; equal opportunity to respond to such evidence; and equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination. Because both parties can review and respond to this evidence, discuss the investigation with others in order to identify additional evidence, introduce any additional evidence into the proceeding, and receive guidance from an advisor of their choice throughout, the process will be substantially more thorough and fair and the resulting outcomes will be more reliable. Proposed paragraph (b)(3)(iv) generally tracks the language in the Clery Act regulations at 34 CFR 688.46(k)(2)(iii) and (iv) and would apply to all recipients subject to Title IX. And, proposed paragraph (b)(3)(viii) is consistent with the Family Educational Rights and Privacy Act (FERPA), under which a student has a right to inspect and review records that directly relate to that student. The Department believes that permitting both parties to be accompanied by an advisor or other individual of their choice (who may be an attorney) is also important at the elementary and secondary education level to ensure that both parties are treated equitably.

To ensure that the complainant and respondent are able to meaningfully participate in the

process and that any witnesses have adequate time to prepare, proposed section 106.45(b)(3)(v) would require recipients to provide to the party whose participation is invited or expected written notice of all hearings, investigative interviews, or other meetings with a party, with sufficient time for the party to prepare to participate in the proceeding. Without this protection, a party's ability to participate in a hearing, interview, or meeting might not be meaningful or add any value to the proceeding. The Department believes that this proposed provision, which is similar to the Clery Act regulation at 34 CFR 688.46(k)(3)(i)(B) with respect to timely notice of meetings, is equally important at the elementary and secondary education level and the postsecondary education level to ensure that both parties are treated equitably.

Cross examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting John H. Wigmore, 5 Evidence § 1367, at 29 (3d ed., Little, Brown & Co. 1940)). The Department recognizes the high stakes for all parties involved in a sexual harassment investigation, and recognizes that the need for recipients to reach reliable determinations lies at the heart of Title IX's guarantees for all parties. Indeed, at least one federal circuit court has held that in the Title IX context cross-examination is not just a wise policy, but is a Constitutional requirement of Due Process. *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) ("Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and

determine who can be trusted").

The Department has carefully considered how best to incorporate the value of cross-examination for proceedings at both the postsecondary level and the elementary and secondary level. Because most parties and many witnesses are minors in the elementary and secondary school context, sensitivities associated with age and developmental ability may outweigh the benefits of cross-examination at a live hearing. Proposed section 106.45(b)(3)(vi) allows – but does not require - elementary and secondary schools to hold a live hearing as part of their grievance procedures. With or without a hearing, the complainant and the respondent must have an equal opportunity to pose questions to the other party and to witnesses prior to a determination of responsibility, with each party being permitted the opportunity to ask all relevant questions and follow-up questions, including those challenging credibility, and a requirement that the recipient explain any decision to exclude questions on the basis of relevance. If no hearing is held, each party must have the opportunity to conduct its questioning of other parties and witnesses by submitting written questions to the decision-maker, who must provide the answers to the asking party and allow for additional, limited follow-up questions from each party.

In contrast, the Department has determined that at institutions of higher education, where most parties and witnesses are adults, grievance procedures must include live cross-examination at a hearing. Proposed section 106.45(b)(3)(vii) requires institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses. If a party does not have an advisor at the hearing, the recipient must provide that party an advisor aligned with that party to conduct cross-examination. Cross- examination conducted by the parties' advisors (who may be attorneys) must be permitted notwithstanding the discretion of the recipient under subsection 106.45(b)(3)(iv) to

otherwise restrict the extent to which advisors may participate in the proceedings. In the context of institutions of higher education, the proposed regulation balances the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party. Further, the proposed regulation allows either party to request that the recipient facilitate the parties being located in separate rooms during cross-examination while observing the questioning live via technological means. The proposed regulations thereby provide the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent. *Cf. Baum*, 903 F.3d at 583 ("Universities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment. And in sexual misconduct cases, allowing the accused to cross- examine the accuser may do just that. But in circumstances like these, the answer is not to deny cross-examination altogether. Instead, the university could allow the accused student's agent to conduct cross-examination on his behalf. After all, an individual aligned with the accused student can accomplish the benefits of cross-examination—its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.").

In addition, proposed sections 106.45(b)(3)(vi) and (vii) would set forth a standard for when questions regarding a complainant's sexual behavior may be asked, applicable to all recipients. These sections incorporate language from (and are in the spirit of) the rape shield protections found in Federal Rule of Evidence 412, which is intended to safeguard

complainants against invasion of privacy, potential embarrassment, and stereotyping. *See* Fed. R. Evid. 412 Advisory Committee's Note. As the Court has explained, rape shield protections are intended to protect complainants "from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior." *Michigan v. Lucas*, 500 U.S. 145, 146 (1991). Similarly, proposed sections 106.45(b)(3)(vi) and (vii) would prevent harassing or irrelevant questions about a complainant's sexual behavior or predisposition from being asked. Importantly, these proposed paragraphs also ensure that questions about a complainant's sexual behavior can be asked to prove that someone other than the respondent committed the conduct alleged by the complainant, or when evidence about specific incidents of the complainant's sexual behavior with respect to the respondent is offered to prove consent. Federal Rule of Evidence 412 applies these exceptions to the general prohibition against asking about a complainant's sexual behavior, and for the same reasons, such exceptions promote truth-seeking in campus proceedings.

To maintain a transparent process, the parties need a complete understanding of the evidence obtained by the recipient and how a determination regarding responsibility is made. For that reason, proposed section 106.45(b)(3)(viii) would require recipients to provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including evidence upon which the recipient does not intend to rely in making a determination regarding responsibility. The evidence must also be provided electronically and the parties must be given at least ten days to submit a written response; these requirements will facilitate each party's ability to identify evidence that supports

their position and emphasize such evidence in their arguments to the decision-maker. The scope of the parties' right to inspect and review evidence collected by the recipient is consistent with students' privacy rights under FERPA, under which a student has a right to inspect and review records that directly relate to that student.

Proposed section 106.45(b)(3)(ix) would require recipients to create an investigative report that summarizes relevant evidence and provide a copy of the report to the parties, allowing both parties at least ten days prior to any hearing or other time of determination regarding responsibility the opportunity to respond in writing to the report. These requirements will put the parties on the same level in terms of access to information to ensure that both parties participate in a fair, predictable process that will allow the parties to serve as a check on any decisions the recipient makes regarding the inclusion or relevance of evidence. Notwithstanding the foregoing rights of the parties to review and respond to the evidence collected by the recipient, the recipient must at all times proceed with the burden of conducting the investigation into all reasonably available, relevant evidence; the burden of collecting and presenting evidence should always remain on the recipient and not on the parties.

### C. Standard of evidence

*Section 106.45(b)(4)(i)*

Proposed Regulations: We propose adding section 106.45(b)(4)(i) stating that in reaching a determination regarding responsibility, the recipient must apply either the preponderance of the evidence standard or the clear and convincing evidence standard. The recipient may, however, employ the preponderance of the evidence standard only if

the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

Reasons: The statutory text of Title IX does not dictate a standard of evidence to be used by recipients in investigations of sexual harassment. Past guidance from the Department originally allowed recipients to choose which standard to employ, but was later changed to require recipients to use only the preponderance of the evidence. When the Department issued guidance requiring recipients to use only preponderance of the evidence, it justified the requirement by comparing the grievance process to civil litigation, and to the Department's own process for investigating complaints against recipients under Title IX. Although it is true that civil litigation generally uses preponderance of the evidence, and that Title IX grievance processes are analogous to civil litigation in many ways, it is also true that Title IX grievance processes lack certain features that promote reliability in civil litigation. For example, many recipients will choose not to allow active participation by counsel; there are no rules of evidence in Title IX grievance processes; and Title IX grievance processes do not afford parties discovery to the same extent required by rules of civil procedure.

Moreover, Title IX grievance processes are also analogous to various kinds of civil administrative proceedings, which often employ a clear and convincing evidence standard. *See, e.g., Nguyen v. Washington Dept. of Health*, 144 Wash. 2d 516 (2001) (requiring clear and convincing evidence in sexual misconduct case in a professional

disciplinary proceeding for a medical doctor as a way of protecting due process); *Disciplinary Counsel v. Bunstine,* 136 Ohio St. 3d 276 (2013) (clear and convincing evidence applied in sexual harassment case involving lawyer). These cases recognize that, where a finding of responsibility carries particularly grave consequences for a respondent's reputation and ability to pursue a profession or career, a higher standard of proof can be warranted. Indeed, one court has held that in student disciplinary cases involving serious accusations like sexual assault where the consequences of a finding of responsibility would be significant, permanent, and far-reaching, a preponderance of the evidence standard is inadequate. *Lee v. University of New Mexico*, No. 1:17-cv-01230- JB-LF (D. N.M. Sept. 20, 2018) ("Moreover, the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript").

After considering this issue, the Department decided that its proposed regulation should leave recipients with the discretion to use either a preponderance or a clear and convincing standard in their grievance procedures. The Department does not believe it would be appropriate to impose a preponderance requirement in the absence of all of the features of civil litigation that are designed to promote reliability and fairness. Likewise, the Department believes that in light of the due process and reliability protections afforded under the proposed regulations, it could be reasonable for recipients to choose the preponderance standard instead of the clear and convincing standard, and thus, it is appropriate for the Department to give them the flexibility to do so.

To ensure that recipients do not single out respondents in sexual harassment matters for uniquely unfavorable treatment, a recipient would only be allowed to use the preponderance of the evidence standard for sexual harassment complaints if it uses that standard for other conduct code violations that carry the same potential maximum sanction as the recipient could impose for a sexual harassment conduct code violation. Likewise, to avoid the specially disfavored treatment of student respondents in comparison to respondents who are employees such as faculty members, who often have superior leverage as a group in extracting guarantees of protection under a recipient's disciplinary procedures, recipients are also required to apply the same standard of evidence for complaints against students as they do for complaints against employees, including faculty. In contrast, because of the heightened stigma often associated with a complaint regarding sexual harassment, the proposed regulation gives recipients the discretion to impose a clear and convincing evidence standard with regard to sexual harassment complaints even if other types of complaints are subject to a preponderance of the evidence standard. Within these constraints, the proposed regulation recognizes that recipients should be able to choose a standard of proof that is appropriate for investigating and adjudicating complaints of sex discrimination given the unique needs of their community.

### D. Additional requirements for grievance procedures

*Section 106.45(b)(4) Determination regarding responsibility*

Proposed Regulations: We propose adding section 106.45(b)(4) stating that the decision-maker(s), who cannot be the same person(s) as the Title IX Coordinator or the

investigator(s), must issue a written determination regarding responsibility applying the appropriate standard of evidence as discussed above.

The written determination must include—

(A)    Identification of the section(s) of the recipient's code of conduct alleged to have been violated;

(B)    A description of the procedural steps taken from the receipt of the complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(C)    Findings of fact supporting the determination;

(D) Conclusions regarding the application of the recipient's policy to the facts;

(E) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any sanctions the recipient imposes on the respondent, and any remedies provided to the complainant designed to restore or preserve access to the recipient's education program or activity; and

(F) The recipient's procedures and permissible bases for the complainant and respondent to appeal.

The recipient must provide the written determination to the parties simultaneously. If the recipient does not offer an appeal, the determination regarding responsibility becomes final on the date that the recipient provides the parties with the written determination. If the recipient offers an appeal, the determination regarding responsibility becomes final at either the conclusion of the appeal process, if an appeal is filed, or, if an appeal is not filed, the date on which an appeal would no longer be considered timely.

Reasons: Proposed section 106.45(b)(4) would address the process that recipients use to make determinations regarding responsibility, with requirements designed to ensure that recipients make sound and supportable decisions through a process that incorporates appropriate protections for all parties while providing adequate notice of such decisions. Requiring the decision-maker to be different from any person who served as the Title IX Coordinator or investigator forecloses a recipient from utilizing a "single investigator" or "investigator-only" model for Title IX grievance processes. The Department believes that fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person. Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (e.g., a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

To foster reliability and thoroughness and to ensure that a recipient's findings are adequately explained, proposed section 106.45(b)(4)(i) would require recipients to issue a written determination regarding responsibility. So that the parties have a complete understanding of the process and information considered by the recipient to reach its decision, proposed section 106.45(b)(4)(ii) would require the notice of determination to include: the sections of the recipient's code of conduct alleged to have been violated; the procedural steps taken from the receipt of the complaint through the determination; findings of fact supporting the determination; conclusions regarding the application of the

recipient's policy to the facts; a statement of, and the recipient's rationale for, the result, including a determination regarding responsibility; any sanctions the recipient imposes on the respondent; and information regarding the appeals process and the recipient's procedures and permissible bases for the complainant and respondent to appeal.

Proposed section 106.45(b)(4)(ii)(E) requires that the written determination contain a statement of, and rationale for, the result, including any sanctions imposed by the recipient and any remedy given to the complainant. Proposed section 106.45(b)(4)(iii) requires that this written determination be provided simultaneously to the parties. These provisions generally track the language of the Clery Act regulations at 34 CFR 668.46(k)(2)(v) and (3)(iv) already applicable to institutions of higher education. The Department believes that the benefits of these provisions, including promoting transparency and equal treatment of the parties, are equally applicable at the elementary and secondary level.

Proposed section 106.45(b)(4)(iii) instructs recipients to provide the written determination simultaneously to both parties so that both parties know the outcome and, if an appeal is available, both parties have equal opportunity to consider filing an appeal. If the recipient does not offer an appeal, the determination regarding responsibility becomes final on the date that the recipient provides the parties with the written determination. If the recipient offers an appeal, the determination regarding responsibility becomes final when the appeal process is concluded, or if no appeal is filed, on the date on which an appeal would not be timely under the recipient's designated time frames. Once the determination regarding responsibility has become final, in cases where the

respondent is found responsible, the recipient must promptly implement remedies designed to help the complainant maintain equal access to the recipient's educational programs, activities, benefits, and opportunities. In cases where the respondent is found not responsible, no remedies are required for the complainant, although a recipient may continue to offer supportive measures to either party.

