2011 WL 831967
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Ria MUCCI, Plaintiff,
v.
RUTGERS, the State University of New Jersey School of Law–camden, XYZ corportation 1–5 (a fictitious corporation), Defendants.

Civil No. 08–4806 (RBK).
|
March 3, 2011.

**Attorneys and Law Firms**

Frank M. Crivelli, Arpaia & Crivelli, LLC, Hamilton, NJ, for Plaintiff.

Aron Morris Schwartz, Greenbaum, Rowe, Smith, & Davis, LLP, Woodbridge, NJ, for Defendant.

**OPINION**

KUGLER, District Judge.

**\*1** This matter arises out of Defendant Rutgers, The State University of New Jersey School of Law–Camden's ("Rutgers") dismissal of Plaintiff Ria Mucci from law school in 2002. Rutgers dismissed Plaintiff for failure to maintain the required minimum grade-point average ("GPA"). Plaintiff claims that Rutgers dismissed her and subsequently denied her numerous petitions for readmission in violation of her Fourteenth Amendment due processes rights and in breach of an implied state-law agreement between students and universities. Plaintiff also asserts state and federal disability discrimination claims based on Rutgers' alleged failure to provide her with reasonable testing accommodations, and claims for fraud and detrimental reliance stemming from a course she audited in 2007. This matter is presently before the Court pursuant to Rutgers' motion for summary judgment dismissing Plaintiff's claims. For the reasons discussed below, the Court grants Rutgers' motion for summary judgment.

**I. BACKGROUND**

Plaintiff enrolled as a full-time, first year law student at Rutgers in the fall of 1997. She struggled academically at various times while enrolled at Rutgers and was ultimately dismissed in June 2002 for failure to obtain a satisfactory GPA. She submitted petitions requesting readmission in 2002, 2003, 2004, 2005, 2007, and 2008, but Rutgers denied all six requests.

**A. The Law School's Academic Regulations**

A student's academic performance at Rutgers is governed by the law school's Academic Rules and Regulations (the "Academic Regulations"). Rule 11.3 of the Academic Regulations provides that a "student shall be considered to be on warning if the student fails to earn a 2.0 average for the first semester of an academic year," and "[a]t the end of the next semester of enrollment, the student shall be reclassified as either in good standing or as dismissed." (Cert. of Craig N. Oren Ex. A, at 23). Rule 11.4(a) provides that a "student who earns less than a 2.0 average in an academic year shall be dismissed." (*Id.*). If a student is dismissed under Rule 11.4, he has a right to be automatically readmitted on probation if: (1) "the student's average during the academic year for which the student was dismissed was 1.75 or better;" and (2) "the student has not previously earned less than a 2.0 average for a year." (*Id.* at 24). A student who does not satisfy those requirements for automatic readmission "may be readmitted only by petitioning the Committee on Scholastic Standing for re-admission on probation." (*Id.*). Rule 14 provides the following standard and procedures for deciding petitions for readmission:

> he Committee may grant such a petition if it finds that the student has demonstrated sufficient potential so that if re-admitted there would be a substantial likelihood that the student would satisfactorily complete his or her law studies. In addition, the Committee may in its discretion, consider whether and to what extent the student has complied with the Rules and Regulations of the law school. In deciding whether to grant such a petition, ... the Committee shall consider all relevant facts shown by

the student or otherwise presented to it. Relevant facts include those that bear on the student's aptitude, motivation for legal studies, or work habits, on any circumstances that have interfered with the student's performance in law school, on means that were available for ameliorating such circumstances, and on the likelihood that such circumstances will not exist in the future. The Committee may also consider the student's performance at the law school and in previous education, as well as the student's work history. The student has the burden of demonstrating all facts necessary to support a petition for re-admission.

**\*2** (*Id.*). The Committee on Scholastic Standing ("CSS") is composed of four faculty members appointed by the Dean and one student member in good academic standing appointed by the Student Bar Association.

The CSS does not have jurisdiction to decide issues of academic integrity. Those issues are governed by the law school's Code of Student Conduct, which provides comprehensive procedures for disposition of charges of academic dishonesty. When a charge is filed against a student, the Dean of Students must conduct a preliminary review to determine whether there is sufficient evidence for the charge to proceed to a hearing. Substantiated charges are disposed of by a hearing before a board of faculty members and students, with a hearing officer presiding. The hearing officer is usually an independent outside attorney.

**B. Plaintiff's Initial Leave of Absence from Law School**
Plaintiff performed poorly during her first semester in the Fall of 1997. She received a D+ in all four of her classes and a term GPA well below 2.0. Pursuant to Rule 11.3, the CSS notified her that she was "on warning" because of her grades and that unless she achieved a 2.0 average by the end of the academic year, she would be dismissed and lose all credit for the year. Due to Plaintiff's poor performance, which she attributed to certain personal problems relating to her health and divorce/custody proceedings, Sybil James, then Dean of Students, and Professor Oren, the CSS chair, counseled her to apply for a leave of absence. In February 1998, Plaintiff applied for a leave of absence, and the CSS granted Plaintiff's request.

**C. Plaintiff's Return to Law School**
In May 1998, Plaintiff petitioned the CSS for readmission to Rutgers in the Fall of 1998. The CSS held a hearing in July 1998. After the hearing, the CSS determined that Plaintiff was still embroiled in her matrimonial proceedings and that the problems associated with her matrimonial situation continued to impose a substantial burden on her. The CSS therefore denied Plaintiff's petition for readmission in the Fall of 1998 and recommended that Plaintiff use the year to resolve her divorce proceedings.

In May 1999, Plaintiff petitioned the CSS for readmission in the Fall of 1999. After a hearing, the CSS granted Plaintiff's petition subject to certain conditions. The CSS placed Plaintiff "on warning" for the academic year and required Plaintiff to retake the entire first-year curriculum. The CSS also required Plaintiff to meet regularly with the then-Director of the Academic Success Program, Susan Williams–Lewonski.

**D. Plaintiff's Performance upon Returning to Law School**
Near the end of the Fall 1999 semester, Ms. Williams–Lewonski sent Professor Oren an email expressing concern regarding Plaintiff's performance. She reported that Plaintiff was consistently late to meetings, was not keeping up with class work and attendance, and was not taking responsibility for her studies. She concluded that Plaintiff "was so far behind in her school work that it's silly." (Oren Cert. Ex. E, at 2).

**\*3** Plaintiff obtained a 2.643 average for the Fall 1999 semester, but received a D+ in Legal Research and Writing. In the Spring 2000 semester, Plaintiff initially received an F in Property and a 1.571 average for the semester, which gave her a 2.107 cumulative average for the year. Because Plaintiff barely achieved the 2.0 average necessary to return to academic "good standing," the CSS notified Plaintiff that her "performance this year, while meeting our minimum requirements, indicates the need for further improvement...." (Oren Cert. Ex. G). Plaintiff's Property grade was subsequently changed to a D, raising her cumulative average to 2.250.

Plaintiff took Professional Responsibility during the Summer 2000 semester and received a C. During the Fall 2000 semester, Plaintiff achieved a 2.25 term average but received an F in Employment Discrimination Law.[1] During the Spring 2001 semester, Plaintiff obtained a 2.938 average and received grades ranging from a C to a B+. Consequently, she remained in academic "good standing" throughout the year. Plaintiff took three courses during the Summer 2001 semester and performed well, obtaining a term average of 3.438, including an A in Elder Law.

[1] Plaintiff retook Employment Discrimination Law during the Fall 2001 semester. She received a B-, which replaced her F for purposes of calculating her GPA. Her adjusted term average for the Fall 2000 semester is 3.0.

### E. Plaintiff's Dismissal from Law School

Plaintiff's academic performance deteriorated dramatically during her third year. In the Fall 2001 semester, her term average was 1.693, including two D's in Federal Income Tax and Patent Law I. Because her term average was below 2.0, the CSS placed her "on warning" pursuant to Rule 11. The CSS informed her that pursuant to the Academic Regulations she would be dismissed from Rutgers if she did not achieve a 2.0 average for the academic year. The CSS advised Plaintiff that its members were willing to counsel her regarding her studies and impressed upon Plaintiff that her future in the legal profession was at stake. Plaintiff met with Dean James in February 2002 to discuss her "on warning" status. However, her academic performance did not improve during the Spring 2002 semester. Her average for the semester was 1.434, including an F in Law and Biomedical Ethics. Her GPA for the year was 1.580.

