# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

JOHN DOE,

      Plaintiff,

vs.

PRINCETON UNIVERSITY,

      Defendant.

CIVIL ACTION NO. 18-CV-16539

---

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO MOTION TO DISMISS COMPLAINT

---

**CHIESA SHAHINIAN &**
  **GIANTOMASI PC**
ONE BOLAND DRIVE
WEST ORANGE, NJ  07052
973.325.1500
*Attorneys for Plaintiff*
*John Doe*

On the Brief:
  Ronald L. Israel, Esq.
  Brigitte M. Gladis, Esq.

## TABLE OF CONTENTS

**<u>Page</u>**

PRELIMINARY STATEMENT ............................................................................................... II

LEGAL ARGUMENT ............................................................................................................ 3

I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS .................................................................................................................... 3

   A.   PRINCETON HAS VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS ............................................................................................................ 3

   B.   PLAINTIFF IS ALSO LIKELY TO SUCCEED ON HIS CONTRACT-BASED CLAIMS ......................................................................... 5

II.   PLAINTIFF WILL SUFFER IRREPARABLE HARM SHOULD THE COURT NOT ISSUE THE INJUNCTION ......................................................... 7

III.   THE BALANCE OF THE EQUITIES WEIGHS STRONGLY IN FAVOR OF PLAINTIFF .................................................................................................. 11

IV.   THE PUBLIC INTEREST FAVORS GRANTING PLAINTIFF'S REQUEST FOR AN INJUNCTION ................................................................... 13

CONCLUSION ..................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Continental Grp., Inc., v. Amoco Chemicals Corp.,
    614 F.2d 351 (3d Cir. 1980) ...................................................................................10

Jackson v. Macalester College,
    169 F. Supp. 3d 918 (D. Minn. 2016) ....................................................................10

Moe v. Seton Hall University,
    2010 WL 1609680 (D.N.J. Apr. 20, 2010) ..............................................................6

Napolitano v. Trustees of Princeton University,
    186 N.J. Super. 576 (Ch. Div. 1982) .......................................................................7

United States v. Mead Corp.,
    533 U.S. 218 (2001) .................................................................................................4

Wuillamey v. Werblin,
    364 F. Supp. 237 (D.N.J. 1973) ............................................................................10

**Statutes**

20 U.S.C. § 1682 ............................................................................................................4

## **PRELIMINARY STATEMENT**

The proposed regulations issued by the U.S. Department of Education ("DOE") concerning Title IX of the Educational Amendments of 1972 ("Title IX") are explicitly intended to "ensur[e] that due process protections are in place for individuals accused of sexual harassment" – due process protections including, for example, a party's right to cross-examine his or her accuser at a live hearing. In its opposition to the application for a preliminary injunction filed by plaintiff John Doe ("Plaintiff"), defendant Princeton University ("Princeton") identifies a litany of alleged "speculative" outcomes of the review and comment period currently underway with respect to DOE's proposed regulations pertaining to the procedure universities must employ in connection with investigations under Title IX. Despite its efforts to muddy the waters, Princeton cannot dispute that, prior to issuing its proposed regulations, DOE performed significant research and interviews with various members of the public, and thus Princeton's effort to couch the outcome of the review and comment period as entirely speculative is inaccurate. Indeed, given the extensive work already performed by DOE, it is expected that, at the conclusion of the review and comment period, the proposed regulations will be enacted. That enactment will require a number of changes to be implemented in Princeton's sex discrimination and sexual misconduct policy (the "Policy"), including changes pertaining to the due process protections owed to respondents

such as Plaintiff (such as the right of cross-examination), and a shift in the burden of proof applied during disciplinary proceedings conducted under the Policy.