*Section 106.45(b)(5) Appeals*

Proposed Regulations: We propose adding section 106.45(b)(5) stating that a recipient may choose to offer an appeal. If a recipient offers an appeal, it must allow both parties to appeal. In cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent. As to all appeals, the recipient must: (i) notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties; (ii) ensure that the appeal decision-maker is not the same person as any investigator(s) or decision-maker(s) that reached the determination regarding responsibility; (iii) ensure that the appeal decision-maker complies with the standards set forth in section 106.45(b)(1)(iii); (iv) give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome; (v) issue a written decision describing the result of the appeal and the rational for the result; and (vi) provide the written decision simultaneously to both parties.

Reasons: Many recipients offer an appeal from the outcome of a Title IX grievance process. After extensive stakeholder engagement on the subject of school-level appeals, the Department believes that by offering that opportunity to both parties, recipients will

be more likely to reach sound determinations, giving the parties greater confidence in the ultimate outcome. Complainants and respondents have different interests in the outcome of a sexual harassment complaint. Complainants "have a right, and are entitled to expect, that they may attend [school] without fear of sexual assault or harassment," while for respondents a "finding of responsibility for a sexual offense can have a lasting impact on a student's personal life, in addition to [the student's] educational and employment opportunities[.]" *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400, 403 (6th Cir. 2017) (internal quotation marks and citations omitted). Although these interests differ, each represents high-stakes, potentially life-altering consequences deserving of an accurate outcome. *See id.* at 404 (recognizing that the complainant "deserves a reliable, accurate outcome as much as" the respondent). The Department proposes that where a recipient offers an appeal, such appeal should be equally available to both parties, reflecting that each party has an important stake in the reliability of the outcome. Importantly, the proposed regulation notes that in cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent. *See e.g.*, *Davis*, 526 U.S. at 648 ("the dissent erroneously imagines that victims of peer harassment now have a Title IX right to make particular remedial demands."); *Stiles ex rel. D.S. v. Grainger Co., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) ("Title IX does not give victims a right to make particular remedial demands.") (internal quotations omitted); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167-68 (5th Cir. 2011) ("Schools are not required to . . . accede to a parent's remedial demands") (internal

citations omitted).

Similarly to the initial investigation and adjudication, the recipient must ensure that any appeal process is conducted in a timely manner and gives both parties an equal opportunity to argue for or against the outcome. Like any of the recipient's Title IX Coordinators, investigators, or decision-makers, the appeal decision-maker must be free from bias or conflicts of interest, and must be trained on the definition of sexual harassment and the recipient's grievance process using training materials that promote impartial decision-making and are free from sex stereotypes. When designating reasonable timeframes for the filing and resolution of appeals, recipients should endeavor to permit parties sufficient time to file an appeal and submit written arguments, yet resolve the appeal process as expeditiously as possible to provide finality of the grievance process for the benefit of all parties.

*Section 106.45(b)(6) Informal resolution*

Proposed Regulations: We propose adding section 106.45(b)(6) stating that at any time prior to reaching a determination regarding responsibility the recipient may facilitate an informal resolution process, such as mediation, that does not involve a full investigation and adjudication, provided that the recipient provides to the parties a written notice disclosing—

(A)　The allegations;

(B)　The requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations, if any; and

(C)　Any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared.

The recipient must also obtain the parties' voluntary, written consent to the informal resolution process.

Reasons: As mentioned previously, the proposed regulations reflect the Department's recognition that recipients' good judgment and common sense are important elements of a response to sex discrimination that meets the requirements of Title IX. The Department also recognizes that in responding to sexual harassment, it is important to take into account the needs of the parties involved in each individual case, some of whom may prefer not to go through a formal complaint process. Recognizing these factors, proposed section 106.45(b)(6) would permit recipients to facilitate an informal resolution process of an allegation of sexual harassment at any time prior to issuing a final determination regarding responsibility, if deemed appropriate by the recipient and the parties. To ensure that the parties do not feel forced into an informal resolution by a recipient, and to ensure that the parties have the ability to make an informed decision, proposed paragraph (b)(6)(i) would require recipients to inform the parties in writing of the allegations, the requirements of the informal resolution process, and any consequences resulting from participating in the informal process. For example, the recipient would need to explain to the parties if one or more available informal resolution options would become binding on the parties at any point, as is often the case with arbitration-style processes, or if the process would remain non-binding throughout, as is often the case with mediation-style processes. Informal resolution options may lead to more favorable outcomes for everyone involved, depending upon factors such as the age, developmental level, and other capabilities of the parties; the knowledge, skills, and experience level of those facilitating or conducting the informal resolution process; the severity of the misconduct alleged; and likelihood of recurrence of the misconduct. Proposed paragraph (b)(6)(ii) would require the recipient to obtain voluntary, written consent from the parties in advance of any informal resolution process in order to ensure that no party is

involuntarily denied the protections that would otherwise be provided by these regulations.

*Section 106.45(b)(7) Recordkeeping*

Proposed Regulations: We propose adding section 106.45(b)(7) stating that a recipient must create, make available to the complainant and respondent, and maintain for a period of three years records of—

(A)    The sexual harassment investigation, including any determination regarding responsibility, disciplinary sanctions imposed on the respondent, and remedies provided to the complainant;

(B) Any appeal and the result therefrom;

(C) Informal resolution, if any; and\

(D)    All materials used to train coordinators, investigators, decision-makers with regard to sexual harassment.

This provision would also provide that a recipient must create and maintain for a period of three years records of any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment. In each instance, the recipient must document the basis for its conclusion that its response was not clearly unreasonable, and document that it has taken measures designed to restore or preserve

access to the recipient's educational program or activity. The documentation of certain bases or measures does not limit the recipient in the future from providing additional explanations or detailing additional measures taken.

Reasons: To ensure that the parties, the Department, and recipients have access to relevant information for an appropriate period of time following the completion of the grievance procedure process, proposed section 106.45(b)(7) would address the recordkeeping requirements related to formal complaints of sexual harassment with which recipients must comply. These requirements would benefit complainants and respondents by empowering them to more effectively hold their recipient schools and institutions accountable for Title IX compliance by ensuring the existence of records that could be used during an investigation by the Department or in private litigation. We believe the required three-year retention period is sufficient to allow the Department and the parties to ensure compliance with the proposed regulations, but we specifically seek comment on the appropriate period for retention in a directed question below. During the record retention period, these records would continue to be subject to the applicable provisions of FERPA, as discussed below.

### III.     Clarifying amendments to existing regulations

*Remedial and affirmative action and self-evaluation (Current section 106.3(a) and Proposed section 106.3(a))*

Statute: The statute does not directly address the issue of particular types of remedies, beyond the statement that compliance may be effected by a withdrawal of federal funding or "by any other means authorized by law." 20 U.S.C. 1682. The Secretary has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving federal financial assistance specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

Current Regulations: Current section 106.3(a) provides that if the Assistant Secretary for Civil Rights finds that a recipient has discriminated against a person on the basis of sex in an education program or activity, the recipient shall be required to take remedial action that the Assistant Secretary deems necessary "to overcome the effects of such discrimination."

Proposed Regulations: We propose modifying the language to apply to any violation of part 106 and adding language to section 106.3(a) stating that the remedial action deemed necessary by the Assistant Secretary shall not include assessment of damages.

Reasons: The proposed changes would clarify, consistent with the Supreme Court's case law in this area and mindful of the difference between a private right of action opening the door to damages assessed by a court and the Department's role administratively enforcing Title IX without express statutory authority to collect damages, that the Assistant Secretary shall not assess damages against a recipient. *Gebser*, 524 U.S. at 288– 89 ("While agencies have conditioned continued funding on providing equitable relief to the victim, the regulations do not appear to contemplate a condition ordering payment of monetary damages, and there is no indication that payment of damages has been demanded as a condition of finding a recipient to be in compliance with the statute") (internal citation omitted).

For example, if a student entitled to speech therapy under her Individualized Education Program (IEP) complains that a school district did not provide the therapy, the Department may permissibly require that the school district reimburse the parents for

their reasonable and documented expenses for obtaining services that that the school district was required to provide. *Cf. Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985) ("[T]he Town repeatedly characterizes reimbursement as 'damages,' but that simply is not the case. Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP."). Likewise, in the context of Title IX, if a recipient allowed male students with athletic scholarships to retain their scholarships even if they are removed from the team or stop participating on the team, but did not allow female students the same ability to retain their scholarship, the Department could require a recipient to come into compliance with Title IX by restoring the relevant scholarship, even though the restoration will require the payment of monies by the recipient. *See, e.g., Romeo Community Schools v. United States Dep't of Health, Education & Welfare*, 600 F.2d 581, 583 (6th Cir. 1979) (emphasis added) ("Romeo received a letter from the regional director of HEW demanding that it alter its practices with respect to pregnancy leave to conform to § 86.57(c) and reimburse and adjust the salaries and retirement credits of any employees who had not been permitted to use accrued sick leave while on pregnancy related leave since June 23, 1972. The letter from HEW also required assurances from Romeo that it would comply with § 86.57, and that reimbursement had been made."). Thus, in those narrow instances where a failure to pay a specific amount for a specific purpose constitutes the crux of the violation, the resolution can include a monetary payment and still be an equitable remedy squarely tied to the violation the Department identified. Notably, this proposed modification does not affect the Department's statutory authority to suspend or terminate federal funding from a recipient

74

that has violated Title IX and refused to come into compliance.

*Effect of other requirements and preservation of rights (Current section 106.6 and Proposed section 106.6)*

Statute: The statute does not directly address the effect of other requirements or the preservation of rights. The Secretary has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving federal financial assistance specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

Current Regulations: Current section 106.6 provides that the obligations under the Title

IX regulations do not alter obligations not to discriminate on the basis of sex under other specified laws and Executive Orders, and the obligation to comply with Title IX is not obviated or alleviated by State or local laws or by a rule or regulation of any organization, club, or league.

*Section 106.6(d) Constitutional protections*

Proposed Regulations: We are proposing to add paragraph (d) to section 106.6 to affirm that nothing in 34 CFR part 106 requires a recipient to: restrict any rights that are protected from governmental action by the First Amendment of the U.S. Constitution; deprive an individual of rights that would otherwise be protected from governmental action under the Due Process Clauses of the Fifth and Fourteenth Amendments; or restrict any other rights guaranteed against governmental action by the U.S. Constitution.

Reasons: Despite the language in current section 106.6 and the discussions in Department guidance regarding the due process protections for public school students and employees and free speech rights under the First Amendment (2001 Guidance at 22) there appears to be significant confusion regarding the intersection of individuals' rights under the U.S. Constitution with a recipient's obligations under Title IX. In particular, during listening sessions the Department

75

heard concerns that Title IX enforcement has had a chilling effect on free speech. We are proposing to add paragraph (d) to clarify that nothing in these regulations requires a recipient to infringe upon any individual's rights protected under the First Amendment or the Due Process Clauses, or other any other rights guaranteed by the U.S. Constitution. The language also makes it clear that, under the Title IX regulations, recipients – including private recipients – are not obligated by Title IX to restrict speech or other behavior that the federal government could not restrict directly. Consistent with Supreme Court case law, the government may not compel private actors to restrict conduct that the government itself could not constitutionally restrict. *See e.g.*, *Peterson v. City of Greenville*, 373 U.S. 244 (1963); *Truax v. Raich*, 239 U.S. 33, 38 (1915). Thus, recipients that are private entities are not required by Title IX or its regulations to restrict speech or other behavior that would be protected against restriction by governmental entities. This protection against governmental restrictions on constitutional rights applies to all the civil rights laws that Department enforces, but we are adding paragraph (d) to the Title IX regulations because the issue arises frequently in the context of sexual harassment. When the Department enforces Title IX and its accompanying regulations, the constitutional rights of individuals involved in a recipient's grievance process will always be considered and protected.

*Section 106.6(e) Interaction with FERPA*

Proposed Regulations: We are also proposing to add paragraph (e) to section 106.6 to clarify that obligations under this part are not obviated or alleviated by the requirements in the FERPA statute or regulations.

Reasons: In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of . . . title IX of the Education Amendments of 1972 . . . ." 20 U.S.C. 1221(d). The proposed regulations under

Title IX should be read to be consistent with a recipient's obligations under FERPA.

*Section 106.6(f) Interaction with Title VII*

Proposed Regulations: We are also proposing to add paragraph (f) to section 106.6 to clarify that nothing in the proposed regulations shall be read in derogation of an employee's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* and its implementing regulations.

Reasons: Employees of a school may have rights under both Title IX and Title VII. To the extent that any rights, remedies, or procedures differ under Title IX and Title VII, this provision clarifies that nothing about the proposed regulations is intended to diminish, restrict, or lessen any rights an employee may have against his or her school under Title VII.

*Designation of coordinator, dissemination of policy, adoption of grievance procedures (Current sections 106.8 and 106.9 and Proposed section 106.8)*

Statute: The statute does not directly address the designation of a Title IX Coordinator, the dissemination of policy, or the adoption of grievance procedures. The Secretary has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving federal financial assistance, specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

Current Regulations: Current section 106.8(a) requires a recipient to designate at least one employee to be the "responsible employee" who has the duty to coordinate the recipient's efforts to comply with and carry out its responsibilities under the regulations, including any investigation of any complaint alleging a recipient's noncompliance with, or actions which would be prohibited by, 34 CFR part 106. Section 106.8(a) also requires recipients to notify all students and employees of the name, office address, and telephone number of such employee or employees.