The parties dispute the basis for Plaintiff's F in Law and Biomedical Ethics. Professor David M. Frankford graded the course based on a single final take-home exam. The exam included two questions. One question was a "policy" question and the other was an "issue-spotting" question. The exam instructions stated that students were to do no research for the examination after it was distributed. The exam was graded on an anonymous basis using blind grading numbers. When Professor Frankford initially graded the exams, he became suspicious of an exam answer that contained passages that read like articles in medical journals but did not attribute the content of those passages to any outside sources and did not place the passages in quotation marks. The exam belonged to Plaintiff. Professor Frankford asked the Faculty Librarian to perform internet searches using some of the text from the suspicious passages. The librarian reported to Professor Frankford that he had identified six instances in which text from the exam answer was copied verbatim or almost verbatim from journal articles or other outside sources.

*4 Professor Frankford then submitted the grades for his class, including an F for Plaintiff's exam. He subsequently sent an email to Dean James stating that he wished to bring plagiarism charges against the then-unidentified student and that he believed that the student violated the exam instructions by conducting outside research after the exam was distributed. In that email, Professor Frankford explained how he arrived at Plaintiff's grade: "On the merits, the answer was very poor. Aside from the plagiarism, the quality of the answer combined with the violation of my rules would result in a grade of F." (Cert of David M. Frankford Ex. A).

Dean James notified Plaintiff that Professor Frankford had brought two charges against her: one for plagiarism and one for violating his exam instructions by conducting outside research after the exam was distributed. Dean James told Plaintiff that a preliminary review would be conducted to determine whether to proceed with the charges. In response, Plaintiff provided Dean James with printed materials that she purportedly downloaded from the internet before the exam was distributed. Plaintiff pointed out that the date on the materials preceded the date of the exam, and, therefore, she had not violated the exam instructions regarding outside research.

After conferring with Dean James, Professor Frankford agreed to regrade Plaintiff's exam on the assumption that she had not violated his instructions. Professor Frankford certifies that after he reread the exam:

> My assessment did not change: it deserved the grade of 'F' on the merits separate and apart from any possible plagiarism or violation of the examination instructions. The answer to the issue-spotting question was so utterly deficient that the limited responsive information

provided in the answer to the policy question was insufficient to pull the overall exam grade up from 'F', issues of plagiarism or violating the test instructions aside.

(Frankford Cert. ¶ 15). On May 21, 2002, Professor Frankford and other administrators met with Plaintiff and told her that her grade was an "F on the merits of her answers." (*Id.* ¶ 16).

Plaintiff's GPA for the 2001–02 academic year was 1.580. Thus, on June 3, 2002, the CSS informed Plaintiff that she was dismissed from Rutgers pursuant to Rule 11.4 because her GPA for the year was below the 2.0 minimum. Moreover, because Plaintiff's average was below 1.75, she did not qualify for automatic reenrollment, and the CSS informed Plaintiff that she was required to petition for reenrollment if she wished to complete her law degree. Because the CSS dismissed Plaintiff based on her GPA unrelated to Professor Frankford's charges of academic dishonesty, Dean James determined that the academic integrity charges were moot and no proceedings were necessary unless Plaintiff was readmitted.

### F. Plaintiff's Subsequent Petitions for Readmission

Plaintiff timely petitioned for readmission on June 20, 2002. The CSS held a hearing on July 16, 2002. Plaintiff and her attorney appeared at the hearing and the CSS gave Plaintiff the opportunity to present whatever information and materials she desired. Plaintiff told the CSS that her academic difficulties were caused by the illnesses of two of her children during the Fall 2001 semester, her own illness in December 2001, and two deaths within her family during the Spring 2002 exam period. The CSS determined that Plaintiff failed to satisfy her burden in support of readmission. Specifically, the CSS found Plaintiff's explanations regarding her poor performance incredible, and that Plaintiff failed to demonstrate a "substantial likelihood" that she would satisfactorily complete her studies as required by Rule 11.4. (Oren.Cert.Ex. A). By letter dated July 16, 2002, the CSS notified Plaintiff of its decision denying her petition. (Oren Cert. Ex. L). The letter did not provide an explanation for the CSS's decision. It simply stated that the CSS had voted to deny the petition "only after careful consideration of [Plaintiff's] petition." (*Id.*).

\*5 On June 9, 2003, Plaintiff petitioned for readmission for the Fall 2003 semester.[2] The CSS held a hearing on July 9, 2003. Plaintiff appeared at the hearing, and the CSS provided her with an opportunity to present whatever information or materials she desired. In her petition, Plaintiff asserted that she had recently been diagnosed with Type II Adult Onset Diabetes. She stated that she was previously unaware of the condition, but that it was the "overriding cause which severely impaired ... [her] performance" during the 2001–02 academic year. (Oren.Cert.Ex.M). In support of Plaintiff's petition, she submitted a letter from a medical doctor stating that she was conclusively diagnosed with diabetes and that it was the doctor's professional opinion based on Plaintiff's description of her health during law school—particularly a loss of energy during examinations—that she suffered from diabetes during law school.

[2] Plaintiff initially petitioned for readmission for the Summer 2003 semester in May 2003. Professor Oren informed Plaintiff that pursuant to the Academic Regulations, if she wished to return to school, she should file a petition for readmission for the Fall 2003 semester.

The CSS rejected Plaintiff's petition for readmission. It concluded that Plaintiff's diabetic condition was an incredible explanation for her poor academic performance. For example, the CSS reasoned that if diabetes was the cause of her poor performance, she should have performed better on take-home examinations because they generally afford students more time to complete answers. However, the CSS found no material difference between Plaintiff's performance on take-home exams and in-class exams. Plaintiff requested reconsideration of the decision. The CSS rejected Plaintiff's request for reconsideration in August 2003.

The next year, in May 2004, Plaintiff submitted another petition for readmission through her attorneys. In support of her petition, she included a Psychological Assessment Report from The Psychological Clinic at Rutgers Graduate School of Applied and Professional Psychology (the "Assessment Report") and a letter from two staff members at the clinic. The Assessment Report states that the Clinic evaluated Plaintiff at her request because she was "hoping that with adequate documentation of her test anxiety and personal problems that she was experiencing during the [2002] spring semester, [Rutgers] will allow her to graduate or at least re-take the spring

courses." (Oren Cert. Ex. 0, at 1). The Clinic interviewed Plaintiff and administered various intelligence, memory, and personality tests. The Clinic concluded that "[t]he assessment results did not yield specific evidence of Ms. Mucci's anxiety adversely affecting her performance under timed testing situations." (Oren Cert. Ex. O). The Clinic nevertheless noted that Plaintiff self-reported anxiety symptoms during law school and that those symptoms may be consistent with an anxiety disorder that manifests only under greater stress than she experienced during the clinical testing. The Clinic also found that "Ms. Mucci's self-report of anxious symptoms was not sufficiently severe to warrant an anxiety disorder diagnosis ... although she would likely qualify for a diagnosis of adjustment disorder with anxious features." (Oren Cert. Ex. O). The Clinic ultimately reached the following conclusion and recommendation:

> *6 Ms. Mucci evidenced intellectual abilities that are conducive to completion of a law degree. However, she also expressed a great deal of anxiety in her personal life and during the testing situation, which could have negatively impacted her academic performance. Although additional time accommodations have been somewhat helpful to Ms. Mucci in maximizing her potential, it seems as if her stress has reached a level where these accommodations are no longer adequate to address her difficulties. It is difficult to ascertain her typical level of anxiety in a given semester, since her dismissal from law school has apparently created more stress than usual. However, the amount of cumulative stress that was created during the final year, when Ms. Mucci experienced the most difficulty, was no doubt greater than normal to her. Her performance during this particularly emotionally demanding time is likely not indicative of her true potential. Active participation in therapy would probably serve to reduce Ms. Mucci's anxiety to a degree that she would be able to return for a semester and successfully complete the courses required to obtain her law degree.

(Oren Cert. Ex. O).[3]

[3] The letters from the staff members at the clinic that Plaintiff included in her petition contain substantially the same conclusions and recommendations.