Notwithstanding this fundamental shift in the applicable framework, Princeton continues to cling to its claim that it need not grant Plaintiff an adjournment of the proceeding, arguing now that it is bound by a Resolution Agreement[1] with DOE to perform its investigation pursuant to its current Policy, without explaining why DOE would punish Princeton's efforts to comply with DOE's new framework. In addition, Princeton attempts to deflect from the issues involved in this case by focusing instead on the potential impact on "all" universities and other institutions. However, the policies of those institutions are not at issue in this case; this case is not a class action, and the only issues before the Court in this matter involve the application of Princeton's Policy to the investigation involving Plaintiff and Jane Roe. As such, the Court is not required on this application to adjudicate any lofty public policy issues, but rather only the specific facts pertaining to Princeton's investigation. Considering only those facts, it is clear that Plaintiff will suffer irreparable harm should the Court permit Princeton to continue its investigation under its current Policy notwithstanding

---

[1] As set forth in Plaintiff's initial brief, should Princeton continue to rely on its agreement with DOE, the Court may need to render a determination as to whether DOE should be made a party to this action.

DOE's guidance otherwise. Accordingly, the Court should grant Plaintiff's application for a preliminary injunction.

## LEGAL ARGUMENT

### I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

#### A. Princeton Has Violated Plaintiff's Due Process Rights

In many instances, Princeton's opposition resorts to opposing arguments not raised by Plaintiff in an effort to avoid addressing the arguments Plaintiff actually raised. For instance, Princeton focuses its argument as to Plaintiff's due process claim on the purported fact that "private universities are not state actors[.]" (Opp. Br., at 13). Indeed, nowhere in Plaintiff's application did he argue that they were – nor did he argue, as Princeton appears to contend, that "Princeton's receipt of federal Title IX funds obligates it to provide constitutional due process." (Id.). Rather, as is clear from Plaintiff's application, Princeton's receipt of federal funding requires that it comply with ***Title IX***, ***pursuant to DOE's direction as to how to do so***. While Princeton devotes its entire due process argument to its contention that constitutional due process strictures are not applicable to private universities, ***nowhere*** in this section does Princeton present ***any*** argument to counter Plaintiff's argument as to DOE's interpretation and enforcement of Title IX – including DOE's reference to due process rights of accused students – because Princeton cannot do so.

3

As set forth in Plaintiff's application, DOE is charged, through the language of the Title IX statute, with enforcing the statute by issuing rules and regulations. See 20 U.S.C. § 1682. Since September 2017, DOE has made clear that schools and universities should rely on the Revised Sexual Harassment Guidance issued in 2001 (the "Guidance"), which directs that procedures "according due process to both parties involved" in a proceeding "will lead to sound and supportable decisions." (See Israel Decl., Ex. D, at 22). DOE's recently proposed regulations also emphasize the need for "adequate due process protections for those involved in grievance processes," and indeed require the imposition of "due process protections for the respondent before any disciplinary sanctions are imposed." (Israel Decl., Ex. B, at 6, 41). Such due process protections would require the right of cross-examination, which has been deemed the "greatest legal engine ever invented for the discovery of truth." (Israel Decl., Ex. B, at 56) (quoting California v. Green, 399 U.S. 149, 158 (1970)). Those conclusions rendered by DOE – that students accused of sexual misconduct are entitled to certain due process protections – should be enforced by the courts and found to be binding on universities in the context of disciplinary proceedings involving allegations of sexual misconduct. See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (noting that courts will generally defer to an agency's "administrative implementation of a particular statutory provision" when the agency has been

4

granted the authority to make such rules). Accordingly, a respondent in a university disciplinary proceeding should be entitled to challenge, in court, a university's failure to accord him or her adequate due process protections, because DOE has confirmed that such protections are necessary in such proceedings and DOE is tasked with enforcing Title IX.

Rather than attempt to explain why that should not be the case, however, Princeton simply ignores Plaintiff's entire argument and misconstrues Plaintiff's claim in an effort to shoehorn this case into the factual landscape of cases previously decided by the courts. (See Opp. Br., at 13-14). The fact remains that since the time that the cases Princeton relies upon were decided, DOE has definitively weighed in on the proper procedure to be implemented in the context of a university's Title IX investigation. The Court should see through Princeton's efforts to create a straw-man argument to conceal its utter failure to address Plaintiff's claims head-on. Because DOE has determined that accused students should be entitled to certain due process protections, and Princeton's current Policy does not comply, Plaintiff is likely to succeed on his due process claim.