34 CFR 106.8(b) requires recipients to adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination.

34 CFR 106.9(a)(1) requires recipients to notify applicants for admission and employment, students and parents of elementary and secondary school students, employees, sources of referral for applicants for admission and employment, and unions or professional organizations holding collective bargaining agreements or professional agreements with the recipient that it does not discriminate on the basis of sex in the education program or activity which it operates. Such notice must state that inquiries about the application of Title IX may be referred to the employee designated pursuant to section 106.8, or to the Assistant Secretary.

34 CFR 106.9(b) lists the types of publications where the recipient shall publish its nondiscrimination policy, and 34 CFR 106.9(c) specifies the manner of distribution of such publications.

Proposed Regulations: We are proposing to clarify the requirements of 34 CFR 106.8(a).

Proposed section 106.8(a) would state that the designated individual is referred to as the "coordinator," and would alter the required methods for notification. Proposed section 106.8(a) would also remove potentially unclear language in the existing regulation that could be read to require that the coordinator must be the one that handles the investigations and otherwise directly carries out the recipient's responsibilities.

We also propose moving the "notification of policy" requirement in current section 106.9(a)(1) to proposed section 106.8(b)(1). Proposed section 106.8(b)(1) would streamline the list of people whom recipients must notify of its policy of non- discrimination based on sex, and clarify that such a notice must state that inquiries about application of Title IX to

78

the recipient may be made to the recipient's Title IX Coordinator or the Assistant Secretary, or to both.

Proposed section 106.8(b)(2) requires recipients to prominently display their Title IX non-discrimination policy on their website (if any) and in each handbook or catalog that it makes available to the list of people who must be notified in paragraph (b)(1), and prohibits recipients from using or distributing publications stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such different treatment is permitted by this part.

We also propose moving the requirements in current 34 CFR 106.8(b) to proposed section 106.8(c), with modifications as proposed below. Proposed section 106.8(c) would clarify that with respect to sexual harassment, the grievance procedures requirements specifically apply to formal complaints as defined in section 106.44(e)(5). Proposed section 106.8(c) would also require recipients to provide notice of their grievance procedures to students and employees.

We also propose adding paragraph (d) to section 106.8 to clarify that the policy and grievance procedures described in this section need not apply to persons outside the United States.

Reasons: Proposed section 106.8(a) would reflect the current reality of Title IX compliance – namely, that recipients generally name a Title IX Coordinator and designate that individual to coordinate their efforts to comply with Title IX. It appears that the phrase "and carry out" in the existing regulation could be read to suggest that the Title IX Coordinator must be the one who carries out the recipient's duties under Title IX, rather than allowing the coordinator to coordinate the actions of others in carrying out those duties. Since the phrase is redundant and can be confusing, we propose removing it. In addition, in light of the expansion of the regulations

79

elsewhere to expressly cover investigations of Title IX complaints, the language specifically including coordination of such investigations in the responsibilities of the designated individual would no longer be necessary, and would therefore be removed.

Proposed section 106.8(a) would also modernize the notification requirements to better ensure that students and employees are aware of how to contact a recipient's Title IX Coordinator. Given the changes in methods of communication since the regulations were issued in 1975, the proposed amendments would require the recipient to notify students and employees of the electronic mail address of the employee or employees designated as Title IX Coordinators, in addition to providing the coordinator's office address and phone number. To alleviate the administrative and financial burden on a recipient to provide a new notice every time it designates an additional or different coordinator, the proposed amendments permit recipients to provide notice of a coordinator's name and contact information or, alternatively, simply a title with an established method of contacting the coordinator that does not change as the identity of the coordinator changes. The Department solicits comments on whether larger institutions of higher education should have a minimum number of individuals with whom individuals can file a complaint of sex discrimination.

Proposed section 106.8(b)(2) would require recipients to prominently display their non-discrimination policy on their websites, if any, and in each handbook or catalog made available to the list of people to whom notice must be sent under paragraph (b)(1). Proposed section 106.8(b)(2) streamlines the list of required publications that must display the recipient's Title IX non-discrimination policy, to reduce the burden on recipients (including the requirement for distribution of written publications included in current 106.9(c)) while still ensuring that the policy is adequately communicated to all required persons, in light of

the reality that most recipients have websites where the non- discrimination policy would have to be prominently displayed. In addition, proposed section 106.8(b)(2) would replace the existing restriction on publications that *suggest* a policy of sex discrimination (either by text or illustration) with a restriction on publications that *state* a policy of sex discrimination. This change would remove the subjective determination of whether the illustrations in a publication could be construed to suggest a policy of sex discrimination and instead focus the requirement on recipients' express statements of policy. As a result, the requirement would be more clear, both for recipients seeking to comply with the requirement and for those enforcing the requirement. Because most recipients have websites on which they must display their Title IX non-discrimination policy pursuant to proposed section 106.8(b)(2), proposed section 106.8(b)(1) streamlines the list of people to whom the recipient must send notice of its policy. Applicants for admission and employment, students, employees, and employee unions and professional organizations must receive the notice under proposed section 106.8(b)(2).

Proposed section 106.8(d) would clarify that the recipient's policy and grievance procedures apply to all students and employees located in the United States with respect to allegations of sex discrimination in an education program or activity of the recipient. The statutory language of Title IX limits its application to protecting "person[s] in the United States." 20 U.S.C. 1681(a).

*Educational institutions controlled by religious organizations (Current and Proposed section 106.12)*

Statute: The statute addresses educational institutions controlled by religious organizations, stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be

consistent with the religious tenets of such organization," 20 U.S.C. § 1681(a)(3), and that the term "program or activity" "does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization," 20

U.S.C. § 1687.

Current Regulations: Current 34 CFR 106.12(a) provides an exemption for educational institutions controlled by a religious organization, to the extent that application of the regulation would be inconsistent with the religious tenets of the organization. To claim this exemption, section 106.12(b) requires recipients to submit a letter to the Assistant Secretary stating which parts of the regulation conflict with a specific tenet of the religion.

Proposed Regulations: We propose revising section 106.12(b) to clarify that an educational institution may – but is not required to – seek assurance of its religious exemption by submitting a written request for such an assurance to the Assistant Secretary. Further, section 106.12(b) is revised to state that even if an institution has not sought assurance of its exemption, the institution may still invoke its religious exemption during the course of any investigation pursued against the institution by the Department.

Reasons: The current regulations suggest that the recipients may only claim the exemption from paragraph (a) by submitting a letter to the Assistant Secretary. The additional language clarifying that the letter to the Assistant Secretary is not required to assert the exemption brings the regulatory language into alignment with longstanding Department practice. The statutory text of Title IX offers an exemption to religious entities without expressly requiring submission of a letter, and the Department believes such a requirement is unnecessary. The Department should not impose confusing or burdensome requirements on religious institutions that qualify for the exemption.

82

*Exercise of rights by parents/guardians of students*

The Department recognizes that when a party is a minor, has been appointed a guardian, is attending an elementary or secondary school, or is under the age of 18, recipients have the discretion to look to state law and local educational practice in determining whether the rights of the party shall be exercised by the parent(s) or guardian(s) instead of or inaddition to the party. For example, if the parent or guardian of a minor student at an elementary or secondary school files a complaint on behalf of the student, and state law and local educational practice recognize the parent or guardian as the appropriate person to exercise that student's legal rights, the student would be a "complainant" under the proposed regulation even though the action of filing the complaint was taken by the parent or guardian instead of the student.

**Directed Questions**

The Department seeks additional comments on the questions below:

1. **Applicability of the rule to elementary and secondary schools**. The proposed rule would apply to all recipients of federal financial assistance, including institutions of higher education and elementary and secondary schools. The Department is interested in whether there are parts of the proposed rule that will be unworkable at the elementary and secondary school level, if there are additional parts of the proposed rule where the Department should direct recipients to take into account the age and developmental level of the parties involved and involve parents or guardians, and whether there are other unique aspects of addressing sexual harassment at the elementary and secondary school level that the Department should consider, such as systemic differences between institutions of higher education and elementary and secondary schools.

2. **Applicability of provisions based on type of recipient or age of parties.** Some

aspects of our proposed regulations, for instance, the provision regarding a safe harbor in the absence of a formal complaint in proposed section 106.44(b)(3) and the provision regarding written questions or cross examination in proposed section 106.45(b)(3)(vi) and (vii), differ in applicability between institutions of higher education and elementary and secondary schools. We seek comment on whether our regulations should instead differentiate the applicability of these or other provisions on the basis of whether the complainant and respondent are 18 or over, in recognition of the fact that 18-year-olds are generally considered to be adults for many legal purposes.

3. **Applicability of the rule to employees**. Like the existing regulations, the proposed regulations would apply to sexual harassment by students, employees, and third parties. The Department seeks the public's perspective on whether there are any parts of the proposed rule that will prove unworkable in the context of sexual harassment by employees, and whether there are any unique circumstances that apply to processes involving employees that the Department should consider.

4. **Training**. The proposed rule would require recipients to ensure that Title IX Coordinators, investigators, and decision-makers receive training on the definition of sexual harassment, and on how to conduct an investigation and grievance process, including hearings, that protect the safety of students, ensures due process for all parties, and promotes accountability. The Department is interested in seeking comments from the public as to whether this requirement is adequate to ensure that recipients will provide necessary training to all appropriate individuals, including those at the elementary and secondary school level.

5. **Individuals with disabilities**. The proposed rule addresses the rights of students with disabilities under the IDEA, Section 504, and Title II of the ADA in the context of

emergency removals (proposed section 106.44(c)). The Department is interested in comments from the public as to whether the proposed rule adequately takes into account other issues related to the needs of students and employees with disabilities when such individuals are parties in a sex discrimination complaint, or whether the Department should consider including additional language to address the needs of students and employees with disabilities as complainants and respondents. The Department also requests consideration of the different experiences, challenges, and needs of students with disabilities in elementary and secondary schools and in postsecondary institutions related to sexual harassment.

6. **Standard of Evidence**. In section 106.45(b)(4)(i), we are proposing that the determination regarding responsibility be reached by applying either a preponderance of the evidence standard or the clear and convincing standard, and that the preponderance standard be used only if it is also used for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. We seek comment on (1) whether it is desirable to require a uniform standard of evidence for all Title IX cases rather than leave the option to schools to choose a standard, and if so then what standard is most appropriate; and (2) if schools retain the option to select the standard they wish to apply, whether it is appropriate to require schools to use the same standard in Title IX cases that they apply to other cases in which a similar disciplinary sanction may be imposed.

**7. Potential clarification regarding "directly related to the allegations" language.**
Proposed section 106.45(b)(3)(viii) requires recipients to provide each party with an equal opportunity to inspect and review any evidence directly related to the allegations obtained as part of the investigation, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, and provide each party with an equal

85

opportunity to respond to that evidence prior to completion of the investigative report. The "directly related to the allegations" language stems from requirements in FERPA, 20 U.S. Code § 1232g(a)(4)(A)(i). We seek comment on whether or not to regulate further with regard to the phrase, "directly related to the allegations" in this provision.

8.   **Appropriate time period for record retention.** In section 106.45(b)(7), we are proposing that a recipient must create, make available to the complainant and respondent, and maintain records for a period of three years. We seek comments on what the appropriate time period is for this record retention.

9.   **Technology needed to grant requests for parties to be in separate rooms at live hearings.** In section 106.45(b)(3)(vii) we require institutions of higher education to grant requests from parties to be in separate rooms at live hearings, with technology enabling the decision-maker and parties to see and hear each other simultaneously. We seek comments on the extent to which institutions already have and use technology that would enable the institution to fulfill this requirement without incurring new costs or whether institutions would likely incur new costs associated with this requirement.

### Executive Orders 12866 and 13563

*Regulatory Impact Analysis (RIA)*

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1)   Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or

safety, or State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2)     Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3)     Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4)     Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

Under Executive Order 12866, section 3(f)(1), the changes made in this regulatory action materially alter the rights and obligations of recipients of federal financial assistance under Title IV of the Higher Education Act of 1965 (Title IV). Therefore, the Secretary certifies that this is a significant regulatory action subject to review by OMB. Also under Executive Order 12866 [14]and the Presidential Memorandum "Plain Language in Government Writing," the Secretary invites comment on how easy these regulations are to understand in the Clarity of the Regulations section.

Under Executive Order 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under Executive Order 12866 and that imposes total costs greater than zero, it must identify two deregulatory actions. For FY 2019, no regulations exceeding the agency's total incremental cost allowance will be permitted, unless required by law or approved in writing by the Director of the Office of Management and Budget. The proposed regulations are a significant regulatory action under EO 12866 but do not impose total costs greater than zero. Accordingly, the Department is not required to identify two deregulatory actions under

---

[14] Exec. Order No. 12866, Regulatory Planning and Review, 58 Fed. Reg. 190 (Oct. 4, 1993), www.reginfo.gov/public/jsp/Utilities/EO_12866.pdf.

EO 13771.[15]

We have also reviewed these proposed regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency--

(1)     Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2)     Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account--among other things and to the extent practicable--the costs of cumulative regulations;

(3)     In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4)     To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5)     Identify and assess available alternatives to direct regulation, including economic incentives--such as user fees or marketable permits--to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from

---

[15] Exec. Order No. 13771, Reducing Regulation and Controlling Regulatory Costs, 82 Fed. Reg. 22 (Jan. 30, 2017), www.gpo.gov/fdsys/pkg/FR-2017-02-03/pdf/2017-02451.pdf.

technological innovation or anticipated behavioral changes."

We are issuing these proposed regulations only on a reasoned determination that their benefits justify their costs. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or tribal governments in the exercise of their governmental functions.