The CSS held a hearing in July 2004 regarding Plaintiff's petition. Plaintiff and her counsel appeared and the CSS gave them an opportunity to present any information or materials they desired. The CSS unanimously denied Plaintiff's petition. Professor Oren identifies two reasons for the CSS's decision. First, the CSS was "troubled" by several perceived inaccuracies or misrepresentations in Plaintiff's petition. (Oren Cert. ¶ 40). For example, Plaintiff's petition states that the law school "ignored" her "difficulties with time management and test anxiety." (Id. ¶ 41). The CSS found that this statement was "simply untrue" because Plaintiff had "been given test accommodations in the form of time-and-a-half and semi-private, quiet testing rooms for her entire law school career for all in-class, timed exams." (Id.). The CSS also found Plaintiff's claim that her academic struggles were caused by "adjustment disorder with anxious features" to be incredible because: (1) Plaintiff offered those explanations for the first time in her petition even though the supporting medical documentation predated her earlier petition; and (2) the documentation did not attribute Plaintiff's academic difficulties squarely to any personality disorders. (Id. ¶¶ 43–44). The CSS was also troubled by the fact that Plaintiff's petition did not reference her prior explanations for bad performance; namely, her alleged illness during the Fall 2001 exams, her children's health issues during the Fall 2001 semester, and the deaths of relatives during her Spring 2002 exams. Those inconsistencies "reinforced the CSS's sense that [Plaintiff] was looking for reasons to use as a way to excuse her poor performance rather than focusing on her own responsibilities as a student, on whether her study skills were deficient, on whether she was properly organized, and the like." (Id. ¶ 48).

*7 Second, the CSS found that even if Plaintiff's difficulties could be credibly attributed to her anxiety and/ or adjustment disorders, she presented no evidence that she had taken steps to deal with those problems. For example, the Assessment Report concluded that "[a]ctive

participation in therapy would probably serve to reduce [Plaintiff's] anxiety to a degree that she would be able to return for a semester and successfully complete ... her law degree." (Oren Cert. Ex. O). The CSS noted, however, that "[t]here was no information before the CSS that [Plaintiff] had continued in any sort of treatment, what that treatment was, or, most importantly, how any such treatment related to her academic deficiencies." (Oren Cert. ¶ 46).

On July 28, 2004, the CSS notified Plaintiff that her petition was denied. According to Professor Oren, "[t]he approach [Plaintiff] had taken on her successive petitions —of offering new and differing reasons to excuse or escape from the consequences of her deficient academic performance instead of focusing on how to address her academic shortcomings—left the CSS with the distinct impression that she had not identified and solved the problem that had led to her unsatisfactory and unacceptable academic performance in the 2001–2002 academic year." (Id. ¶ 49). "It was the consensus of the CSS that [Plaintiff] was not truly focusing on her academic shortcomings but was continuing to look for excuses and shortcuts; she did not convince the CSS that she was seriously interested in reforming her approach to her academic responsibilities." (Id. ¶ 49). The CSS also informed Plaintiff that, pursuant to Rule 18.6 of the Academic Regulations, which permits the CSS to determine when a student may reapply for readmission, Plaintiff could not submit a petition for readmission for three years.

### G. Plaintiff's First Lawsuit

On August 23, 2004, Plaintiff filed a Complaint asserting various claims stemming from the CSS's denial of her petitions for readmission (*"Mucci I"* ). The named defendants timely filed an Answer asserting, among other defenses, the statute of limitations as a bar to Plaintiff's claims. The parties settled *Mucci I* before a decision on the merits, and Plaintiff dismissed her claims. However, pursuant to the parties' settlement agreement, Plaintiff could reassert claims stemming from Rutgers' dismissal and denial of her petitions if Plaintiff petitioned for readmission in 2007 and the CSS denied her petition.

The settlement agreement also provides that "[i]f any subsequent action brought by [Plaintiff] includes Re-filed claims, Defendants may assert any and all defenses presently available in [*Mucci I* ] as well as any and all defenses otherwise available, provided, however, that for purposes of the statute of limitations, limitations periods applicable to Re-filed Claims shall be deemed to have been tolled from the date of filing of the complaint in the Lawsuit (August 23, 2004) to the date of notice to [Plaintiff]" of the CSS's denial of her petition for readmission. (Cert. of Aaron M. Schwartz Ex. C). The settlement agreement also included as an attachment a three-page letter from Professor Oren detailing steps that Plaintiff should take to strengthen her petition for readmission.

### H. Plaintiff's 2007 Petition

*8 Pursuant to the settlement agreement, Plaintiff petitioned for readmission in June 2007. The CSS held a hearing in July 2007. Plaintiff appeared at the hearing with her attorney and was afforded an opportunity to present any materials they desired. Plaintiff submitted a three-page letter on her own behalf. Plaintiff's letter recounted various jobs she held and steps she took during the intervening period to prepare for readmission to law school. Specifically, Plaintiff represented that she was "employed as a full-time substitute teacher" and that "in recent months" she had interned at a local attorney's office. (Oren Cert. Ex. Q). She submitted a letter from that attorney regarding her internship. By letter dated July 27, 2007, the CSS notified Plaintiff of its decision to deny her petition. In that letter, Professor Oren summarized the consensus of the majority as follows:

> We were troubled that you had not substantially complied with the suggestions we made in our letter attached to the settlement agreement.... In particular, you were unable to indentify concrete steps you have taken to improve your study habits and exam-taking skills. We were also concerned that you showed a tendency to exaggerate what you had done. Your petition, for instance, gives the impression that you had acted as a full-time substitute [teacher]; but, under questioning, you said that you had only been eligible to do so but had not actually done it. In addition, you seemed to overstate the extent to

> which you and Mr. Malignaggi [the local attorney] worked together.

(Oren Cert. Ex. Q).

The CSS determined that Plaintiff could petition for readmission the following year and provided Plaintiff with suggestions to build her case for readmission. Specifically, the CSS suggested that Plaintiff "unofficially" audit a course at the law school and take advantage of the law school's Academic Support Program. (*Id.*). According to Professor Oren, the CSS determined that if Plaintiff audited a course, "she should take the final exam in the course (although it would not count in her GPA) as a way of demonstrating that she could do at least 'C' (2.0) level work—the level she would have to meet if she were readmitted." (Oren Cert. ¶ 58). The CSS's letter to Plaintiff does not address whether Plaintiff would have to take the final exam if she chose to audit a course. The letter states only that she would need to obtain the professor's permission and the audit would be free of charge because it would be "unofficial." (Oren Cert. ¶ Ex. Q).

Pursuant to the CSS's suggestion, Plaintiff and Professor Oren exchanged several emails regarding her auditing a class. Eventually, Professor David Dembe agreed to allow Plaintiff to audit his Decedents' Estates and Trusts course. In an email to Plaintiff, Professor Oren informed her that she could audit the course. Professor Oren also informed Plaintiff: "We expect you to take the final examination. Your grade will not count toward your grade point average. All the same, taking the exam and getting a grade will be valuable to you and to us in gauging your progress." (Oren Cert. Ex. R). Professor Oren copied Plaintiff's attorney on the email, who acknowledged receipt. Plaintiff did not object to any of Professor Oren's terms and proceeded to audit the course.

*\*9* During the semester, Plaintiff received an email from the Office of the Dean of Students regarding testing accommodations. Plaintiff responded to the email by submitting a form requesting accommodations for the final exam in Professor Dembe's class. Plaintiff did not specify exactly what accommodations she sought, but she submitted a one-page document signed by an "Associate Professor of Psychiatry" from an unidentified institution. The document did not reference Plaintiff by name. It simply stated that Rutgers should provide "50% extended time to complete all timed examinations." (Cert. of Angela Baker Ex. F). Because the Decedents' Estates and Trusts exam was a twenty-four hour, self-scheduled take-home exam that Professor Dembe designed to be completed in approximately three hours, and because Plaintiff's documentation did not support any additional accommodations, the Dean determined that Plaintiff did not need any accommodations for Professor Dembe's exam. Plaintiff took the final exam and received a C-. Professor Oren promptly notified Plaintiff's attorney of her grade.

### I. Plaintiff's 2008 Petition

In May 2008, Plaintiff once again petitioned for readmission. In support of her petition she submitted a letter from Dr. Michael Colis, Ph.D., a clinical neuropsychologist, and a letter from Dr. Richard Jermyn, D.O., Diplomate, Board of Physical Medicine and Rehabilitation. The letters discuss an evaluation by another doctor regarding Plaintiff's cognitive functioning following a 2005 automobile accident. The letters recommend that Plaintiff receive extra time and a "distraction free" venue for taking her exams.