### B. Plaintiff Is Also Likely to Succeed On His Contract-Based Claims

Both Plaintiff and Princeton agree: New Jersey law does not define the relationship between a student and a university in strictly contractual terms. Nonetheless, a student may assert a breach of contract claim against a university,

5

so long as the student puts the university on notice of the factual basis for the claim. See Moe v. Seton Hall University, 2010 WL 1609680, at *5 (D.N.J. Apr. 20, 2010). Nothing cited in Princeton's brief alters that analysis. Indeed, Princeton concedes that Plaintiff's Complaint contains allegations concerning Princeton's failure to abide by its own Policy, namely the provision of the Policy permitting an extension of the timeframe for an investigation for "good cause." (See Opp. Br., at 16). While Princeton quibbles with Plaintiff's request for an "extension" – instead choosing to label it as a requested "suspension" – Princeton cannot dispute that Plaintiff has *not* requested that Princeton cease its investigation entirely forever; rather, Plaintiff very clearly has requested that Princeton simply hold off on its investigation until the proper terms of that investigation have been clarified by DOE, which will undoubtedly happen sometime in the near future.[2] What is unclear from Princeton's opposition is why the University is so vehemently opposed to a brief delay of this investigation pending a probable substantial change in DOE's approach to Title IX investigations – especially when Princeton's own Policy contemplates that the process may be delayed for legitimate reasons.

---

[2] At a minimum, the Court should grant Plaintiff's request for an injunction requiring Princeton to delay the investigation during the 60-day public comment period for the proposed regulations. By the time that period has concluded, or shortly thereafter, it should be clear as to the procedure DOE will require universities to follow with respect to Title IX investigations, and the Court may be better equipped to render a decision as to how the investigation should proceed at that time.

Similarly, Plaintiff's breach of the covenant of good faith and fair dealing claim is not barred by a failure to allege the existence of a contract, as Princeton suggests. Indeed, the trial court in one of the cases cited by Princeton explicitly concluded that a private university's conduct should be judged under the rubric of good faith and fair dealing. See Napolitano v. Trustees of Princeton University, 186 N.J. Super. 576, 584 (Ch. Div. 1982) (noting that "the legal standard against which the court must measure the university's conduct is that of good faith and fair dealing"). Here, Plaintiff has alleged that, although he has established "good cause" for an adjournment of the investigation, Princeton has nonetheless improperly proceeded in pressing the investigation without ensuring that Plaintiff's rights, set forth in his agreement with Princeton, are adequately protected.

Given the foregoing, Plaintiff has established a likelihood of success on the merits of his breach of contract, anticipatory breach of contract, and breach of the covenant of good faith and fair dealing claims.

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM SHOULD THE COURT NOT ISSUE THE INJUNCTION

Princeton cannot dispute that, absent an injunction, Plaintiff will be subject to Princeton's current Policy, which lacks the procedural protections emphasized as necessary by DOE, including the right to cross-examination. Being subject to a process DOE has determined would be deficient will irreparably harm Plaintiff and may ultimately subject him to unnecessary discipline and associated stigma.

A fundamental premise underlying Princeton's contention that Plaintiff's claimed harm is somehow "speculative" is that the proposed regulations issued by DOE are not likely to be enacted. (See Opp. Br., at 1-2, 9). However, that premise is fatally flawed, in that it fails to take into account the significant efforts that DOE has already undertaken to ensure the enactment of its proposed regulations. For instance, as the DOE summary of the proposed regulations states, DOE began its analysis of the proper procedure to be followed by schools and colleges in connection with Title IX back in mid-2017. (See Israel Decl., Ex. B, at 9). Outlining the process leading up to the issuance of the proposed regulations, DOE stated:

> The Department conducted listening sessions and discussions with stakeholders expressing a variety of positions for and against the status quo, including advocates for survivors of sexual violence; advocates for accused students; organizations representing schools and colleges; attorneys representing survivors, the accused, and institutions; Title IX Coordinators and other school and college administrators; child and sex abuse prosecutors; scholars and experts in law, psychology, and neuroscience; and numerous individuals who have experienced school-level Title IX proceedings as a complainant or respondent. The Department also reviewed information that includes white papers, reports, and recommendations issued over the past several years by legal and public policy scholars, civil rights groups, and committees of nonpartisan organizations as well as books detailing case studies of campus Title IX proceedings.