In this RIA we discuss the need for regulatory action, the potential costs and benefits, assumptions, limitations, and data sources, as well as regulatory alternatives we considered. Although the majority of the costs related to information collection are discussed within this RIA, elsewhere in this notice under Paperwork Reduction Act of 1995 we also identify and further explain burdens specifically associated with information collection requirements.

### 1. Need for Regulatory Action

Based on its extensive review of the critical issues addressed in this rulemaking, the Department has determined that current regulations and guidance do not provide sufficiently clear standards for how recipients must respond to incidents of sexual harassment, including defining what conduct constitutes sexual harassment. To address this concern, we propose this regulatory action to address sexual harassment under Title IX for the central purpose of ensuring that recipients understand their legal obligations, including what conduct is actionable as harassment under Title IX, the conditions that activate a mandatory response by the recipient, and particular requirements that such a response must meet in order to ensure that the recipient is protecting the rights of all its students to equal access to education free from sex discrimination.

In addition to addressing sexual harassment, the Department has concluded it is also necessary to amend three parts of the existing regulations that apply to all sex

discrimination under Title IX. We propose expressly stating that Title IX does not require recipients to infringe upon existing constitutional protections, that the Department may not require money damages as a remedy for violations under Title IX, and that recipients that qualify for a religious exemption under Title IX need not submit a letter to the Department as a prerequisite to claiming the exemption.

2. Discussion of Costs, Benefits, and Transfers

The Department has analyzed the costs and benefits of complying with these proposed regulations. Due to the number of affected entities, the variation in likely responses, and the limited information available about current practices, particularly at the local educational agency (LEA) level, we cannot estimate the likely effects of these proposed regulations with absolute precision. The Department specifically invites public comment on: data sources which would provide comprehensive information regarding current practices in Title IX enforcement, information regarding the number of recipients in each analytical group described in section 4.b below, and time estimates for the activities described in 4.c disaggregated by type of recipient. Despite these limitations, we estimate that these regulations would result in a net cost savings of between $286.4 million to

$367.7 million over ten years.

3. Benefits of the Proposed Regulations

The proposed regulatory action will result in recipients better understanding their legal obligations to address sexual harassment under Title IX by providing a legal framework for recipients' responses to sexual harassment that ensures all reports of sexual harassment are treated seriously and all persons accused are given due process protections before being disciplined for sexual harassment. The proposed regulatory action will correct problems identified by the Department with the current framework governing sexual harassment

90

(under current regulations and guidance), such as recipients not understanding their duties and responsibilities and a lack of robust due process protections in recipient grievance procedures under Title IX. In addition, the proposed regulatory action will correct capturing too wide a range of misconduct resulting in infringement on academic freedom and free speech.

### 4. Costs of the Proposed Regulations

These proposed regulations would among other things: define sexual harassment for Title IX purposes; clarify when a recipient's obligation to investigate a complaint of sexual harassment is activated; define the minimum requirements of grievance procedures for Title IX purposes; establish a process for informal resolution of sexual harassment claims; and require appropriate documentation of all Title IX complaints and investigations.

Prior to discussing the Department's estimates, we believe it is important to emphasize that these estimates are not an attempt to quantify the economic effects of sexual harassment, broadly, or sexual assault, specifically. Other studies[16] have attempted to quantify such costs and, while incidents of sexual assault may have real economic consequences, these estimates are only intended to capture the economic impacts of this proposed regulatory action. The Department does not believe it is reasonable to assume that these proposed regulations will have a quantifiable effect on the underlying rate of sexual harassment occurring in the education programs or activities of recipients. As a result, we do not attempt to capture costs that arise out of the underlying incidents themselves, but rather those associated with the actions prescribed by the proposed regulations and the likely response of regulated entities to those proposed requirements.

### 4.a. Establishing a Baseline

---

[16] *See, e.g..*, Cora Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 AM. J. OF PREVENTATIVE MED. 691 (2017).

To accurately estimate the costs of these proposed regulations, the Department needed to establish an appropriate baseline for current practice. In doing so, it was necessary to know the current number of Title IX investigations occurring in LEAs and institutions of higher education (IHEs) eligible for Title IV federal funding. In 2014, the U.S. Senate Subcommittee on Financial and Contracting Oversight released a report [17] which included survey data from 440 four-year IHEs regarding the number of investigations of sexual violence that had been conducted during the previous five year period. Two of the five possible responses to the survey were definite numbers (0, 1), while the other three were ranges (2-5, 6-10, >10). Responses were also disaggregated by size of institution (Large, Medium, or Small). Although the report does not clearly identify a definition of "sexual violence" provided to survey respondents, the term would appear to capture only a subset of the types of incidents that may result in a Title IX investigation. Indeed, when the Department examined public reports of Title IX reports and investigations at 55 IHEs nationwide, incidents of sexual misconduct represented, on average, 45 percent of investigations conducted. Further, a number of the types of incidents that were categorized as "sexual misconduct" in those reports may, or may not, have been categorized as "sexual violence," depending on the survey respondent. To address the fact that the subcommittee report may fail to capture all incidents of sexual misconduct at responding IHEs, the Department first top-coded the survey data. To the extent that survey respondents treated the terms "sexual misconduct" and "sexual violence" interchangeably, this top-coding approach may result in an overestimate of the number of sexual misconduct investigations conducted at institutions. By top-coding the ranges (e.g., "5" for any respondent indicating "2-5") and assuming 50 investigations for any respondent indicating more than 10 investigations, the

---

[17] CLAIRE MCCASKILL, S. SUBCOMM. ON FINANCIAL CONTRACTING OVERSIGHT – MAJORITY STAFF, SEXUAL VIOLENCE ON CAMPUS, 113th Cong. (2014), https://www.mccaskill.senate.gov/SurveyReportwithAppendix.pdf.

Department was able to estimate the average number of sexual misconduct investigations conducted by four-year institutions in each size category. We then divided this estimate by five to arrive at an estimated number of investigations per year. To address the fact that incidents of sexual misconduct only represent a subset of all Title IX investigations conducted by IHEs in any given year, we then multiplied this result by two, assuming (consistent with our convenience sample of public Title IX reporting) that sexual misconduct investigations represented approximately 50 percent of all Title IX investigations conducted by institutions.

Because the report only surveyed four-year institutions, the Department needed to impute similar data for two-year and less-than-two-year institutions, which represent approximately 57 percent of all Title IV-eligible institutions. In order to do so, the Department analyzed sexual offenses reported under the Clery Act and combined those data with total enrollment information from the Integrated Postsecondary Education Data System (IPEDS) for all Title IV-eligible institutions within the United States. Assuming that the number of reports of sexual offenses under the Clery Act is positively correlated with the number of investigations, the Department arrived at a general rate of investigations per reported sexual offense at four-year IHEs by institutional enrollment. These rates were then applied to two-year and less-than-two-year institutions within the same category using the average number of sexual offenses reported under the Clery Act for such institutions to arrive at an average number of investigations per year by size and level of institution. These estimates were then weighted by the number of Title IV- eligible institutions in each category to arrive at an estimated average 2.36 investigations of sexual harassment per IHE per year.[18] To the extent that the number of investigations and the number of Clery Act reports of sexual

---

[18] To determine the sensitivity of this estimate to our coding of the survey data, the Department also conducted these analyses by coding the data using medians for each range (e.g., 3.5 for the "2-5" range) with a code of 30 for the ">10" group and by top-coding using a 100 for the ">10" group. These alternative approaches would result in baseline estimates ranging from 1.48 to 4.31 investigations per year per IHE.

offenses are not uniformly correlated across types of institutions (i.e., less-than-two-year, two-year, and four-year), this may represent an over- or-under-estimate of the actual number of investigations per IHE per year. We invite the public to provide any pertinent evidence on determining investigations of sexual harassment per IHE per year to improve our baseline estimates.

The Department does not have information on the average number of investigations of sexual harassment occurring each year in LEAs. As part of the Civil Rights Data Collection (CRDC), the Department does, however, gather information on the number of incidents of harassment based on sex in LEAs each year. During school year 2015-2016, LEAs reported an average of 3.23 of such incidents. Therefore, the Department assumes that LEAs, on average, currently conduct approximately 3.23 Title IX investigations each year. We invite public comment on the extent to which this is a reasonable assumption.

4.b. Developing the Model

After the Department issued guidance regarding Title IX compliance in 2011, the Department noted a much larger number of incidents of sexual harassment being reported to and investigated by LEAs and IHEs each year. In 2017, the Department rescinded that guidance and published alternative, interim guidance while this proposed regulatory action was underway. The Department reaffirmed that the interim guidance is not legally binding on recipients. Wiersma-Mosley and DiLoreto[19] did not identify substantial rollback of Title IX activities among IHEs compared to Richards,[20] who found substantial changes relative to Karjane, Fisher, and Cullen.[21] Consistent with those studies, we believe it is highly likely

[19] Jacquelyn D. Wiersma-Mosley and James DiLoreto, *The Role of Title IX Coordinators on College and University Campuses*, 8 BEHAV. SCI. 1, 5–6(2018), *available at* https://www.mdpi.com/2076- 328X/8/4/38/htm (click on "Full-Text PDF").

[20] Tara N. Richards, *An updated review of institutions of higher education's (IHEs) response to sexual assault: Results from a nationally representative sample*, J. OF INTERPERSONAL VIOLENCE 1, 11–12 (2016).

[21] HEATHER M. KARJANE, BONNIE S. FISHER, AND FRANCIS T. CULLEN, EDUC. DEVELOPMENT CTR., INC.,

that a subset of recipients have continued Title IX enforcement in accordance with the prior, now rescinded guidance, due to the uncertainty of the regulatory environment, and that it is reasonable to assume that some subset of recipients either never complied with the 2011 DCL or the 2014 Q&A or amended their compliance activities after the rescission of that guidance. We do not, however, know with absolute certainty how many recipients fall into each category, making it difficult to accurately predict the likely effects of this proposed regulatory action.

In general, the Department assumes that recipients fall into one of three groups: (1) recipients who have complied with the statutory and regulatory requirements and either did not comply with the 2011 DCL or the 2014 Q&A or who reduced Title IX activities to the level required by statute and regulation after the rescission of the 2011 DCL or the 2014 Q&A and will continue to do so; (2) recipients who continued Title IX activities at the level required by the 2011 DCL or the 2014 Q&A but will amend their Title IX activities to the level required under current statute and the proposed regulations issued in this proceeding; and (3) recipients who continued Title IX activities at the level required under the 2011 DCL or the 2014 Q&A and will continue to do so after final regulations are issued. In this structure, we believe that recipients in the second group are most likely to experience a net cost savings under these proposed regulations. We therefore only estimate savings for this group of recipients. To the extent that recipients in the other two groups experience savings, we herein underestimate the savings from this proposed action. We note that we calculate some increased costs for recipients in all three categories.

In estimating the number of recipients in each group, we assume that most LEAs and Title IV-eligible IHEs are generally risk averse regarding Title IX compliance, and so we assume

CAMPUS SEXUAL ASSAULT: HOW AMERICA'S INSTITUTIONS OF HIGHER EDUCATION RESPOND 62–94(2002), https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf.

that very few would have adjusted their enforcement efforts after the rescission of the 2011 DCL or the 2014 Q&A or would have failed to align their activities with the guidance initially. Therefore, we estimate that only 5 percent of LEAs and 5 percent of IHEs fall into Group 1.[22]Given the particularly acute financial constraints on LEAs, we assume that a vast majority (90 percent) will fall into Group 2 – meeting all requirements of the proposed regulations and applicable laws, but not using limited resources to maintain a Title IX compliance structure beyond such requirements. Among IHEs, we assume that, for a large subset of recipients, various pressures will result in retention of the status quo in every manner that is permitted under the proposed regulations. These institutions are voluntarily assuming higher costs than the regulations require. Nonetheless, our model does account for their decision to do so, and we only assume that 50 percent of IHEs experience any cost savings from these proposed regulations (placing them in Group 2). Therefore, we estimate that Group 3 will consist of 5 percent of LEAs and 45 percent of IHEs. We invite public comment on the extent to which the estimated number of entities in each group is appropriate, or whether recipients would expect costs or costs savings from the proposed regulations, and why.

Unless otherwise specified, our model uses median hourly wages for personnel employed in the education sector as reported by the Bureau of Labor Statistics[23] and an employer cost for employee compensation rate of 1.46.[24]

4.c. Cost estimates

We assume that, once the Department issues final regulations, all recipients will need to

---

[22] If our estimates were revised to increase the number of recipients in this group, our calculated net savings would be reduced. *See* section 4.e. Sensitivity Analysis for more information.

[23] U.S. Dept. of Labor, Bureau of Labor Statistics, *May 2017 National Industry-Specific Occupational Employment and Wage Estimates: Sector 61 – Educational Services* (Mar. 30, 2018), https://www.bls.gov/oes/current/naics2_61.htm.

[24] U.S. Dept. of Labor, Bureau of Labor Statistics, *Economic News Release: Table 1. Civilian Workers, by Major Occupational and Industry Group* (Sept. 18, 2018), https://www.bls.gov/news.release/ecec.t01.htm.

review the regulations. At the LEA level, we assume this would involve the Title IX Coordinator (assuming a loaded wage rate of $65.22 per hour for educational administrators) for 4 hours and a lawyer (at a rate of $90.71 per hour) for 8 hours. At the IHE level, we assume the Title IX Coordinator and lawyer would spend more time reviewing the regulations, at 8 hours and 16 hours, respectively. This results in a total cost of $29,732,680 in Year 1.