The CSS held a hearing in July 2008. Plaintiff appeared without counsel, made a presentation, and was given an opportunity to present whatever material she desired. The CSS denied Plaintiff's petition. According to Professor Oren:

> The consensus was that permitting [Plaintiff] to audit the Decedents' Estates and Trusts course had given her an opportunity to show that she could do "C" level work. Earning a "C-minus" when she was taking a single course rather than an eight or 12 credit course load strongly suggested to the CSS that it was unlikely that [Plaintiff] could successfully complete an entire semester with a 2.0 average. The sense was that she did not have to study for any other exams and had no papers to write, yet could not even complete an untimed take-home exam within the 24 hour window allowed from the time she downloaded the exam.

(Oren Cert. ¶ 74).

### J. The Instant Lawsuit

Following the CSS's denial of Plaintiff's 2008 petition, Plaintiff filed the instant lawsuit against Rutgers. Plaintiff's Complaint includes ten counts. Count I does not assert a cause of action but alleges that the settlement agreement in *Mucci I* does not bar Plaintiff from bringing this action. Count II alleges that Rutgers fraudulently induced her to audit the Decedents' Estates and Trusts course by failing to inform her that she would be required to take the final exam and that the CSS would consider her grade when deciding her readmission petition. Count III asserts a claim for detrimental reliance based on the same allegations regarding the Decedents' Estates and Trusts exam. Count IV appears to be a claim under 42 U.S.C. § 1983 for violations of Plaintiff's procedural due process rights based on Rutgers' repeated denial of her petitions for readmission. Count V appears to be a claim under 42 U.S.C. § 1983 for violations of Plaintiff's substantive due process rights based on Rutgers' denial of her petitions for readmission. Count VI is also a substantive due process claim alleging that because Rutgers refused to admit Plaintiff and because the American Bar Association requires law students to complete their law degrees within five years, Rutgers has effectively deprived Plaintiff of her purported right to complete her law degree. Count VII is a procedural due process claim alleging that Rutgers dismissed her in 2002 because of alleged plagiarism charges without providing appropriate process. Count VIII is a breach-of-contract claim under New Jersey law based on an implied agreement between students and universities. Count IX is a discrimination claim under the American's with Disabilities Act ("ADA"). Count X is a discrimination claim under the New Jersey Law Against Discrimination ("NJLAD"). Plaintiff seeks damages and an order requiring Rutgers to readmit her. Rutgers now moves for summary judgment dismissing all of Plaintiff's claims.

### II. LEGAL STANDARD

*10 Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, the Court is not to make credibility determinations regarding witness testimony. *Sunoco, Inc. v. MX Wholesale Fuel Corp.,* 565 F.Supp.2d 572, 575 (D.N.J.2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

However, to defeat a motion for summary judgment, the nonmoving party must present competent evidence that would be admissible at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys.,* 63 F.3d 1267, 1275 n. 17 (3d Cir.1995). The nonmoving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions [or] conclusory allegations or suspicions" to establish the existence of a genuine issue of material fact. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982) (citation omitted); *see* Fed.R.Civ.P. 56(e). "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' mandates the entry of summary judgment." *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 857–58 (3d Cir.2000) (quoting *Celotex Corp.,* 477 U.S. at 322).

### III. DISCUSSION

#### A. Plaintiff's Fraudulent Inducement Claim

Plaintiff alleges that Rutgers committed legal and equitable fraud by misrepresenting to her that she would not be required to take the final exam in Decedents' Estates and Trusts and that the CSS would consider her grade when deciding her readmission petition.

To prove legal fraud under New Jersey law, a plaintiff must establish: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *McConkey v. AON Corp.,* 354 N.J.Super. 25, 804 A.2d 572, 584 (N.J.Super.Ct.App.Div.2002) (citing *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367 (N.J.1997)). To establish equitable fraud, a plaintiff must prove: (1) a material misrepresentation of a presently existing or past fact; (2) an intention that the other person rely on the misrepresentation; and (3) detrimental and reasonable reliance. *Jewish Ctr. of Sussex County*

v. *Whale,* 86 N.J. 619, 432 A.2d 521, 524 (N.J.1981). A plaintiff may recover damages only if she proves legal fraud. *Id.* at 524. A plaintiff may obtain equitable relief without damages by proving equitable fraud. *Id.* A plaintiff must prove equitable and legal fraud by clear and convincing evidence. *McConkey,* 804 A.2d at 584; *Daibo v. Kirsch,* 316 N.J.Super. 580, 720 A.2d 994, 999 (N.J.Super.Ct.App.Div.1998).

*11 In support of her fraud claim, Plaintiff relies exclusively on the Academic Regulations that govern the auditing of courses. Rule 8.8 of the Academic Regulations provides that students officially auditing courses "need not take the final examination." (Oren Cert. Ex. A, at 20). Rule 8.8 also provides that auditors "may be given either a grade of S (satisfactory) or U (unsatisfactory) for an audited course." (*Id.*). Plaintiff argues that, based on those rules, she assumed that she would not have to take the final exam for Decedents' Estates and Trusts and would not be given a conventional grade.

However, Plaintiff does not proffer any evidence in support of her claim that she reasonably relied on Rule 8.8 when she agreed to audit Decedents' Estates and Trusts. To the contrary, Plaintiff admitted at her deposition that she received Professor Oren's August 17, 2007 email stating:

> As an auditor, you will not need to pay any tuition. Your participation will not earn you credit or show on your transcript. We expect you to take the final examination. Your grade will not count toward your grade-point average. All the same, taking the exam will be valuable to you and to us in gauging your progress.

(Mucci Dep. 161:6–163:5; Schwartz Cert. Ex. D, D–41). Plaintiff also admits that Professor Oren repeated those expectations to her in one or more phone conversations after his August 17, 2007 email. (Mucci Dep. 164:22–165:7). In opposition to Rutgers' motion, Plaintiff does not offer any testimony that notwithstanding Professor Oren's clear communications, she actually relied on Rule 8.8 rather than Professor Oren's instructions. Plaintiff cannot survive summary judgment by making unsubstantiated assertions regarding a necessary element of fraud. If she actually relied on Rule 8.8 rather than Professor Oren's communications, she must testify to that fact or present some circumstantial evidence in support of her claim. In light of Professor Oren's communications with Plaintiff, no reasonable jury could conclude that Plaintiff actually relied on Rule 8.8 when she agreed to audit Decedents' Estates and Trusts.

Moreover, even if Plaintiff testified that she actually relied on Rule 8.8, there is no evidence to suggest that her reliance was reasonable. First, the plain text of Rule 8.8 suggests that it did not apply to Plaintiff's auditing of Decedents' Estates and Trusts. Rule 8.8 applies to official auditing by admitted "students." It provides that "students" may formally enroll in classes as "auditors" and that audited courses will appear on their transcripts. Plaintiff cannot seriously argue that she reasonably believed that she was an admitted student at the time she audited Decedents' Estates and Trusts.[4] Thus, even if Plaintiff actually believed that her auditing of Decedents' Estates and Trusts was governed by Rule 8.8, the text of the rule itself suggests that her reliance was unreasonable. Plaintiff offers no evidence to suggest that her purported interpretation of Rule 8.8 was reasonable.

4   Indeed, the CSS made clear to Plaintiff that her auditing arrangement was "unofficial" and that the course would not appear on her transcript. (*Id.*).

*12 Second, Plaintiff's asserted reliance on Rule 8.8 was unreasonable in light of Professor Oren's repeated communications to Plaintiff that the CSS expected her to take the final exam and that the CSS would use her grade to gauge her progress. Plaintiff presents no evidence to support her claim that it was reasonable for her to ignore those communications and rely instead on her own dubious interpretation of Rule 8.8. Thus, Plaintiff cannot establish a claim for fraud, and the Court grants summary judgment dismissing that claim.

**B. Plaintiff's "Detrimental Reliance" Claim**
Plaintiff asserts "detrimental reliance" as "an alternative cause of action for the same alleged conduct" contained in her fraud claim. (Pl's Br. in Opp'n to Def.'s M. Summ. J., at 22). That is, she claims that she detrimentally relied on Rutgers' alleged representations that she would not have to take an exam in Decedents' Estates and Trusts and that the CSS would not use her grade as a basis for denying her petition for readmission.

Plaintiff's claim is properly framed as a quasi-contract claim under the doctrine of promissory estoppel.[5] "Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington,* 194 N.J. 223, 944 A.2d 1, 19 (N.J.2008); *see Lobiondo v. O'Callaghan,* 357 N.J.Super. 488, 815 A.2d 1013, 1020 (N.J.Super.Ct.App.Div.2003).

[5] Plaintiff concedes this in her brief. (*See* Pl's Br. in Opp'n to Def.'s M. Summ. J., at 23).