(Israel Cert., Ex. B, at 9-11). DOE's proposed regulations were issued only after DOE engaged in a lengthy research process – a process that included discussion with advocates of all groups maintaining an interest in the subject matter of the

8

proposed regulations, much like a public comment process – and thus those regulations were not issued lightly or without the benefit of input from the public. As such, Princeton's suggestion that DOE might just scrap the proposed regulations entirely following the public comment period is not credible. After conducting such significant and time-consuming research before issuing the regulations, it is beyond speculative to suggest that DOE will do anything other than enact them following the review and comment period. Indeed, DOE's actions since it began its research process concerning the proposed regulations is indicative of how it is actually likely to proceed at the conclusion of the public comment period; prior to issuing the proposed regulations, DOE withdrew guidance documents that had been governing the Title IX process for years – signaling its intention to modify the process currently in place at universities, like Princeton, throughout the country. (See Israel Cert., Ex. C). For that reason, it is almost certain that following the review and comment period, DOE will implement the regulations as proposed.

    Accordingly, the case law Princeton relies upon to claim that Plaintiff will not suffer irreparable harm in this case is totally inapposite. For example, Princeton cites a number of cases simply holding that "speculative" harm is not "irreparable." (See Opp. Br., at 8-9). Plaintiff does not dispute this general proposition. However, the cases Princeton relies upon for that proposition have no bearing on

9

the outcome of this case, as they dealt with vastly different facts and law. See, e.g., Continental Grp., Inc., v. Amoco Chemicals Corp., 614 F.2d 351, 358-59 (3d Cir. 1980) (because there was no imminent risk of disclosure of trade secret by former employee, preliminary injunction not warranted). Moreover, although Princeton makes an effort to argue that changes in the law that have not yet been adopted cannot support the issuance of an injunction, those cases, too, are not dispositive in this matter. (See Opp. Br., at 9-10). See, e.g., Wuillamey v. Werblin, 364 F. Supp. 237, 241 (D.N.J. 1973) (discussing speculative nature of estimate of air pollution to be generated by sports complex in the future). Princeton's efforts to categorize DOE's proposed regulations as simply a "forthcoming" change in the law overlook the fact that, since 2017, DOE has directed changes consistent with those regulations by withdrawing guidance documents inconsistent therewith. As such, it is evident that once the review and comment period elapses, DOE intends to enact the proposed regulations.

Finally, Princeton's contention that Jackson v. Macalester College, 169 F. Supp. 3d 918, 921-22 (D. Minn. 2016), "is directly on point to this case" and mandates a denial of Plaintiff's application is inaccurate. Jackson – decided before DOE's shift in policy – addresses a plaintiff's attempt to restrain an investigation pending his civil claims, but does not address the substance of those claims. Moreover, the asserted harm in Jackson pertained to the likelihood of discipline,

10

which was determined to be speculative. By contrast, Plaintiff in this case does not assert that he will be irreparably harmed as a result of improper discipline, but rather as a result of the improper process applied to his investigation. Whereas the possibility of discipline may be speculative, by all accounts Princeton has confirmed its intention to conduct the investigation pursuant to Princeton's current Policy, which is inconsistent with DOE's new framework. The reliance on that Policy is irreparable harm Plaintiff will suffer, thereby supporting the issuance of a preliminary injunction.

### III. THE BALANCE OF THE EQUITIES WEIGHS STRONGLY IN FAVOR OF PLAINTIFF

Princeton is simply incorrect in stating that the balance of the equities tips in its favor. Indeed, while claiming that it is acting solely out of the concern for the "well-being" of the Princeton "community," critically, it overlooks the fact that Plaintiff is a *member* of that community, and Princeton should, in fact, be concerned about *his* well-being – including by ensuring that it is providing Plaintiff with a fair proceeding that complies with DOE's guidelines. Nowhere in its brief does Princeton acknowledge the fact that it was *Plaintiff* – not Jane Roe – that initially approached Princeton staff in *January 2018* with concerns about *Jane Roe*'s harassing behavior – concerns that Princeton wholly ignored. Evidently Princeton is only concerned about its students' well-being when such concern serves its own interests.