We also assume that recipients would be required to revise their grievance procedures to ensure compliance with the proposed regulations. Although the requirements of these proposed regulations closely mirror requirements in other regulations and statutes, we assume that all recipients will need to revise their procedures. We believe that revising grievance procedures at the LEA level will require the work of the Title IX Coordinator for 4 hours and a lawyer for 16 hours. At the IHE level, we assume this would require the Title IX Coordinator devote 8 hours and a lawyer devote 32 hours. In total, we estimate the cost of revising grievance procedures to be approximately $51,603,180 in Year 1.

The proposed regulations also require recipients to post nondiscrimination statements on their websites as required under the existing regulation. We assume, however, that this is already standard practice for many recipients. We assume that 40 percent of LEAs and 20 percent of IHEs[25] will need to do work to post these statements. At the LEA level, we assume that this work will require 0.5 hours from the Title IX Coordinator, 0.5 hours from a lawyer, and 2 hours from a web developer (at $44.12 per hour). At the IHE level, we assume this would require 1 hour from the Title IX Coordinator, 1 hour from a lawyer, and 2 hours from a web developer. We estimate the total cost of posting nondiscrimination statements on the recipient's website will cost $1,347,520 in Year 1.

---

[25] Richards, *supra* note 20, at 11 and Wiersma-Mosley & DiLoreto, *supra* note 19, at 5 found that approximately 80 percent of IHEs (81 percent and 79 percent, respectively) posted their policies and procedures.

The proposed regulations also require relevant staff to receive training on the requirements of Title IX. Although recipients may currently engage in annual training of Title IX staff, [26]we assume that all recipients will conduct new or revised training aligned with these proposed regulations. We assume that the training will take 16 hours each for the Title IX Coordinator, the investigator, and a decision-maker at both the LEA and IHE level for a timately $$14,458,650 in Year 1. We do not calculate additional costs in future years as we assume that recipients will resume training of staff one their prior schedule after Year 1.

The proposed regulations require recipients to conduct an investigation only in the event of a formal complaint of sexual harassment. In reviewing a sample of public Title IX documents, the Department noted that larger IHEs were more likely than smaller IHEs to conduct investigations only in the event of formal complaints, as opposed to investigating all reports they received. Consistent with this observation, the Department found that the rate of average investigations relative to the number of reports of sexual offenses under the Clery Act was lower at large (more than 10,000 students) four-year institutions than it was at smaller four-year institutions. As a result, the Department used the Clery Act data to impute the likely effect of these proposed regulations on various institutions. Specifically, we assume that, under these regulations, the gap in the rate of investigations between large IHEs and smaller ones would decrease by approximately 50 percent. Therefore, we estimate that the requirement to investigate only in the event of formal complaints would result in a reduction in the average number of investigations per IHE per year of 0.75. This reduction is equivalent to all IHEs in Group 2 experiencing a reduction in investigations of approximately 32 percent. In addition, the proposed regulations only require investigations in the event of sexual harassment within a recipient's education program or activity. Again,

---

[26] Angela F. Amar et al., *Administrators' perceptions of college campus protocols, response, and student prevention efforts for sexual assault*, 29 VIOLENCE VICT. 167 (2014).

assuming that Clery Act reports correlate with all incidents of sexual harassment (as defined in these proposed regulations), we assume a further reduction in the number of investigations per IHE per year of approximately 0.18, using the number of non-campus, public property, and reported-by-police reports as a proxy for the number of off-campus sexual harassment investigations currently being conducted by IHEs.[27] As a result, we estimate that each IHE in Group 2 will experience a reduction in the number of Title IX investigations of approximately 0.93 per year.[28]

At the LEA level, given the lack of information regarding the actual number of investigations conducted each year, the Department assumes that only 50% of the incidents reported in the CRDC would result in a formal complaint, for a reduction in the number of investigations of 1.62 per year. We invite the public to provide any information on the extent to which this is a reasonable assumption.

To be clear, these estimates are not meant to discourage recipients from investigating at a higher rate. Nor do these estimates of a decrease in investigations predict a decrease in recipient's obligation to respond in some appropriate way to a report of sexual harassment. For example, as noted earlier, nothing in the proposed regulations would prevent a recipient from initiating a student conduct proceeding or offering supportive measures to students who report sexual harassment that occurs outside the recipient's education program or activity.

---

[27] The Department notes that this likely represents a severe under-estimate of the actual proportion of incidents of sexual harassment that occur off-campus. According to a study from United Educators, approximately 41 percent of sexual assault claims examined occurred off-campus. United Educators, Facts from United Educator's Report *Confronting Campus Sexual Assault* (2015),

https://www.ue.org/sexual_assault_claims_study/. Nonetheless, it is likely that some subset of these incidents occurred "under" the recipients' "education program or activity" and would still require a response by the recipient. If the Department were to assume 25 percent of those incidents required investigation under the proposed rules and increased its estimate of the number of off-campus incidents that would no longer require investigation to 30 percent (rather than the current 11 percent), the estimated cost savings of these proposed regulations would increase to approximately $359 to $456 million over ten years.

[28] We note that the alternative coding options discussed above would result in an estimated reduction in the number of investigations each year between 0.60 and 1.58.

99

Although we estimate that the number of investigations under the proposed regulations will decrease at both the IHE and LEA levels, Title IX Coordinators are still expected to respond to informal complaints or reports. Such responses will not be dictated by the recipient's grievance procedures, but may involve talking with the reporting party, discussing options, connecting him or her with relevant on- or off-campus resources, conducting some sort of further investigation, and other supportive measures[29]. Although the proposed regulations require such supportive measures to be offered without fee or charge, we do not estimate specific costs associated with the provision of particular supportive measures. We have chosen not to include such costs for several reasons. First, in many instances, particular services are already offered without fee or cost to students. For example, many IHEs offer free mental health services to students. In such an instance, it is difficult to identify the marginal cost of an additional individual seeking out such already covered services. Second, even if we were able to identify the marginal cost of the provision of such services to the recipient, it would be difficult to accurately capture the portion of that cost attributable to the referral by the Title IX coordinator rather than to the underlying reported harassment. For example, Krebs et al.[30] found that 22 percent of victims of forced sexual assault sought out psychological counseling, 11 percent moved residences, and 8 percent dropped a class. It is difficult to assess what marginal impact these proposed regulations would have on the likelihood of complainants and respondents taking such actions. In the event that a clear fee exists for a particular service that the recipient would waive in accordance with these proposed regulations, we could calculate a cost arising from the lost revenue to the recipient. Due to the lack of adequate information about such fee structures and the highly

---

[29] Amar et al. *supra* note 26, at 174 identified the most common campus services provided at the IHE level were mental health services, health services, law enforcement, and victim assistance/advocacy.

[30] CHRISTOPHER P. KREBS ET AL.,THE CAMPUS SEXUAL ASSAULT (CSA) STUDY: FINAL REPORT, NAT'L INST. OF JUST. (2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.

personalized nature of supportive measures provided to complainants and respondents, we cannot at this time provide such estimates with any precision. We invite the public to provide any information on the relative fees that may be waived by recipients as a result of these proposed regulations and the frequency with which such measures are implemented.

We assume that the provision of supportive measures will take approximately 3 hours per report for Title IX coordinators and 8 hours for an administrative assistant at the LEA level. At the IHE level, we estimate that it would require 3 hours per incident for the Title IX coordinator and 16 hours for an administrative assistant. We therefore estimate that the response to informal complaints will cost approximately $5,356,590 per year.

At the LEA level, we assume that the average response to a formal complaint will require 8 hours from the Title IX Coordinator, 16 hours for an administrative assistant, one hour each for two lawyers (assuming both parties obtain legal counsel),[31] 20 hours from an investigator, and 8 hours from a decision-maker. We also assume that, in 75 percent of LEAs, the Title IX coordinator also acts as the decision-maker, which would not be allowable under the proposed regulations. Assuming a reduction in the average number of investigations of 1.62 per LEA per year and the use of an independent decision-maker in each investigation, these proposed regulations would result in a cost savings of $57,136,120 per year at the LEA level.

At the IHE level, we assume that the average response to a formal complaint would require 24 hours from the Title IX Coordinator, 40 hours from an administrative assistant, 40 hours each for 2 lawyers (assuming both parties obtain counsel), 40 hours for an investigator, and 16 hours for a decision-maker. We note that, under these proposed regulations, recipients are required to provide parties with advisors to conduct cross- examination if they do not

---

[31] This average is based on the assumption that in a significant number of cases at the LEA level, either or both of the parties will choose to proceed without an attorney, or with a non-attorney advisor, such that the average cost for advisors will be two attorney hours.

have an advisor present. Given that our estimates assume all parties obtain counsel, we do not believe that this additional requirement would result in an increased cost not otherwise captured by our estimates. Consistent with Wiersma- Mosley and DiLareto, we also assume that the Title IX coordinator serves as the decision-maker in 60 percent of IHEs. Assuming an average reduction of 0.0.93 investigations per year per IHE and the use of independent decision-makers, we estimate these proposed regulations to result in a net cost savings of $41,440,300 per year at the IHE level.

We recognize that some recipients may currently conduct investigations in a manner with a less robust due process framework than what would be required under the proposed regulations. For these recipients, included in Group 1 as described in section 4.b, the regulations may result in an increased cost per investigations. At the LEA level, we assume these regulations would require 2 additional hours from the Title IX coordinator, 4 hours from an administrative assistant, 1 hour each from two lawyers, 10 additional hours from an investigator, and 8 additional hours from a decision-maker per investigation, for a total increased cost of approximately $1,609,200 per year. At the IHE level, we assume that these proposed regulations would require an additional 6 hours from a Title IX coordinator, 10 hours from an administrative assistant, 20 hours each from two lawyers, 20 hours from an investigator, and 16 hours from a decision-maker, for a total increased cost of $2,829,570 per year.

We note that the proposed regulations require a hearing for formal complaints at the IHE level. We do not estimate any additional cost associated with this provision beyond those outlined above, given that the use of hearing boards has become a relatively common practice at the IHE level.[32]

---

[32] Amar et al., *supra* note 26, at 172–3 found that approximately 87 percent of institutions used a hearing board which typically involved students, faculty, staff, and administrators. To the extent that these proposed regulations

In addition, the proposed regulations allow for formal complaints to be informally resolved. We assume that 10 percent of all formal complaints at the LEA and IHE level would be resolved through informal resolution.[33] In such instances at the LEA level, we assume the Title IX Coordinator and administrative assistant will each have to dedicate 4 hours beyond what they would have for a full adjudication to reflect the potential additional administrative tasks associated with this approach. Nonetheless, we estimate that informal resolution will save half of the time outlined above for lawyers and investigators, and save the full estimated time commitment of decision-makers. At the IHE level, we assume similar time savings for lawyers, investigators, and decision- makers, with Title IX Coordinators and administrative assistants each dedicating an additional 8 hours per case. In total, we assume informal resolution will result in a cost savings of approximately $3,414,980 per year.

The proposed regulations also require grievance procedures to include the opportunity for both parties to appeal if an appeal is offered.. Richards indicates that approximately 84 percent of IHEs have an appeals process. For purposes of these estimates, we assume that any recipient in Group 3, as described in section 4.b, currently operates an appeals process. However, all recipients in Groups 1 and 2 would need to institute such a structure. Given that many recipients in Groups 1 and 2 may currently operate an appeals process, this approach would overestimate the costs of these proposed regulations. Based on our review of Title IX documents from various institutions, we assume that approximately 50 percent of investigations taken through to a determination of responsibility will result in an appeal by either party. We assume that, at the LEA level, each appeal will require 4 hours from the

---

result in IHEs reducing the membership of hearing boards to, for example, a single decision-maker, these regulations would result in additional cost savings not otherwise captured here.

[33] This figure likely represents an underestimate of the actual number that would be resolved informally. Wiersma-Mosley & DiLoreto, *supra* note 19, at 6, report that 34 percent of cases were resolved through informal resolution.

Title IX coordinator, 8 hours from an administrative assistant, one hour each from two lawyers, and 8 hours from a decision- maker. At the IHE level, we assume each appeal will require 12 hours from a Title IX coordinator, 20 hours from an administrative assistant, 10 hours each from 2 lawyers, and 8 hours from a decision-maker. In total, we estimate the appeals process will cost approximately $20,770,220 per year. To the extent that IHEs choose not to offer appeals, this calculation would represent an overestimate of actual burden.

The proposed regulations require recipients to maintain certain documentation regarding their Title IX activities. We assume that the proposed recordkeeping and documentation requirements would have a higher first year cost associated with establishing the system for documentation with a lower out-year cost for maintaining it. At the LEA level, we assume that the Title IX Coordinator would spend 4 hours in Year 1 establishing the system and an administrative assistant would spend 8 hours doing so. At the IHE level, we assume recipients are less likely to use a paper filing system and are likely to use an electronic database for managing such information. Therefore, we assume it will take a Title IX Coordinator 24 hours, an administrative assistant 40 hours, and a database administrator ($50.71) 40 hours to set up the system for a total Year 1 estimated cost of approximately $38,836,760.

In later years, we assume that the systems will be relatively simple to maintain. At the LEA level, we assume it will take the Title IX Coordinator 2 hours and an administrative assistant 4 hours to do so. At the IHE level, we assume 4 hours from the Title IX Coordinator, 40 hours from an administrative assistant, and 8 hours from a database administrator. In total, we estimate an ongoing cost of approximately $15,189,260 per year.

In total, the Department estimates these proposed regulations will result in a net cost

104

savings of approximately $286.4 million to $367.7 million over ten years on a net present value basis.

4.d.        Other Issues in the Proposed Regulations

The proposed regulations address three topics that do not involve a recipient's response to sexual harassment and which the Department estimates will not result in any net cost or benefit to regulated entities.