Plaintiff cannot prove this claim because she cannot prove that Rutgers made a clear and definite promise or that she reasonably relied on the alleged promise. First, the evidence proves that Rutgers clearly informed Plaintiff that she would be expected to take the final exam and that the CSS would use her grade as a basis for "gauging" her progress. The only evidence Plaintiff offers in response to those communications is Rule 8.8. However, as discussed above, the text of Rule 8.8 applies to formal auditing by admitted students. Rule 8.8 does not include any promises relevant to Plaintiff's "unofficial" auditing of Decedents' Estates and Trusts. Thus, Plaintiff does not present any evidence of a clear or definite promise by Rutgers.

Second, there is no evidence that Plaintiff reasonably relied on Rutgers' alleged promises. Plaintiff admits that Professor Oren told her in writing and over the phone that the CSS expected her to take the final exam and that the CSS would use her performance on the exam to gauge her progress. In light of those communications, it was unreasonable for Plaintiff to assume that she would not have to take the exam and that the CSS would not consider her grade when evaluating her petition for readmission. Plaintiff presents no evidence to the contrary. There are no issues of fact regarding this claim.

### C. Plaintiff's Due Process Claims and the Statute of Limitations

*13 Plaintiff asserts a variety of procedural and substantive due process claims in Counts IV through VII of the Complaint. Count IV is a procedural due process claim based on Plaintiff's dismissal in 2002 as well as her subsequent petitions for readmission in 2002, 2003, 2004, 2007, and 2008. Count V is a substantive due process claim based on Rutgers' 2002 dismissal and subsequent refusal to readmit Plaintiff. Count VI is a substantive due process claim based on Rutgers' failure to readmit Plaintiff and the American Bar Association's requirement that law students complete law school within five years of their initial enrollment. Count VII is a procedural due process claim based solely on Plaintiff's dismissal in 2002. Rutgers argues that any claims based on Plaintiff's 2002 dismissal and her 2002 and 2003 petitions for readmission are barred by the applicable two-year statute of limitations.

Plaintiff's constitutional claims are authorized by 42 U.S.C. § 1983. Section 1983 provides a private right of action for violations of an individual's constitutional rights. *See Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Congress did not provide a specific federal statute of limitations for claims brought under Section 1983, but the Supreme Court has held that 42 U.S.C. § 1988 directs federal courts to "borrow" the state statute of limitations from the most analogous state law cause of action. *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The Third Circuit has uniformly applied New Jersey's two-year statute of limitations for personal injury claims to all Section 1983 claims. *See O'Connor v. City of Newark,* 440 F.3d 125, 126–27 (3d Cir.2006) (applying N.J. Stat. Ann. § 2A:14–2 to Section 1983 claim). Thus, Plaintiff's due process claims are subject to a two-year limitations period.

Plaintiff was notified of her dismissal from law school by letter dated June 3, 2002. She then petitioned for readmission and the CSS notified her of its decision to deny the petition by letter dated July 16, 2002. Plaintiff filed her Complaint in *Mucci I* more than two years later on August 23, 2004. Thus, according to Rutgers, any due process claims based on Plaintiff's 2002 dismissal and readmission petition are time barred.

Regarding Plaintiff's 2003 petition, the CSS notified Plaintiff that her petition was denied on July 10, 2003. Although Plaintiff filed her Complaint in *Mucci I* approximately a year later in August 2004, the settlement agreement provides:

> If any subsequent action brought by [Plaintiff] includes Re-filed Claims, Defendants may assert any and all defenses presently available in the Lawsuit as well as any and all defenses otherwise available, provided, however, that *for purposes*

> *of the statute of limitations, limitations periods applicable to Re-filed Claims shall be deemed to have been tolled from the date of filing of the complaint in the Lawsuit (August 23, 2004) to the date of notice to [Plaintiff] of [the CSS's denial of a subsequent petition for readmission].*

**\*14** (Schwartz Cert. Ex. C) (emphasis added). In June 2007, after the parties executed the settlement agreement, Plaintiff petitioned the CSS for readmission. The CSS notified Plaintiff on July 27, 2007, of its decision to deny her petition. Consequently, the statute of limitations regarding Plaintiff's claims began to run again at that time. However, although the limitations period was running, Plaintiff did not refile her Complaint in this matter until September 22, 2008. Thus, excluding the period during which the settlement agreement tolled the limitations period (August 23, 2004 to July 27, 2007), Plaintiff waited more than five years to file her claims based on the CSS's denial of her 2003 petition. Rutgers therefore argues that that claim is also time barred.

Plaintiff acknowledges that her claims are governed by a two-year limitations period. However, she argues that none of her claims are time barred because the doctrine of "exhaustion of administrative remedies" required that she file repeated petitions for readmission before suing in court. Plaintiff also argues that Rutgers waived the statute of limitations as an affirmative defense because Rutgers did not originally assert the defense in response to Plaintiff's Complaint in *Mucci I* and because the settlement agreement in *Mucci I* provides that she may reassert any claims that were not originally time barred. Plaintiff further argues that her claims are not time barred because Rutgers' conduct constitutes a continuing violation of her due process rights.

The Court finds that Plaintiff's due process claims based on her 2002 dismissal and 2002 and 2003 petitions are time barred. First, Plaintiff's contention that Rutgers waived the defense by not properly including it in a responsive pleading in *Mucci I* is simply untrue. Rutgers specifically pled the statute of limitations as an affirmative defense in its Answer to Plaintiff's Complaint in *Mucci I*. (*See* Supp. Cert. of Aron M. Schwartz Ex. A, at 12 ("Some or all of plaintiff's claims are barred by applicable statutes of limitations"). Second, the settlement agreement unambiguously provides that the statute of limitations would be "tolled" from the date when Plaintiff filed her complaint in *Mucci I* until the date the CSS notified her that her petition was denied. The clear intent of the parties was that the limitations period would start to run again if Rutgers denied Plaintiff's petition. Thus, Rutgers did not waive the statute of limitations when it entered into the settlement agreement.

Third, the statute of limitations is not tolled in this case under the doctrine of "exhaustion of administrative remedies." Because Section 1983 claims are subject to the state statute of limitations most analogous to a Section 1983 cause of action, Section 1983 claims are also subject to that statute of limitations' tolling rules. *Bd. of Regents of Univ. of St. N.Y. v. Tomanio*, 446 U.S. 478, 484–85, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (the "borrowing" of the analogous state statute of limitations "logically include[s] rules of tolling"). Under New Jersey law, "a statute of limitations governing timeliness of an action will not be tolled for a pending determination in another tribunal absent an exhaustion requirement in the statute." *Byrd v. Manning*, 253 N.J.Super. 307, 601 A.2d 770, 775 (N.J.Super.Ct.App.Div.1992) (citing *W.V. Pangborne & Co. v. New Jersey Dep't of Transp.*, 116 N.J. 543, 562 A.2d 222, 228 (N.J.1989)). "The general rule is that in order that the pendency of other proceedings shall have the effect of tolling the statute of limitations on a cause of action, the proceedings must be such as to prevent enforcement of the remedy by action." *W.V. Pangborne & Co.*, 562 A.2d at 228. Thus, in *Byrd*, the Court rejected the plaintiff's argument that New Jersey's statute of limitations applicable to his Section 1983 claim was tolled by pending criminal proceedings. The court held that the statute was not tolled because there was no relevant statutory exhaustion requirement and because the pending criminal proceedings did not prevent the plaintiff from seeking redress under Section 1983. *Id.* at 775.

**\*15** Plaintiff identifies no statutory exhaustion requirement that would prevent her from seeking judicial redress of her alleged constitutional violations stemming from her 2002 dismissal and her subsequent petitions for readmission in 2002 and 2003. Plaintiff could have immediately challenged those decisions in court without pursuing any subsequent petitions for readmission. Plaintiff identifies no law or Academic Regulation that required her to file repeated petitions for readmission before seeking redress for her alleged constitutional

violations in court. Thus, Plaintiff's repeated petitions for readmission did not toll the statute of limitations.