The reality is that Princeton is currently investigating conduct that is alleged to have occurred in Spring 2017 – more than 18 months ago. Princeton appears to have had no qualms about delaying an investigation from January 2018 – when it was first advised by Plaintiff of an issue – to November 2018, when it appears to have begun the current investigation. Although claiming that the balance of the equities weighs in its favor because of its need to protect the "safety" of its students, Princeton cannot seriously claim that there would be any threat to any student's safety through the maintenance of the status quo pending the implementation of DOE's proposed regulations. Indeed, Plaintiff is currently an on-campus resident of Princeton and no-contact orders have been successfully in effect between Plaintiff and Jane Roe for some time, without any issue on Plaintiff's part.

In addition, Princeton defies logic by claiming that Plaintiff's requested injunction would violate current DOE guidance and could cause Princeton to lose its federal aid for its failure to "promptly" investigate claims of sexual misconduct or discrimination. (Opp. Br., at 19). For one, as argued above, Princeton did not appear to be concerned about any requirement that it "promptly" investigate Plaintiff's claims about Jane Roe's behavior. Further, why would ***DOE*** pull Princeton's funding for attempting to comply with ***DOE's*** mandates pertaining to Title IX investigations? Moreover, were Princeton actually concerned about losing

its federal funding, it could simply reach out to DOE itself for clarification as to the procedure to follow in this case, given DOE's recent position concerning the need for due process protections in Title IX investigations;[3] Princeton has not claimed that it has done so, casting doubt on its asserted fear of losing funding.

As set forth above, Plaintiff has established that he will suffer irreparable harm should the injunction not issue. Meanwhile, the injunction will present no burden on Princeton whatsoever, but rather would serve to ensure that Princeton's claimed need to protect the "well-being" of the Princeton community is actually satisfied by protecting Plaintiff's procedural rights.

## IV. THE PUBLIC INTEREST FAVORS GRANTING PLAINTIFF'S REQUEST FOR AN INJUNCTION

Curiously, in its claim that an injunction in this matter would not be in the public interest, Princeton refers to the Guidance[4] for the proposition that a school has an obligation to "promptly" respond to claims of sexual harassment. (Opp. Br.

---

[3] DOE's Office for Civil Rights advises that "For assistance related to civil rights, you may contact the OCR headquarters office in Washington D.C. or the OCR enforcement office serving your state or territory," and encourages "students and parents, ***representatives of education institutions***, and other OCR customers to use e-mail or fax to communicate with OCR when possible." See Office for Civil Rights, Contact OCR, *available at* https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm (emphasis added).

[4] We note that, as discussed above, the Guidance also states that procedures "according due process to both parties involved" in misconduct cases "will lead to sound and supportable decisions." (Israel Decl., Ex. D, at 22).

13

at 21). As set forth above, it is disingenuous for Princeton to now hide behind a shield of "promptness" when the conduct at issue occurred in Spring 2017, and Princeton has been on notice of it since January 2018. Princeton, however, does recognize its obligation to respond "effectively" to such claims. (Id.). Nonetheless, Princeton does not explain why ensuring that respondents in sexual misconduct investigations are provided with the proper due process protections would hamper its ability to "effectively" respond to such claims; one would think that the application of the proper process to review such claims would much better fulfill Princeton's obligation of an "effective" response.

Moreover, while Princeton attempts to argue the alleged broader implications of issuing an injunction, this Court is only presented with Plaintiff's claims. This is not a class action and Plaintiff does not purport to represent anyone but himself. Accordingly, the Court need not consider the unidentified investigations occurring in unidentified "academic communities," but should instead focus on the concrete facts of this case. When doing so, it becomes clear that the public should have an interest in ensuring that a university apply the procedures mandated by DOE in Title IX investigations, and that a brief delay until the scope of those procedures is confirmed will not significantly impact the University, but will likely have a tremendous impact on the individual being investigated. As such, an injunction is warranted in this case.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his application and enjoin Princeton's pending Title IX investigation until such time as DOE's proposed regulations are implemented.

Respectfully submitted,

CHIESA SHAHINIAN & GIANTOMASI
 PC
*Attorneys for Plaintiff*
*John Doe*


By */s/ Ronald L. Israel* _____
    RONALD L. ISRAEL

Dated:  December 14, 2018