First, the proposed regulations emphasize that nothing about enforcement of Title IX shall require the Department or a recipient to violate the constitutional rights of any person. The Departments estimates that there are no costs or cost savings arising from this proposed provision because it does not require any new act on the part of a recipient. Second, the proposed regulations state that money damages shall not be required by the Department as a remedy for a recipient's violation of Title IX or its regulations. The Department's OCR generally does not impose money damages as a remedy under Title IX; however, occasionally OCR does require a recipient to pay sums of money as reimbursement to remedy a Title IX violation. Although the number of instances in which OCR imposes money damages is minimal, the Department wishes to emphasize through the proposed regulation that any remedy involving payment of money must be linked to bringing the recipient into compliance with Title IX, rather than falling into a category of imposing money damages. There is no cost associated with this proposed regulation because no new act is required of recipients.

Third, the proposed regulations clarify that a religious institution is not required to preemptively submit a written letter to the Department to claim the religious exemption from Title IX provided for by statute. There is no cost associated with the proposed regulation concerning religious institutions because the proposed regulation simply clarifies

that such institutions do not need to submit a written letter to the Department to claim the religious exemption available under the Title IX statute, and does not require any new action by recipients.

### 4.e. Sensitivity Analysis

The Department's estimated costs and benefits for these proposed regulations are largely driven by two assumptions: the number of recipients that will not conduct activities beyond those required for compliance with the final regulations, and the change in the number of investigations conducted each year by each of those recipients. To assess the robustness of our estimates, we have conducted nine different simulations of our model with varying combinations of an upper, lower, and current estimate for each of these two factors. Regarding the upper bound for the number of recipients that will not conduct activities beyond those required for compliance with the final regulations, we assume 100 percent of LEAs and 85 percent of IHEs. For the lower bound, we assume 50 percent of LEAs and 33 percent of IHEs. In both instances, we assume the remainder of recipients are in Group 3. As discussed above, alternative coding of investigation rate data would have resulted in an estimated reduction in the number of investigations per IHE per year ranging from 0.60 to 1.58. Therefore, these estimates served as our upper and lower bound estimates for those institutions with a 25 percent to 75 percent reduction for LEAs. The estimated net present value of each of these alternative models, discounted at seven percent, is included in the table below.[34]

Table 1: Sensitivity Analysis

|  | Number of recipients reducing number of investigations | | |
|---|---|---|---|
|  | Upper Bound | Primary Estimate | Lower Bound |

---

[34] We note that a three percent discount rate would result in larger estimated savings over the ten year time horizon

| Estimated reduction in investigations per recipient | Upper Bound | ($820,648,142) | ($431,940,097) | ($221,468,788) |
|---|---|---|---|---|
| | Primary Estimate | ($534,363,019) | ($286,449,261) | ($110,309,915) |
| | Lower Bound | ($388,322,321) | ($210,250,875) | ($53,605,189) |

Based on this analysis, the Department believes that its evaluation of the likely costs and benefits is accurate in assuming these proposed regulations would result in a net cost savings to recipients over a ten year period. Although we believe the estimates presented herein are conservative estimates of savings, even extreme lower bound estimates result in a calculated net cost savings.

### 5. Regulatory Alternatives Considered

The Department considered the following alternatives to the proposed regulations: (1) leaving the current regulations and current guidance in place and issuing no proposed regulations at all; (2) leaving the current regulations in place and reinstating the 2011 DCL or the 2014 Q&A; and (3) issuing proposed regulations that added to the current regulations broad statements of general principles under which recipients must promulgate grievance procedures. Alternative (2) was rejected by the Department for the reasons expressed in the preamble to these proposed regulations; the procedural and substantive problems with the 2011 DCL and the 2014 Q&A that prompted the Department to rescind that guidance remained as concerning now as when the guidance was rescinded, and the Department determined that restoring that guidance would once again leave recipients unclear about how to ensure they implemented prompt and equitable grievance procedures. Alternative (1) was rejected by the Department because even though current regulations require recipients to have grievance procedures providing for "prompt and equitable" resolution of

sex discrimination complaints, current regulations are entirely silent on whether Title IX and those implementing regulations cover sexual harassment; addressing a crucial topic like sexual harassment through guidance would unnecessarily leave this serious issue subject only to non-legally binding guidance rather than regulatory prescriptions. The lack of legally binding standards would leave survivors of sexual harassment with fewer legal protections and persons accused of sexual harassment with no predictable, consistent expectation of the level of fairness or due process available from recipients' grievance procedures. Alternative (3) was rejected by the Department because the problems with the status quo regarding recipients' Title IX procedures, as identified by numerous stakeholders and experts, made it clear that a regulation that was too vague or broad (e.g., "Provide due process protections before disciplining a student for sexual harassment") would not provide sufficient predictability or consistency across recipients to achieve the benefits sought by the Department. After careful consideration of various alternatives, the Department believes that the proposed regulations represent the most prudent and cost effective way of achieving the desired benefits of (a) ensuring that recipients know their specific legal obligations with respect to responses to sexual harassment and (b) ensuring that schools and colleges take all reports of sexual harassment seriously and all persons accused of sexual harassment are treated fairly.

6. Accounting Statement

As required by OMB Circular A-4, in the following table we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these proposed regulations. This table provides our best estimate of the changes in annual monetized costs, benefits, and transfers as a result of the proposed regulations.

Table 2: Accounting Statement

| Category | Benefits |
|---|---|
| Clarity, specificity, and permanence with respect to recipient schools and colleges knowing their legal obligations under Title IX with respect to sexual harassment | Not Quantified |
| A legal framework for schools' | Not Quantified |

| | | |
|---|---|---|
| and colleges' response to sexual harassment that ensures all reports of sexual harassment are treated seriously and all persons accused are given due process before being disciplined for sexual harassment | | |
| Preserve constitutional rights, assure recipients that monetary damages will not be required by the Department, recognize religious exemptions in the absence of written request | Not Quantified | |

| Category | Costs | |
|---|---|---|
| | 7% | 3% |
| Reading and understanding the rule | $3,956,322 | $3,384,055 |
| Revision of grievance procedures | $6,866,478 | $5,873,268 |
| Posting of non-discrimination statement | $179,305 | $153,369 |
| Training of Title IX Coordinators, investigators, decision-makers | $1,923,912 | $1,645,626 |
| Response to informal reports | 5,336,591 | $5,336,591 |
| Reduction in the number of | ($99,176,416) | ($99,176,416) |

| | | |
|---|---|---|
| investigations | | |
| Increased investigation requirements | $4,438,769 | $4,438,769 |
| Appeal process | $20,770,218 | $20,770,218 |
| Informal resolution of complaints | ($3,414,979) | ($3,414,979) |
| Creation and maintenance of documentation | $18,335,868 | $17,880,723 |

**Clarity of the Regulations**

Executive Order 12866 and the Presidential memorandum ''Plain Language in Government Writing'' require each agency to write regulations that are easy to understand. The Secretary invites comments on how to make these proposed regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the proposed regulations clearly stated?

• Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the proposed regulations (use of headings, paragraphing, etc.) aid or reduce their clarity?

• Would the proposed regulations be easier to understand if we divided them into more (but shorter) sections? (A ''section'' is preceded by the symbol ''section'' and a numbered heading; for example, section 106.9 Dissemination of policy.)

• Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

• What else could we do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, see the instructions in the **ADDRESSES** section of the preamble.

**Deregulatory Action**

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this proposed rule will result in cost savings. Therefore, this proposed rule would be considered an Executive Order 13771 deregulatory action.

**Regulatory Flexibility Act (Small Business Impacts)**

This analysis, required by the Regulatory Flexibility Act, presents an estimate of the effect of the proposed regulations on small entities. The U.S. Small Business Administration (SBA) Size Standards define proprietary institutions of higher education as small businesses if they are independently owned and operated, are not dominant in their field of operation, and have total annual revenue below $7,000,000. Nonprofit institutions are defined as small entities if they are independently owned and operated and not dominant in their field of operation. Public institutions and local educational agencies are defined as small organizations if they are operated by a government overseeing a population below 50,000.

Publicly available data from the National Center on Education Statistics' Common Core of Data indicate that, during the 2015-2016 school year, 99.4 percent of local educational agencies had enrollments of less than 50,000 students.

The Department's eZ-Audit data shows that there were 1,522 Title IV proprietary schools with revenue less than $7,000,000 for the 2015-2016 Award Year;[35] however, the

---

[35] U.S. Dept. of Educ., Federal Student Aid, *Proprietary School 90/10 Revenue Percentages*, studentaid.ed.gov/sa/about/data-center/school/proprietary (select "2015-2016 Award Year: Report and Summary

Department lacks data to identify which public and private, nonprofit institutions qualify as small. Given the data limitations, the Department proposes a data-driven definition for "small institution" in each sector.

1. Proposed Definition

The Department has historically assumed that all private nonprofit institutions were small because none were considered dominant in their field. However, this approach masks significant differences in resources among different segments of these institutions. The Department proposes to use enrollment data for its definition of small institutions of postsecondary education. Prior analyses show that enrollment and revenue are correlated for proprietary institutions. Further, enrollment data are readily available to the Department for every postsecondary institution while revenue is not. The Department analyzed a number of data elements available in IPEDS, including Carnegie Size Definitions, IPEDS institutional size categories, total FTE, and its own previous research on proprietary institutions referenced in ED-2017-OPE-0076i. As a result of this analysis, the Department proposes to use this definition to define small institutions:

- Two-year IHEs, enrollment less than 500 FTE; and
- Four-year IHEs, enrollment less than 1,000 FTE.

Table 3 shows the distribution of small institutions under this proposed definition using the 2016 IPEDS institution file.[36]

---

Chart" from the dropdown menu; click "Go")

[36] *See* U.S. Dept. of Educ., Nat'l Ctr. for Educ. Statistics, Integrated Postsecondary Educ. Data System 2016 Institutional Characteristics: Directory Information survey file (2016), nces.ed.gov/ipeds/datacenter/DataFiles.aspx (select "Compare institutions;" select "By Groups" and then "EZ Group" in the drop down menu; select "Title IV Participating" and "U.S. Only" and then click the "Search" button; click "Continue;" select "Browse/Search Variables;" click the plus sign next to "institutional Characteristics" > "Control or Affiliation" > "Institutional Control or Affiliation" and click the check boxes for "2016-2017" and "Control of Institution;" then select "Institutional Characteristics" > "Institution classifications" > "1980-81 to current year" and check the boxes for "2016-2017" and "Sector of institution;" click the plus sign next to "Frequently Used/Derived Variables" > "Fall enrollment/retention rates" > Total, full- and part-time enrollment and fall FTE" and check the boxes next to "Fall 2016-" and "Total enrollment").

113

Table 3: Small Institutions under Proposed Definition

| Level | Type | Small | Total | Percent |
|-------|------|-------|-------|---------|
| 2-year | Public | 342 | 1,240 | 28% |
| 2-year | Private | 219 | 259 | 85% |
| 2-year | Proprietary | 2,147 | 2,463 | 87% |
| 4-year | Public | 64 | 759 | 8% |
| 4-year | Private | 799 | 1,672 | 48% |
| 4-year | Proprietary | 425 | 558 | 76% |
| Total | | 3,996 | 6,951 | 57% |

Under the proposed definition, the two-year small institutions are 68% of all two-year institutions (2,708/3,962), 68% of all small institutions (2,708/3,996), and 39% of the overall population of institutions (2,708/6,951); whereas, four-year small institutions are 43% of all four-year institutions (1,288/2,989), 32% of all small institutions (1,288/3,996), and 19% of the overall population of institutions (1,288/6,951). Figure 1 shows a visual representation of the universe and the percentage that would be defined as small using the above proposed definition.

---

Figure 1: Small Institutions as a subset of all institutions



Key:  ☐ Small institutions  ☐ All institutions

Similarly, small public institutions are 20% of all public institutions (406/1,999), 10% of all small public institutions (406/3,996), and 6% of the overall population of institutions (406/6,951). Small private nonprofit institutions are 53% of all private nonprofit institutions (1,018/1,999), 25% of all small institutions (1,018/3,996), and 15% of the overall population of institutions (1,018/6,951). Finally, and small proprietary institutions are 85% of all proprietary institutions (2,572/1,999), 64% of all small institutions (2,572/3,996), and 37% of the overall population of institutions (2,572/6,951). The Department requests comment on the proposed definition. It will consider these suggestions in development of the final rule.

2. Impact Estimate Using Proposed Definition

    *2.a. Impact on Local Education Agencies*

As disused in the *Discussion of Costs, Benefits, and Transfers* section of the Regulatory Impact Analysis, the Department estimates that these proposed regulations will result in a net

cost savings for regulated entities, including LEAs. Although the savings accruing to any particular LEA depend on a number of factors, including the LEA's Title IX enforcement history, its response to the proposed regulations, and the number of formal complaints of sexual harassment the LEA receives in the future, the Department was interested in whether the regulations would have a disproportionate effect on small LEAs—that is, whether small LEAs were likely to realize benefits proportionate to their size and number.

Using data from the 2015-2016 Civil Rights Data Collection, we examined the number of allegations of harassment and bullying based on sex by LEA size. Given the extreme upper end of the enrollment distribution that qualifies an LEA as no longer a small entity for these purposes—less than one percent of all LEAs—it is reasonable to expect that the number of reported incidents of such harassment in small LEAs closely aligns with the average number for all LEAs. On average, LEAs reported 3.23 allegations of harassment or bullying on the basis of sex in the 2015-2016 school year. By comparison, large LEAs (those with more than 50,000 students) reported an average of 112.54 such incidents and small LEAs reported 2.64 allegations on average.

Based on the model described in the *Discussion of Costs, Benefits, and Transfers* section above, the Department estimates that a small LEA that experienced only an 8 percent reduction in investigations annually would experience a net cost savings over the ten year time horizon.