Plaintiff's "continuing violation" argument also fails. The "continuing violation" doctrine tolls the statute of limitations if the defendant commits a series of "acts which are not individually actionable but may be aggregated to make out" a claim. *O'Connor,* 440 F.3d 127 (citing *AMTRAK v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). However, the statute of limitations is not tolled if the defendant's misconduct involves "discrete acts [that] are individually actionable." *Id.* The Supreme Court has held that, in the employment context, actions such as "termination, failure to promote, denial of transfer, or refusal to hire" are "discrete acts" that do not toll the statute of limitations.[6] *Morgan,* 536 U.S. at 114. Rutgers' dismissal of Plaintiff from law school and its subsequent denial of her readmission petitions were discrete acts most analogous to termination of employment or refusal to hire. Thus, they constitute discrete acts that do not warrant tolling the statute of limitations. *Cf. id.*

[6] Plaintiff does not cite any cases applying the "continuing violation" doctrine to Section 1983 claims based on the dismissal of graduate or college students. Plaintiff cites only an employment discrimination case applying the doctrine in the context of a hostile work environment claim. *See O'Connor,* 440 F.3d at 127. Thus, it is unclear whether the doctrine would find proper application in this context. In any event, even if the doctrine is properly applied here, the Court finds that the statute of limitations is not tolled because each action by Rutgers was individually actionable.

Because the statute of limitations was not tolled regarding Plaintiff's Section 1983 claims, the Court grants summary judgment dismissing Count VII of the Complaint, which is based entirely on Rutgers' 2002 dismissal of Plaintiff, as well as those portions of Counts IV, V, and VI that allege constitutional violations based on Plaintiff's 2002 dismissal and Rutgers' denial of her 2002 and 2003 petitions for readmission.

### D. Plaintiff's Procedural Due Process Claims

Rutgers argues that Plaintiff's timely due process claims should nevertheless be denied because Rutgers afforded Plaintiff the constitutionally required due process.

The Fourteenth Amendment prohibits states from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. To succeed on a Section 1983 claim for a violation of the Fourteenth Amendment's procedural protections, a plaintiff must prove: (1) that a state actor deprived her of a recognized "liberty" or "property" interest; and (2) that the deprivation occurred without adequate process.[7] *See Bd. of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Robb v. Philadelphia,* 733 F.2d 286, 292 (3d Cir.1984). Property and liberty interests are "not generally created by the Constitution." *Robb,* 733 F.2d at 292 (discussing property interests); *see Horowitz,* 435 U.S. at 82–84 (discussing liberty interests). "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A property interest exists if state law creates "a legitimate claim of entitlement to" the disputed interest. *Id.*

[7] Rutgers does not contest that it is an "instrumentality of the state" subject to suit under Section 1983. *See Kovats v. Rutgers,* 633 F.Supp. 1469, 1472 (D.N.J.1986) (holding that Rutgers, the State University of New Jersey was subject to suit under Section 1983 for claims by professors who were discharged without a hearing).

**\*16** Regarding the process required under the Fourteenth Amendment, "due process is not a fixed concept, but a flexible doctrine that varies with the particular circumstances." *Van de Zilver v. Rutgers Univ.,* 971 F.Supp. 925, 932 (D.N.J.1997) (citing *Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). The "requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Kahn v. United States,* 753 F.2d, 1208, 1218 (3d Cir.1985). The Supreme Court has applied that standard in the context of a student dismissal at a state university. *See Horowitz,* 435 U.S. at 80.

In *Horowitz,* a medical student was dismissed for failure to meet academic standards. *Id.* at 79. The student sued the university alleging that she was dismissed without adequate process. *Id.* at 80. The Court held that the university provided adequate process because: (1) the faculty fully informed the student on multiple occasions

that it was dissatisfied with the plaintiff's academic performance and that her poor performance posed a threat to graduation and continued enrollment; and (2) the university's "ultimate decision to dismiss [the student] was careful and deliberate." *Id.* at 85. The student was not afforded a formal hearing or an opportunity to appear before the committee that decided to dismiss her. *Id.* at 81. In support of those minimal procedural requirements, the Court wrote:

> Academic evaluations of a student ... bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement.... Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id.* at 89–90. Consistent with that ruling by the Supreme Court, "[t]he Third Circuit has construed *Horowitz* to require no more than 'an informal faculty evaluation with the student,' prior to an academic dismissal." *Van de Zilver,* 971 F.Supp. at 932 (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J.,* 781 F.2d 46, 50–51 (3d Cir.1986)).

Plaintiff argues that Rutgers' repeated denials of her readmission petitions in 2004, 2005, 2007, and 2008 deprived her of a protected property interest without appropriate procedural protections. Without addressing whether Plaintiff has a protected liberty or property interest in readmission to Rutgers, the Court finds that Plaintiff received the constitutionally required process during her 2004, 2005, 2007, and 2008 readmission hearings.

First, Plaintiff received more process than the student in *Horowitz.* Before the CSS decided Plaintiff's readmission, the CSS afforded Plaintiff the opportunity to make a written submission in support of her petition, appear before the CSS in person, and present any materials or arguments in support of her petition. The CSS also independently reviewed Plaintiff's grades and past academic performance. Then, after Plaintiff was given an opportunity to be heard in person and present materials in support of her petition, the CSS deliberated over her petition and reached a decision based on a majority vote. There is no evidence to suggest that this process was not fair, careful, and deliberate. *See Horowitz,* 435 U.S. at 85 (upholding academic dismissal based on procedures that did not provide for student to appear before committee).

**\*17** Nevertheless, Plaintiff claims that Rutgers did not provide adequate process because it failed to comply with its own Academic Regulations governing the process for readmission. Specifically, Plaintiff claims that Rutgers refused to readmit her even though the evidence she presented at the 2004 hearing clearly satisfied Rule 11.4(d)'s standard for readmission. That argument fails. Plaintiff does not allege that Rutgers set aside any particular procedural requirements for deciding her readmission petitions. Rather, Plaintiff contests the CSS's ultimate determination that she failed to satisfy Rule 11.4(d)'s substantive standard for readmission. As the Supreme Court has made clear, courts should not venture into the substance of academic evaluations by state universities:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Ewing,* 474 U.S. at 225; *see also Miller v. Hamline Univ. Sch. of Law,* 601 F.2d 970 (8th Cir.1979) (applying this deferential standard in the context of a student's petition for readmission to law school). The CSS reviewed Plaintiff's submissions and presentations and

reached a determination regarding her academic potential. The Fourteenth Amendment's procedural protections do not entitle Plaintiff to a substantive review of that determination by this Court.

Plaintiff also argues that Rutgers violated her procedural rights because she was entitled to the heightened process due in a student disciplinary hearing. *See Horowitz*, 435 U.S. at 85–86 (noting that heightened procedural due process rights apply for dismissal based on disciplinary proceedings); *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that heightened process is due in a disciplinary dismissal). Plaintiff argues that because her initial dismissal was based in part on allegations of academic dishonesty, the Court should review her subsequent petitions for readmission under the heighted due process standard applied to student disciplinary proceedings. This argument also fails. Plaintiff attempts to do an end run around the statute of limitations barring her challenge to the CSS's initial dismissal in 2002. Plaintiff did not timely challenge her 2002 dismissal as a disguised disciplinary proceeding. Thus, that claim is barred.[8] Because Plaintiff does not present any evidence that the CSS improperly treated her subsequent readmission petitions as disguised disciplinary proceedings, Rutgers' conduct during those proceedings is subject to review under the standard announced in *Horowitz*. As noted above, Rutgers provided Plaintiff with adequate process under that standard.

[8] Plaintiff's argument would fail even if the statute of limitations did not bar her from challenging her dismissal in 2002. As discussed below regarding Plaintiff's breach of contract claim, Plaintiff presents no evidence that Rutgers dismissed her in 2002 for academic integrity reasons. The evidence proves only that Rutgers dismissed Plaintiff because her grades, on the merits, failed to satisfy the school's minimum requirements.

### E. Plaintiff's Substantive Due Process Claim

*18 Unlike the substantive rights protected by procedural due process, which emanate from state law, substantive due process rights emanate from the Constitution. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229–30, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring). Substantive due process rights are therefore much narrower in scope. *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir.2003). The Supreme Court has not recognized a constitutionally protected property or liberty interest in completing a professional program of study. *See id.* at 251 ("we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process"); *see also Van de Zilver*, 971 F.Supp. at 934–35 (concluding that there is no substantive due process right to complete a program of study).