### 2.b. Impact on Institutions of Higher Education

As with LEAs, the Department estimates that these proposed regulations will result in a net cost savings for IHEs over the ten year time horizon. The amount of savings that any particular IHE will realize, if any, depends on a wide number of factors, including its Title IX compliance history, its response to the proposed regulations, and the number of formal

116

complaints of sexual harassment the IHE receives in the future. Regardless of these variables, the Department did analyze extant data sources to attempt to analyze the likely differential impact across IHEs of various sizes.

As noted in the *Discussion of Costs, Benefits, and Transfers* section of the <u>Regulatory Impact Analysis</u>, an analysis of data reported by IHEs under the Clery Act found that smaller institutions tended to have, on average, fewer such reports per IHE.[37] Applying the definitions noted above, we also found that small entities had far fewer reports than did large entities.[38]

Table 4: Average Clery Act Reports of Sexual Offenses by Size/Type of Institution

| Level | Type | Not Small | Small | Total |
|-------|------|-----------|-------|-------|
| 4-year | Public | 12.1 | 1.1 | 11.3 |
| 4 –year | Private | 8.7 | 0.7 | 4.7 |
| 4-year | Proprietary | 0.5 | 0.1 | 0.2 |
| 2-year | Public | 0.7 | 0.2 | 0.7 |
| 2-year | Private | 1.2 | 0.1 | 0.3 |
| 2-year | Proprietary | 0.1 | 0.0 | 0.0 |

Assuming that Clery Act reports are correlated with the number of incidents of sexual harassment under Title IX, we would assume that small institutions have a lower number of Title IX complaints each year. As a result, they may experience less cost savings under this proposed rule given the smaller baseline. This lower baseline may, however, be offset slightly by the higher relative number of investigations undertaken at smaller institutions,

---

[37] We note that although enrollment and the number of Clery Act reports are positively correlated, enrollment alone explains only 26 percent of the observed variation in the number of reports.

[38] We note that this finding is driven largely by institutional size rather than a higher rate of offenses at larger institutions. Across all levels and school types, except for private 4-year institutions, small entities had higher rates of Clery Act reports per enrolled student than did larger ones. Private institutions generally had the highest rates, with private 4-year institutions having the highest rate of Clery Act reports of any category examined.

as noted in the Senate report. Additionally, we note that small institutions also have a higher than average number of Clery Act reports occurring off-campus, indicating that they may also have a larger number of Title IX sexual harassment reports originating off-campus. In examining the model described in the *Discussion of Costs, Benefits, and Transfers Section* above, the Department estimates that, due to the small baseline number of investigations likely conducted by such entities currently, small institutions would need to realize a 37 percent reduction in investigations (equivalent to approximately one fewer investigation every five years) in order to realize a net cost savings across the 10 year time horizon. If the institution did not need to update its grievance procedures, it would only need to recognize a 33 percent reduction (approximately one fewer investigation every six years).

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and the burden of responding, the Department provides the general public and federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This requirement helps ensure that: the public understands the Department's collection instructions; respondents can provide the requested data in the desired format; reporting burden (time and financial resources) is minimized; collection instruments are clearly understood; and the Department can properly assess the impact of collection requirements on respondents. The following sections contain information collection requirements:

Section 106.45(b)(7)--Recordkeeping.

Section 106.45(b)(7) would require recipients to maintain certain documentation regarding their Title IX activities. LEAs and IHEs would be required to create and maintain for a

118

period of three years records of: sexual harassment investigations; determinations; appeals; disciplinary sanctions and remedies; informal resolutions; materials used to train coordinators, investigators, and decision-makers; any actions, including supportive measures, taken in response to a report or formal complaint of sexual harassment; and documentation of the bases upon which the recipient concluded that its response was not clearly unreasonable and that its measures taken were designed to restore or preserve access to the recipient's educational program or activity. This information will allow a recipient and OCR to assess on a longitudinal basis the prevalence of sexual harassment affecting access to a recipient's programs and activities, whether a recipient is complying with Title IX when responding to reports and formal complaints, and the necessity for additional or different training. We estimate the volume of records to be created and retained may represent a decline from current recordkeeping due to clarification elsewhere in the proposed regulations that no investigation needs to be conducted where allegations, if true, do not constitute sexual harassment as defined under the regulations, and that informal means may be used to resolve sexual harassment complaints, both changes likely resulting in fewer investigative records being generated. We estimate that recipients would have a higher first-year cost associated with establishing the system for documentation with a lower out-year cost for maintaining it. At the LEA level, we assume that the Title IX Coordinator would spend 4 hours in Year 1 establishing the system and an administrative assistant would spend 8 hours doing so. At the IHE level, we assume recipients are less likely to use a paper filing system and are likely to use an electronic database for managing such information. Therefore, we assume it will take a Title IX Coordinator 24 hours, an administrative assistant 40 hours, and a database administrator 40 hours to set up the system for a total Year 1 estimated cost for 16,606 LEAs and 6,766 IHEs of approximately

119

$38,836,760. In later years, we assume that the systems will be relatively simple to maintain. At the LEA level, we assume it will take the Title IX Coordinator 2 hours and an administrative assistant 4 hours to do so. At the IHE level, we assume 4 hours from the Title IX Coordinator, 40 hours from an administrative assistant, and 8 hours from a database administrator. In total, we estimate an ongoing cost of approximately $15,189,260 per year.

We estimate that LEAs would take 12 hours and IHEs would take 104 hours to establish and maintain a recordkeeping system for the required sexual harassment documentation during Year 1. In out-years, we estimate that LEAs would take 6 hours annually and IHEs would take 52 hours annually to maintain the recordkeeping requirement for Title IX sexual harassment documentation. The total burden for this recordkeeping requirement over three years is 398,544 hours for LEAs and 1,407,328 hours for IHEs. Collectively, we estimate the burden over three years for LEAs and IHEs for recordkeeping of Title IX sexual harassment documents would be 1,805,872 hours under OMB Control Number 1870-NEW.

Section 106.44(b)(3).

Section 106.44(b)(3) applies only to IHEs and would require that where a complainant reports sexual harassment but does not wish to file a formal complaint, the IHE would have a safe harbor against a finding of deliberate indifference where it offers the complainant supportive measures, but must inform the complainant in writing of the complainant's right to file a formal complaint. This information provided by IHEs to complainants will ensure that complainants receive supportive measures to assist them in the aftermath of sexual harassment and also remain aware of their right to file a formal complaint that requires the IHE to investigate the sexual harassment allegations.

We estimate that most IHEs will need to create a form, or modify a form they already use, to comply with this requirement to inform the complainant in writing. We estimate that it will take Title IX Coordinators one (1) hour in Year 1 to create or modify a form to use for these purposes, that there will be no cost in out-years, and that the cost of maintaining such a form is captured under the recordkeeping requirements of section 106.45(b)(7) described above, for a total Year 1 cost of $441,270. Total burden for this requirement over three years is 6,766 hours .

### Section 106.45(b)(2): *Notice of Allegations*

Section 106.45(b)(2) would require all recipients, upon receipt of a formal complaint, to provide written notice to the complainant the respondent, informing the parties of the recipient's grievance procedures and providing sufficient details of the sexual harassment allegations being investigated. This written notice will help ensure that the nature and scope of the investigation, and the recipient's procedures, are clearly understood by the parties at the commencement of an investigation.

We estimate that most LEAs and IHEs will need to create a form, or modify one already used, to comply with these requirements. We estimate that it will take Title IX Coordinators one (1) hour to create or modify a form to use for these purposes, and that an attorney will spend 0.5 hours reviewing the form for compliance with section 106.45(b)(2). We estimate there will be no cost in out-years, and that the cost of maintaining such a form is captured under the recordkeeping requirements of section 106.45(b)(7) described above, for a total Year 1 cost of $2,584,310. Total burden for this requirement over three years is 35,058 hours.

### Section 106.45(b)(6): *Informal resolution*

Section 106.45(b)(6) would require that recipients who wish to provide parties with the

option of informal resolution of formal complaints, may offer this option to the parties but may only proceed by: first, providing the parties with written notice disclosing the sexual harassment allegations, the requirements of an informal resolution process, any consequences from participating in the informal resolution process; and second, obtaining the parties' voluntary, written consent to the informal resolution process.

This provision permits—but does not require—LEAs and IHEs to allow for voluntary participation informal resolution as a method of resolving the allegations raised in formal complaints without completing the investigation and adjudication.

We estimate that not all LEAs or IHEs will choose to offer informal resolution as a feature of their grievance process; of those who do, we estimate that most will need to create a form, or modify one already used, to comply with the requirements of this section. We estimate that it will take Title IX Coordinators one (1) hour to create or modify a form to use for these purposes, and that an attorney will spend 0.5 hours reviewing the form for compliance with section 106.45(b)(6). We estimate there will be no cost in out-years, and that the cost of maintaining such a form is captured under the recordkeeping requirements of section 106.45(b)(7) described above, for a total Year 1 cost of $2,584,310. The total burden for this requirement over three years is 35,058 hours.

Collection of Information

| Regulatory section | Information collection | OMB Control Number and estimated burden [change in burden] |
|---|---|---|

122

| Regulatory section | Information collection | OMB Control Number and estimated burden [change in burden] |
|---|---|---|
| 106.45(b)(7) | This proposed regulatory provision would require LEAs and IHEs to maintain certain documentation related to Title IX activities. | OMB 1870-NEW. The burden over the first three years would be $69,215,280 and 1,805,872 hours. |
| 106.44(b)(3) | This proposed regulatory provision would require IHEs who offer supportive measures to notify the complainant of the right to file a formal complaint. | OMB 1870-NEW. The burden over the first three years would be $441,270 and 6,766 hours. |
| 106.45(b)(2) | This proposed regulatory provision would require LEAs and IHEs to provide parties with written notice when investigating a formal complaint. | OMB 1870-NEW. The burden over the first three years would be $2,584,310 and 35,058 hours. |
| 106.45(b)(6) | This proposed regulatory provision would require LEAs and IHEs to provide written notice to parties wishing to participate in informal resolution of a formal complaint. | OMB 1870-NEW. The burden over the first three years would be $2,584,310 and 35,058 hours. |

We have prepared an Information Collection Request (ICR) for these proposed requirements. If you want to review and comment on the ICR(s), please follow the instructions listed under the ADDRESSES section of this notice. Please note that the

Office of Information and Regulatory Affairs (OMB) and the Department of Education review all comments posted at www.regulations.gov.

When commenting on the information collection requirements, we consider your comments on these collections of information in--

• Deciding whether the collections are necessary for the proper performance of our functions, including whether the information will have practical use;

• Evaluating the accuracy of our estimate of the burden of the collections, including the validity of our methodology and assumptions;

• Enhancing the quality, usefulness, and clarity of the information we collect; and

• Minimizing the burden on those who must respond, which includes exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques.

ADDRESSES: Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at www.regulations.gov by selecting Docket ID No. ED 2018-OCR-0064 or via postal mail, commercial delivery, or hand delivery. Please specify the Docket ID number and indicate "Information Collection Comments" on the top of your comments if your comment(s) relate to the information collection for this rule. Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 400 Maryland Avenue, SW., LBJ 216-36, Washington, D.C. 20202-4537. Comments submitted by fax or email and those submitted after the comment period will not be accepted. FOR FURTHER INFORMATION CONTACT: Electronically mail ICDocketMgr@ed.gov. Please do not send comments here.

**Intergovernmental Review**

This program is not subject to Executive Order 12372 and the regulations in 34 CFR part 79 because it is not a program or activity of the Department that provides federal financial assistance.

**Assessment of Educational Impact**

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e-4, the Secretary particularly requests comments on whether these proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

**Federalism**

Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations in 34 CFR 106.34 and 34 CFR 106.35 may have federalism implications, as defined in Executive Order 13132. We encourage State and local elected officials to review and provide comments on these proposed regulations.

**Accessible Format**

Individuals with disabilities can obtain this document in an accessible format (e.g., braille, large print, audiotape, or compact disc) on request to the person listed under FOR FURTHER INFORMATION CONTACT.

**Electronic Access to This Document**

The official version of this document is the document published in the *Federal Register*. Free internet access to the official edition of the *Federal Register* and the Code of Federal

Regulations is available via the Federal Digital System at: www.gpo.gov/fdsys. You can view this document at that site, as well as all other documents of this Department published in the *Federal Register*, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the *Federal Register* by using the article search feature at: www.federalregister.gov. Through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects in 34 CFR Part 106**

Education, Sex discrimination, Civil rights, Sexual harassment

Dated: November 15, 2018

Betsy DeVos
*Secretary of Education*

For the reasons discussed in the preamble, the Secretary proposes to amend part 106 of title 34 of the Code of Federal Regulations as follows:

PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

1. The authority citation for part 106 continues to read as follows:

Authority: 20 U.S.C. 1681 *et seq.*, unless otherwise noted.

2. Section 106.3 is amended by revising the title and paragraph (a) to read as follows:

## § 106.3 Available remedies

(a) Remedial action. If the Assistant Secretary finds that a recipient has violated this part, such recipient shall take such remedial action as the Assistant Secretary deems necessary to remedy the violation, which shall not include assessment of damages against the recipient. Nothing herein prohibits the Assistant Secretary from deeming necessary equitable relief to remedy a violation of this part.

\* \* \* \* \*

3. Section 106.6 is amended by revising the title and adding paragraphs (d), (e) and (f) to read as follows:

## § 106.6 Effect of other requirements and preservation of rights.

\* \* \* \* \*

(d) *Constitutional protections.* Nothing in this part requires a recipient to:

(1) Restrict any rights that would otherwise be protected from government action 2by the First Amendment of the U.S. Constitution;

(2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or

(3) Restrict any other rights guaranteed against government action by the U.S. Constitution.