Moreover, the Court has cautioned, that it is "reluctant to expand the concept of substantive due process." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It has limited substantive due process protections to interests "protected by specific constitutional guarantees, ... freedom from government actions that shock the conscience, ... and certain interests that [are] so rooted in the traditions and conscience of our people as to be fundamental." *Bell*, 351 F.3d at 250 (internal citations and quotation marks omitted). Consequently, courts have consistently found that a student's dismissal from a university for failure to meet minimum academic standards does not implicate a substantive due process right. *See, e.g., id.* (medical student's dismissal for academic performance reasons did not implicate substantive due process rights); *Van de Zilver*, 971 F.Supp. at 934–35 (student's dismissal from joint program of study did not implicate substantive due process rights); *Sarkissian v. W. Va. Univ. Bd. of Governors*, No. 05–144, 2008 U.S. Dist. LEXIS 26365, at *4–5, 2008 WL 901722 (N.D.W.Va. Mar. 31, 2008) (medical student did not have a substantive due process interest in completing residency).

With the exception of certain fundamental rights, which are not implicated here, a state improperly deprives a person of a substantive due process right if it acts arbitrarily and capriciously. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). To establish that an action or policy is arbitrary and capricious, a plaintiff must prove that the state did not have a rational basis for its conduct or that it was motivated by bad faith or ill will unrelated to a legitimate government objective. *Ewing*, 474 U.S. at 227–28; *Horowitz*, 435 U.S. at 91. In this regard, courts are particularly deferential to academic determinations by educational institutions. *See Bell*, 351 F.3d at 251, *Van de Zilver*, 971 F.Supp. at 934; *Love v. Duke Univ.*, 776 F.Supp. 1070, 1075 (M.D.N.C.1991), *aff'd*, 950 F.2d 31 (4th Cir.1991) ("since academic dismissals are wholly discretionary, great deference must be given to these

decisions."). Academic determinations should not be set aside unless they constitute "a substantial departure from accepted academic norms." *Ewing*, 474 U.S. at 225.

*19 Plaintiff's substantive due process claim fails. First, Plaintiff cites no evidence or legal authority to support her allegation that she has a constitutionally recognized interest in readmission to the law school. In light of the Supreme Court's admonition that courts should not readily expand the scope of substantive due process protections, this Court finds no basis for concluding that Plaintiff has a substantive due process right to complete her legal studies. *See Bell*, 351 F.3d at 249–50 (reaching same conclusion regarding medical student's right to "continued enrollment" in medical school notwithstanding her failure to satisfy minimum academic requirements).

Second, even if the Court were to find that Plaintiff has a constitutional interest in readmission to law school, there is no evidence that Rutgers arbitrarily and capriciously deprived her of that right. A minimum grade-point average is a legitimate and rational means for evaluating student performance and eligibility to continue in a program of study. *See Kunkel v. Widener Univ. Sch. of Law*, No. 94–5066, 1995 U.S. Dist. LEXIS 5749, at *6–7, 1995 WL 263547 (E.D.Pa. May 2, 1995) (holding that law school did not act arbitrarily when it established a minimum GPA requirement and dismissed a student for failing to achieve the minimum GPA). Rutgers published minimum grade requirements for students and dismissed Plaintiff when she did not maintain those requirements. Rutgers subsequently reviewed Plaintiff's petitions for readmission to determine whether she would likely be able to satisfy the minimum academic requirements for graduation. That process was not arbitrary or capricious. There is no evidence that Rutgers infringed Plaintiff's substantive due process rights.[9]

[9] The fact that the American Bar Association requires students to complete their law degree in five years does not change the analysis. First, as noted above, Plaintiff does not have a constitutional liberty or property interest in completing her law degree. Thus, the fact that the five-year rule has the effect of depriving Plaintiff of her ability to complete her degree does not alone create a constitutional violation. Second, even if the five-year rule implicated a constitutional property or liberty interest, there is no evidence that the rule is arbitrary or capricious. Thus, Rutgers' motion for summary judgment denying Plaintiff's substantive due process claim based on the five-year rule (Count VI) is granted.

### F. Plaintiff's Breach of Contract Claim

New Jersey recognizes an implied agreement between students and universities. *See Mittra v. Univ. of Med. and Dentistry of N.J.*, 316 N.J.Super. 83, 719 A.2d 693, 694 (N.J.Super.Ct.App.Div.1998) (rejecting the argument that the student-university relationship should be analyzed in "purely contractual terms" but nevertheless finding certain obligations implicit in the student-university relationship); *Napolitano v. Trustees of Princeton Univ.*, 186 N.J.Super. 548, 453 A.2d 263, 272 (N.J.Super.Ct.App.Div.1982) (same); *see also Hernandez v. Overlook Hosp.*, 149 N.J. 68, 692 A.2d 971, 975 (N.J.1997).[10] However, New Jersey courts "hold that the relationship between the university and its students should not be analyzed in purely contractual terms." *Mittra*, 719 A.2d at 694. Rather, when evaluating whether a student's dismissal was improper, courts require only that the student receive "reasonable notice and a fair hearing in general conformity with the institution's rules and regulations." *Id.* Moreover, New Jersey courts will not subject issues of academic performance to searching judicial review. *Id.* Rather, they "defer to the university's broad discretion in its evaluation of academic performance." *Id.*

[10] The New Jersey Supreme Court has not addressed whether there is a legally enforceable implied agreement between students and universities, and the Appellate Division cases addressing the issue are unclear as to whether the obligations they impose on universities derive from contract and general associational principles or from constitutional due process principles. In *Napolitano*, for example, the Appellate Division relied extensively on due process precedent from other jurisdictions and did not squarely address the state-action requirement as applied to Princeton University. *See Napolitano*, 453 A.2d at 274–75. Similarly, in *Mittra*, the Appellate Division rejected the argument that strict contract principles apply to the student-university relationship and instead relied on precedent regarding a student's due process rights. *See Mittra*, 719 A.2d at 697–98. Thus, it is unclear whether New Jersey recognizes an independent breach of contract claim for dismissal from a university or whether that claim is properly

framed as a due process violation under the New Jersey State Constitution. In any event, as discussed above, the Court finds that Plaintiff fails to satisfy the substantive standard established by the Appellate Division in *Napolitano* and *Mittra*.

**\*20** Plaintiff argues that Rutgers failed to provide "reasonable notice and a fair hearing in general conformity" with its own rules and regulations because it dismissed her in 2002 for academic integrity reasons without following the procedures in the Code of Student Conduct.[11] *See id.* Plaintiff asserts that if she had not received an F in Law and Biomedical Ethics, she would have maintained a GPA above the 1.75 minimum. Plaintiff further asserts that her grade in Law and Biomedical Ethics was based in part on Professor Frankford's conclusion that she plagiarized portions of her exam answer and failed to comply with the exam instructions. According to Plaintiff, the Code of Student Conduct required that Rutgers conduct a preliminary investigation and hearing regarding Professor Frankford's charges of academic integrity before finalizing her grades. Because Rutgers calculated Plaintiff's GPA based on her F in Law and Biomedical Ethics without first resolving the academic integrity charges, Plaintiff concludes that Rutgers dismissed her without following the Code of Student Conduct.

[11] Because Plaintiff brings this claim as a breach-of-contract claim under New Jersey law, it is subject to a six-year statute of limitations. *See* N.J. Stat. Ann. § 2A:14–1. Thus, Plaintiff's challenge of her dismissal in 2002 is not time-barred.

Plaintiff's argument fails. Professor Frankford initially awarded Plaintiff an F for the following reasons: "On the merits, the answer was very poor. Aside from the Plagiarism, the quality of the answer combined with the violation of my rules would result in a grade of F." (Frankford Cert. Ex. A). Plaintiff subsequently challenged Professor Frankford's allegation that she violated the exam rules, and Professor Frankford agreed to regrade the exam based solely on the answer's merits. After regrading the exam, Professor Frankford determined that Plaintiff's exam "deserved the grade of 'F' on the merits separate and apart from any possible plagiarism or violation of the examination rules." (Frankford Cert. ¶ 15).

Plaintiff does not present any evidence to rebut the fact that Professor Frankford awarded her an F on the merits. She simply asserts that her exam did not deserve the grade of F, and, therefore, Professor Frankford gave her an F partially because of his conclusion that she violated the exam instructions. However, as the New Jersey Supreme Court has held, "[a]ssessing a student's academic performance must be left to the sound judgment of the individual academic institution." *Hernandez,* 692 A.2d at 975. This Court must defer to Professor Frankford's assessment of the merits of Plaintiff's exam answer. Because Plaintiff was dismissed for failure to maintain academic standards, and because Rutgers complied with its Academic Regulations before dismissing Plaintiff, Rutgers did not breach its obligations to Plaintiff under state law.[12]

[12] Plaintiff also asserts that "no fair evaluation of the record presented by [Plaintiff] at her 2004, 2007, and/or 2008 petition hearings could admit of any conclusion but that [Plaintiff] satisfied" the standard for readmission. This argument fails for the reasons expressed above regarding Plaintiff's due process claims. As in the due process context, New Jersey law is extremely deferential to universities regarding dismissals for academic reasons. *See Hernandez,* 692 A.2d at 975; *Mittra,* 719 A.2d at 694. At each of Plaintiff's readmission hearings, the CSS determined that she had not satisfied the standard for readmission. This was an academic determination subject to deference by the Court.