(e) *Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g and 34 CFR Part 99.* The obligation to comply with this part is not obviated or alleviated by the FERPA statute or regulations.

(f) *Title VII of the Civil Rights Act of 1964.* Nothing in this part shall be read in derogation of an employee's rights under title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* or any regulations promulgated thereunder.

* * * * *

4. Section 106.8 is revised to read as follows:

**§ 106.8 Designation of coordinator, dissemination of policy, and adoption of grievance procedures.**

(a) *Designation of coordinator.* Each recipient must designate at least one employee to coordinate its efforts to comply with its responsibilities under this part. The recipient must notify all its students and employees of the name or title, office address, electronic mail address, and telephone number of the employee or employees designated pursuant to this paragraph.

*(b) Dissemination of policy.*

(1) *Notification of policy.* Each recipient must notify applicants for admission and employment, students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient that it does not discriminate on the basis of sex in the education program or activity that it operates, and that it is required by title IX and this part not to discriminate in such a manner. Such notification must state that the requirement not to discriminate in the education program or activity extends to employment and admission (unless Subpart C does not apply to the recipient) and that inquiries about the application of title IX and this part to such recipient may be referred to the employee designated pursuant to section 106.8(a), to the Assistant Secretary, or both.

(2) *Publications.*

(i) Each recipient must prominently display a statement of the policy described in paragraph (b)(1) of this section on its website, if any, and in each handbook or catalog that it makes available to persons entitled to a notification under paragraph (b)(1) of this section.

(ii) A recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part.

(c) *Adoption of grievance procedures.* A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and of formal complaints as defined in section 106.44(e)(5). A recipient must provide notice of

the recipient's grievance procedures, including how to report sex discrimination and how to file or respond to a complaint of sex discrimination, to students and employees.

(d) *Application.* The requirements that a recipient adopt a policy and grievance procedures as described in this section apply only to exclusion from participation, denial of benefits, or discrimination on the basis of sex occurring against a person in the United States.

\* \* \* \* \*

5. Section 106.9 is removed and reserved.

6. Section 106.12 is amended by revising paragraph (b) to read as follows:

\* \* \* \* \*

(b) *Assurance of exemption.* An educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section may do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization. An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption. In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the institution had previously sought assurance of the exemption from the Assistant Secretary.

\* \* \* \* \*

7. Subpart D—Discrimination on the Basis of Sex in Education Program or Activities Prohibited is amended by adding sections 106.44 and 106.45 to read as follows:

**§ 106.44 Recipient's response to sexual harassment**.

(a) *General.* A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

*(b) Specific circumstances.*

(1) A recipient must follow procedures consistent with section 106.45 in response to a formal complaint. If the recipient follows procedures (including implementing any appropriate remedy as required) consistent with section 106.45 in response to a formal complaint, the recipient's response to the formal complaint is not deliberately indifferent and does not otherwise constitute discrimination under title IX.

(2) When a recipient has actual knowledge regarding reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment, the Title IX Coordinator must file a formal complaint. If the Title IX Coordinator files a formal complaint in response to the reports, and the recipient follows procedures (including implementing any appropriate remedy as required) consistent with section 106.45 in response to the formal complaint, the recipient's response to the reports is not deliberately indifferent.

(3) For institutions of higher education, a recipient is not deliberately indifferent when in the absence of a formal complaint the recipient offers and implements supportive measures designed to effectively restore or preserve the complainant's access to the recipient's education program or activity. At the time supportive measures are offered, the recipient must in writing inform the complainant of the right to file a formal complaint at that time or a later date, consistent with other provisions of this part.

(4) If paragraphs (b)(1) through (b)(3) of this section are not implicated, a recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must, consistent with paragraph (a) of this section, respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

(5) The Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient merely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence.

(c) *Emergency removal.* Nothing in this section precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate threat to the health or safety of students or employees justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. This provision shall not be construed to modify any rights under the Individuals with Disabilities Education Act,

Section 504 of the Rehabilitation Act of 1973, or title II of the Americans with Disabilities Act.

(d) *Administrative leave.* Nothing in this section precludes a recipient from placing a non-student employee respondent on administrative leave during the pendency of an investigation.

(e) *Definitions.* As used in this part:

(1) *Sexual harassment* means:

(i) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

(ii) Unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

(iii) Sexual assault, as defined in 34 CFR 668.46(a).

(2) *Complainant* means an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint. For purposes of this subsection, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under section 106.44(e)(6).

(3) *Respondent* means an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment.

(4) *Supportive measures* means non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the

complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve access to the recipient's education program or activity, without unreasonably burdening the other party; protect the safety of all parties and the recipient's educational environment; and deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures. The recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the institution to provide the supportive measures. The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

(5) *Formal complaint* means a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment against a respondent about conduct within its education program or activity and requesting initiation of the recipient's grievance procedures consistent with section 106.45.

(6) *Actual knowledge* means notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to a teacher in the elementary and secondary context with regard to student-on-student harassment. Imputation of knowledge based solely on respondeat superior or constructive notice is insufficient to constitute actual knowledge. This standard is not met when the only

official of the recipient with actual knowledge is also the respondent. The mere ability or obligation to report sexual harassment does not qualify an employee, even if that employee is an official, as one who has authority to institute corrective measures on behalf of the recipient.

**§ 106.45 Grievance procedures for formal complaints of sexual harassment.**

(a) *Discrimination on the basis of sex.* A recipient's treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX. A recipient's treatment of the respondent may also constitute discrimination on the basis of sex under title IX.

(b) *Grievance procedures.* For the purpose of addressing formal complaints of sexual harassment, grievance procedures must comply with the requirements of this section.

(1) *Basic requirements for grievance procedures.* Grievance procedures must—

(i) Treat complainants and respondents equitably. An equitable resolution for a complainant must include remedies where a finding of responsibility for sexual harassment has been made against the respondent; such remedies must be designed to restore or preserve access to the recipient's education program or activity. An equitable resolution for a respondent must include due process protections before any disciplinary sanctions are imposed;

(ii) Require an objective evaluation of all relevant evidence – including both inculpatory and exculpatory evidence – and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness;

(iii) Require that any individual designated by a recipient as a coordinator, investigator, or decision-maker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. A recipient must ensure that coordinators, investigators, and decision-makers receive training on both the definition of sexual harassment and how to conduct an investigation and grievance process, including hearings, if applicable, that protect the safety of students, ensure due process protections for all parties, and promote accountability. Any materials used to train coordinators, investigators, or decision-makers may not rely on sex stereotypes and must promote impartial investigations and adjudications of sexual harassment;

(iv) Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process;

(v) Include reasonably prompt timeframes for conclusion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals if the recipient offers an appeal, and a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of the parties or witnesses, concurrent law enforcement activity, or the need for language assistance or accommodation of disabilities;

(vi) Describe the range of possible sanctions and remedies that the recipient may implement following any determination of responsibility;

(vii) Describe the standard of evidence to be used to determine responsibility;

(viii) Include the procedures and permissible bases for the complainant and respondent to appeal if the recipient offers an appeal; and

(ix) Describe the range of supportive measures available to complainants and respondents.

(2) *Notice of allegations.*

(i) *Notice upon receipt of formal complaint.* Upon receipt of a formal complaint, a recipient must provide the following written notice to the parties who are known:

(A) Notice of the recipient's grievance procedures.

(B) Notice of the allegations constituting a potential violation of the recipient's code of conduct, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the specific section of the recipient's code of conduct allegedly violated, the conduct allegedly constituting sexual harassment under this part and under the recipient's policy, and the date and location of the alleged incident, if known. The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must also inform the parties that they may request to inspect and review evidence under paragraph (b)(3)(viii) of this section and inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

(ii) *Ongoing notice requirement.* If, in the course of an investigation, the recipient decides to investigate allegations not included in the notice provided pursuant to paragraph (b)(2)(i)(B) of this section, the recipient must provide notice of the additional allegations to the parties, if known.

(3) *Investigations of a formal complaint.* The recipient must investigate the allegations in a formal complaint. If the conduct alleged by the complainant would not constitute sexual harassment as defined in section 106.44(e) even if proved or did not occur within the recipient's program or activity, the recipient must dismiss the formal complaint with regard to that conduct. When investigating a formal complaint, a recipient must—

(i) Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties;

(ii) Provide equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence;

(iii) Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence;

(iv) Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, and not limit the choice of advisor or presence for either the complainant or respondent in any meeting or grievance proceeding; however, the recipient may establish restrictions regarding the extent to

which the advisor may participate in the proceedings, as long as the restrictions apply

equally to both parties;

(v) Provide to the party whose participation is invited or expected written notice

of the date, time, location, participants, and purpose of all hearings, investigative

interviews, or other meetings with a party, with sufficient time for the party to prepare to

participate;

(vi) For recipients that are elementary and secondary schools, the recipient's

grievance procedure may require a live hearing. With or without a hearing, the decision-

maker must, after the recipient has incorporated the parties' responses to the investigative

report under paragraph (b)(3)(ix) of this section, ask each party and any witnesses any

relevant questions and follow-up questions, including those challenging credibility, that a

party wants asked of any party or witnesses. If no hearing is held, the decision-maker

must afford each party the opportunity to submit written questions, provide each party

with the answers, and allow for additional, limited follow-up questions from each party.

With or without a hearing, all such questioning must exclude evidence of the

complainant's sexual behavior or predisposition, unless such evidence about the

complainant's sexual behavior is offered to prove that someone other than the respondent

committed the conduct alleged by the complainant, or if the evidence concerns specific

incidents of the complainant's sexual behavior with respect to the respondent and is

offered to prove consent. The decision-maker must explain to the party proposing the

questions any decision to exclude questions as not relevant;

(vii) For institutions of higher education, the recipient's grievance procedure must

provide for a live hearing. At the hearing, the decision-maker must permit each party to

ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at a hearing must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under subsection 106.45(b)(3)(iv) to otherwise restrict the extent to which advisors may participate in the proceedings. If a party does not have an advisor present at the hearing, the recipient must provide that party an advisor aligned with that party for to conduct cross-examination. All cross-examination must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility;

(viii) Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. Prior to

140

completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format, such as a file sharing platform, that restricts the parties and advisors from downloading or copying the evidence, and the parties shall have at least ten days to submit a written response, which the investigator will consider prior to completion of the investigative report. The recipient must make all such evidence subject herein to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination; and

(ix) Create an investigative report that fairly summarizes relevant evidence and, at least ten days prior to a hearing (if a hearing is required under section 106.45) or other time of determination regarding responsibility, provide a copy of the report to the parties for their review and written response.

*(4) Determination regarding responsibility.*

(i) The decision-maker(s), who cannot be the same person(s) as the Title IX Coordinator or the investigator(s), must issue a written determination regarding responsibility. To reach this determination, the recipient must apply either the preponderance of the evidence standard or the clear and convincing evidence standard, although the recipient may employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

(ii) The written determination must include—

(A) Identification of the section(s) of the recipient's code of conduct alleged to have been violated;

(B) A description of the procedural steps taken from the receipt of the complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(C) Findings of fact supporting the determination;

(D) Conclusions regarding the application of the recipient's policy to the facts;

(E) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any sanctions the recipient imposes on the respondent, and any remedies provided by the recipient to the complainant designed to restore or preserve access to the recipient's education program or activity;

(F) The recipient's procedures and permissible bases for the complainant and respondent to appeal, if the recipient offers an appeal.

(iii) The recipient must provide the written determination to the parties simultaneously. If the recipient does not offer an appeal, the determination regarding responsibility becomes final on the date that the recipient provides the parties with the written determination. If the recipient offers an appeal, the determination regarding responsibility becomes final at either the conclusion of the appeal process, if an appeal is filed, or, if an appeal is not filed, the date on which an appeal would no longer be considered timely;

(5) *Appeals*. A recipient may choose to offer an appeal. If a recipient offers an

appeal, it must allow both parties to appeal. In cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent. As to all appeals, the recipient must: (i) notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties; (ii) ensure that the appeal decision-maker is not the same person as any investigator(s) or decision-maker(s) that reached the determination of responsibility; (iii) ensure that the appeal decision-maker complies with the standards set forth in section 106.45(b)(1)(iii); (iv) give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome; (v) issue a written decision describing the result of the appeal and the rationale for the result; and (vi) provide the written decision simultaneously to both parties.

(6) *Informal resolution.* At any time prior to reaching a determination regarding responsibility the recipient may facilitate an informal resolution process, such as mediation, that does not involve a full investigation and adjudication, provided that the recipient--

(i) Provides to the parties a written notice disclosing--

(A) The allegations;

(B) The requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations, if any; and

143

(C) Any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared; and

(ii) Obtains the parties' voluntary, written consent to the informal resolution process.

*(7) Recordkeeping.*

(i) A recipient must create, make available to the complainant and respondent, and maintain for a period of three years records of--

(A) Each sexual harassment investigation including any determination regarding responsibility, any disciplinary sanctions imposed on the respondent, and any remedies provided to the complainant designed to restore or preserve access to the recipient's education program or activity;

(B) Any appeal and the result therefrom;

(C) Informal resolution, if any; and

(D) All materials used to train coordinators, investigators, and decision-makers with regard to sexual harassment.

(ii) A recipient must create and maintain for a period of three years records of any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment. In each instance, the recipient must document the basis for its conclusion that its response was not clearly unreasonable, and document that it has taken measures designed to restore or preserve access to the recipient's educational program or activity. The documentation of certain bases or measures does not limit the recipient in the future from providing additional explanations or detailing additional measures taken.