### G. Plaintiff's Disability Discrimination Claims

Plaintiff asserts that Rutgers violated the ADA and the NJLAD by failing to give her additional time to complete the take-home final exam in the Decedents' Estates and Trusts course that she audited in the Fall 2007 semester. Rutgers argues that Plaintiff may not pursue her failure-to-accommodate claim because: (1) she did not provide Rutgers with requested documentation regarding her disability and coordinate accommodations; and (2) the exam was designed to be completed in three or four hours and Plaintiff received twenty-four hours to complete the exam. Plaintiff responds that she provided sufficient documentation to support receiving up to 50% extended time on her exam, i.e. thirty-six hours.

**\*21** The purpose of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. Pursuant to the ADA, an entity subject to the Act discriminates against a disabled individual

when it fails to make "reasonable accommodations to known physical or mental limitations ...." 42 U.S.C. § 12112(5)(A).[13] To succeed on a failure-to-accommodate claim, a plaintiff must prove: "(1) that she is disabled, (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied." *D'Amico v. N.Y. State Bd. of Law Examiners,* 813 F.Supp. 217, 221 (W.D.N.Y.1993). To determine whether a specific accommodation is reasonable, courts apply a "fact-specific, case-by-case inquiry that considers among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2d Cir.1995). The Third Circuit requires both parties to act in good faith by engaging in an interactive process for purposes of identifying and agreeing on a reasonable accommodation. *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311–14 (3d Cir.1999) (imposing good-faith obligation in employment context). A defendant is not be liable for failure to provide reasonable accommodations under the ADA if the plaintiff does not provide information needed to assess the request for an accommodation. *Id.; see Kaltenberger v. Ohio College of Podiatric Med.,* 162 F.3d 432, 437 (6th Cir.1998) (holding that college did not have obligation to provide accommodations to disabled student under ADA because student did not provide information necessary to corroborate disability); *Goodwin v. Keuka Coll.,* 929 F.Supp. 90, 94 (W.D.N.Y.1995) (same).

[13] The ADA applies to public entities, which are defined to include "any department, agency, ... or other instrumentality of a State...." 42 U.S.C. § 12131(1). Rutgers is an instrumentality of the State for operation of the state university. *See* N.J.S.A. 18A:65–2. Thus, it is subject to the ADA.

The NJLAD provides protections to disabled persons analogous to the ADA's protections. *See* N.J. Stat. Ann. § 10:5–12(f) (providing for protection against discrimination); *Jones v. Aluminum Shapes,* 339 N.J.Super. 412, 772 A.2d 34, 40–41 (N.J.Sup.Ct.App.Div.2001) (holding that "it is well-settled law in New Jersey that our state courts, in interpreting the LAD, should look to federal anti-discrimination cases"). New Jersey courts therefore apply the standards developed under the ADA when analyzing NJLAD claims. *Jones,* 772 A.2d at 40–44. Additionally, New Jersey courts require the parties to engage in the same interactive process required by the ADA for determining whether an accommodation is necessary and reasonable. *Id.*

Plaintiff's ADA and NJLAD claims fail because she does not present any evidence suggesting that Rutgers failed to offer her a reasonable accommodation based on the information she provided. While plaintiff was a matriculated student, she received "test accommodations in the form of time-and-a-half and semi-private, quiet testing rooms for ... all in-class, timed exams." (Oren Cert. ¶ 64). Plaintiff had never received, requested, or submitted documentation supporting an accommodation for take-home exams. (Baker Cert. ¶¶ 11, 16). In September 2007, Plaintiff received an email from the Office of the Dean of Students requesting that Plaintiff complete a form explaining whether she would be seeking testing accommodations for the Decedents' Estates and Trusts exam. Plaintiff did not timely respond to that email, and the Dean's office resent the request to Plaintiff in October 2007. Plaintiff subsequently submitted the form. Notwithstanding that the exam was a take-home exam and Plaintiff previously received accommodations only for in-class exams, Plaintiff indicated on the form that she was seeking an unspecified accommodation for the Decedents' Estates and Trusts exam. Plaintiff did not provide any medical documentation in support of her request, but she indicated that she would provide support at a later time.

*22 The Dean's Office made multiple requests from Plaintiff for medical documentation regarding her purported disability, but Plaintiff did not submit any information until the end of November 2007. At that time, Plaintiff sent Rutgers a one-page document titled "Recommendations." (Baker Cert. Ex. F). The document is undated, signed by a non-medical doctor, "David J. Libon, Ph.D., Associate Professor Psychiatry (Neuropsychology)," and does not reference Plaintiff by name. (*Id.*). The document also refers to the subject of the recommendations in both feminine and masculine pronouns. The document recommends that the unidentified subject receive "[u]p to 50% extended time to complete all timed examinations" and "[t]esting in a distraction free environment such as a separate room." (*Id.*). The document further notes that the subject had "cognitive deficits," but it does not offer a formal diagnosis.

Based on that documentation, the Dean determined that Plaintiff did not require accommodations for the Decedents' Estates and Trusts exam. The Dean reached this determination because Plaintiff was permitted twenty-four hours to complete the exam even though the Professor designed the exam to be finished in three to four hours. Additionally, because the exam was a take-home test, Plaintiff could complete the exam at any time during the two-week exam period and in any location she found suitable. Under those circumstances, and in light of the questionable documentation provided by Plaintiff, the Dean determined that additional accommodations were not necessary.

After Plaintiff received notice that she would not receive additional accommodations, she submitted a one-paragraph letter from David J. Libon, Ph.D., which stated in its entirety:

> Ria Mucia [sic] is a middle-aged woman who underwent a neuropsychological evaluation on 5/1/2007. The test results were deleteriously affected by the patient's test taking anxiety. It is likely that Ms. Muccia [sic] could have obtained higher scores if provided with extra time. Therefore, I am writing this letter supporting Ms. Muccia's [sic] request for the maximum time allowable for her upcoming exams.

(Baker Cert. Ex. H). The Dean's Office subsequently notified Plaintiff that notwithstanding Dr. Libon's letter, she did not require any additional accommodations for the Decedents' Estates and Trusts exam.

The Court grants summary judgment dismissing Plaintiff's ADA and NJLAD claims. Plaintiff does not present any evidence supporting her claim that she has a disability that required her to receive more than twenty-four hours to take the Decedents' Estates and Trusts and exam. Even if the Court accepts that the "Recommendations" page and Dr. Libon's letter constitute adequate medical documentation, neither of those documents recommend that Plaintiff receive any accommodations other than what Rutgers actually provided. The "Recommendations" page notes only that Plaintiff should receive "50% extended time to complete all timed examinations" and should be permitted to take exams in a "distraction free environment." (Baker Cert. Ex. F). However, the Decedents' Estates and Trusts exam was designed to be an untimed take-home exam. (Dembe Cert. ¶ 9). Thus, Plaintiff was able to take the exam in a room of her choice and she was permitted to take up to twenty-four hours to work on an exam that was designed to be completed in three to four hours. The Dean determined that those conditions complied with the unidentified "Recommendations" submitted by Plaintiff. Plaintiff presents no evidence to contradict that determination.

*23 Additionally, Dr. Libon's letter does not suggest that Plaintiff receive more than twenty four-hours to take the exam. It simply recommends that Plaintiff receive "the maximum time allowable." (Baker Cert. Ex. H). Rutgers permitted Plaintiff twenty-four hours to complete a three to four hour exam. That accommodation complies with Dr. Libon's recommendations. In short, there is no evidence to suggest that Plaintiff has a recognized disability that required her to have thirty-six hours to take the Decedents' Estates and Trusts exam. [14]

[14] Plaintiff also fails to submit any evidence contradicting Professor Dembe's testimony that the exam was designed to take approximately three hours.

### IV. CONCLUSION

For the reasons discussed above, the Court grants Rutgers' motion for summary judgment dismissing Plaintiff's Complaint. An appropriate Order shall enter today.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 831967, 42 NDLR P 250